IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**RUBEN ROMERO**

    **Plaintiff,**

v.  No.

**CORE CIVIC INC.,
CORE CIVIC OF TENNESSEE, LLC.,
WARDEN BRIAN KOEHN, and
DETENTION OFFICERS JOHN DOE
and JOHN ROE,**

    **Defendants.**

## CIVIL RIGHTS COMPLAINT

Plaintiff Ruben Romero, through his counsel, IVES & FLORES, PA (Laura Schauer Ives and Adam C. Flores) brings this Complaint for damages for negligence and civil rights violations pursuant to 42 U.S.C. §§ 1983, 1988, and the New Mexico common law.

## PRELIMINARY STATEMENT

1. "[P]rison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

2. "Having incarcerated persons with demonstrated proclivities of antisocial criminal, and often violent conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (alterations, internal quotation marks, and citations omitted).

3. The same rule applies to private detention centers, including the Cibola County facility that these Defendants operated.

4. These Defendants completely abandoned Plaintiff in a unit with violent men, dead-set on causing him harm. And when inmates in the pod savagely beat Plaintiff for two minutes and

then left him unconscious on the ground, nobody came to his aid for nearly half an hour while inmates laughed and joked, tampered with evidence, and cleaned Plaintiff's blood off the floor with towels.

5.  These Defendants breached their duties and violated Plaintiff's constitutional rights. Their misconduct resulted in severe injuries. Plaintiff now brings this Complaint:

## JURISDICTION, VENUE, AND PARTIES

6.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and 42 U.S.C. §§ 1983 and 1988.

7.  Venue is proper as all parties reside in the State of New Mexico and the acts complained of occurred exclusively in Cibola County, New Mexico.

8.  On June 12, 2018, Plaintiff Ruben Romero was an inmate in the custody and care of the Cibola County Correctional Center ("CCCC"). Plaintiff was completely dependent upon CCCC, Warden Brian Koehn, and Detention Officer John Doe for his care, safety, and well-being.

9.  Defendant Core Civic Inc., (formerly Corrections Corporation of America) is a foreign for-profit corporation that owns and operates numerous detention facilities in the State of New Mexico, including CCCC, which is located at 2000 Cibola Loop, Milan, NM, 87021.

10. Defendant Core Civic of Tennessee, LLC, is a foreign for-profit limited liability company that owns and operates numerous prison facilities within the State of New Mexico, including CCCC, which is located at 2000 Cibola Loop, Milan, NM, 87021.

11. Together, the Core Civic Defendants (Collectively, "CoreCivic") transact business in the State of New Mexico, are registered to do business in the State of New Mexico, and have a registered agent at Kennedy Moulton & Wells, PC, located at 2201 Third Street NW, Albuquerque, NM, 87102. CoreCivic is vicariously liable for the negligence of its employees.

Additionally, because it performs the traditional state function of operating a prison, CoreCivic acts under the color of state law for purposes of Section 1983.

12. At all times material, Defendant Brian Koehn was CoreCivic's Warden at CCCC, responsible for overseeing the facility and ensuring the safe, secure, and efficient operation of the premises. Defendant Koehn was responsible for supervising the operation of the jail, training employees and detention officers, and ensuring compliance with New Mexico's laws applicable to correctional institutions and the requirements of the Eighth and Fourteenth Amendments to the United States Constitution. Defendant Koehn operated the facility under color of state law and is sued in his individual and official capacity.

13. On June 12, 2018, Defendant John Doe was a detention officer at CCCC and an employee of CoreCivic. Defendant Doe was responsible for processing Plaintiff at intake and placing him in Unit 400-A.

14. On June 12, 2018, Defendant John Roe was a detention officer at CCCC and an employee of CoreCivic. Defendant Roe was either roving the facility or assigned to Unit 400-A when Plaintiff was assaulted.

**FACTUAL BACKGROUND**

15. Plaintiff and his co-defendant, Rudy Valencia, were charged with a felony in the Thirteenth Judicial District Court in Cibola County.

16. The State believed Plaintiff had information relevant to Valencia's charges and granted use immunity in an effort to compel his testimony against Valencia.

17. Thereafter, Valencia sought to harm Plaintiff.

18. Valencia was transported to CCCC, where he was classified with the highest possible security custody level at the facility.

19. The severity of Valencia's most severe current offense, first degree murder, was marked a 7 out of 7 by the classification officer, with 7 being the most dangerous possible classification score.

20. The classification officer also noted that Valencia had a history of institutional violence in detention facilities.

21. Valencia was housed in Unit 400-A, a general population pod in which inmates were permitted to roam freely and interact with one-another.

22. On information and belief, many of the inmates in Unit 400-A were violent offenders, including gang members, with severe security classifications. Nearly everyone in the pod wore red stripes to denote the threat they posed to the facility.

23. On information and belief, Valencia, who is from Cibola County, knew several of the corrections officers and the other inmates in Unit 400-A, and had "pull within the pod." Valencia had the power to demand favors from corrections officers at the facility and to command other inmates to savagely beat enemies.

24. On June 12, 2018, Plaintiff was booked into custody at CCCC by Defendant Doe. Plaintiff was unaware that his co-defendant, Valencia, was also being housed in the facility.

25. Defendants CoreCivic and Koehn either instituted no policy, training, or intake process for identifying co-defendants and keep-aways, or the policies, training, and intake processes that were in place were woefully deficient.

26. On information and belief, classification officers at the facility were not trained to consider any criteria in determining where an inmate may be safely housed at the facility.

27. Although officers scored inmates to determine security threat at intake, inmates with all classification levels were arbitrarily placed in general population and left completely unsupervised by detention officers.

28. When Plaintiff arrived, Defendant Detention Officer Doe did not ask or otherwise investigate during the intake process if Plaintiff had any co-defendants, separatees, keep-aways, or otherwise required protective custody to ensure his safety.

29. Plaintiff was assigned to Unit 400-A. When he arrived in the pod, he recognized some of the other inmates, but did not see Valencia, and did not know Valencia was also in the pod.

30. At the time, Plaintiff was nineteen years old. He was 5'4" and weighed approximately 130 pounds. Plaintiff was one of the only inmates in the pod not assigned red stripes.

31. At around 9:43 PM, Defendant Detention Officer Roe spoke to the inmate in Cell 286 on the top tier and then left the unit. As Doe walked out, the inmate in Cell 286 covered the cell door with a dark blanket.

32. From that point forward, no guard was present in Unit 400-A, and nobody supervised the dangerous inmates in the pod.

33. Unit 400-A is equipped with a surveillance camera, but nobody monitored the unit at all, even remotely.

34. At around 9:48, three inmates met briefly in Cell 286. Meanwhile, Plaintiff sat alone on the bottom tier watching television.

35. At around 9:57, an inmate instructed Plaintiff to go to Cell 286. When Plaintiff went upstairs and entered the cell, another inmate followed him in and closed the door. The inmates severely beat Plaintiff, punching and kicking him in his head and face.

36. Plaintiff screamed for help, but nobody assisted. The pod was completely unsupervised, and the other inmates milled about the pod and looked the other way.

37. At around 9:58, Valencia ran upstairs and into Cell 286. Valencia joined in the assault.

38. The three inmates that attacked Plaintiff were 5'9", 5'11", and 6'1", respectively. They each weighed approximately 200 pounds.

39. Had anyone been monitoring Unit 400-A, even remotely, he or she would have seen the three inmates through the partially open door, stomping on Plaintiff while he lay motionless on the ground.

40. The assault continued for approximately two minutes, until Plaintiff's attackers left the cell.

41. Plaintiff lay unconscious on the floor for the next five minutes until an inmate entered the cell to turn him on his side.

42. At around 10:08, Plaintiff tried to stumble to his feet and eventually crawled slowly out of Cell 286 on all fours, leaving a trail of blood behind him.

43. Plaintiff crawled to the stairs leading down to the bottom tier, and then collapsed in the stairway.

44. Meanwhile, his attackers picked up towels and started cleaning Plaintiff's blood off the floors in plain view. Still, no officers were in the pod to assist Plaintiff.

45. Plaintiff was eventually able to stumble down the stairs with blood pouring out of his face. He called repeatedly for help at the door to Unit 400-A without any response.

46. Finally, at approximately 10:21 PM, nearly thirty minutes after the assault began, a detention officer outside the pod saw Plaintiff standing by the pod entrance "with a swollen and bloody nose face and head."

47. Plaintiff was transported to the hospital with severe and life-altering injuries.

48. On information and belief, Plaintiff has suffered damage to his brain. For months, Plaintiff was unable to even hold a conversation with family.

49. Plaintiff could not function at all for days after the incident, and he still suffers from confusion, memory loss, pain, nightmares, difficulty sleeping, depression and anxiety.

50. To this day, Plaintiff has almost no memory of the assault, or his time in the hospital.

## COUNT I: NEGLIGENCE
### All Defendants

51. All allegations are incorporated herein.

52. Defendants had a duty to exercise reasonable care in housing Plaintiff at CCCC.

53. Defendants breached that duty by: (i) failing to implement intake processes to ensure that co-defendants are not housed together; (ii) housing dangerous inmates known for violence in Unit 400-A without any supervision by corrections officers at all; (iii) failing to provide timely medical care to inmates beaten by other inmates; and (iv) abandoning the pod at an inmate's instruction, and not returning for nearly thirty minutes.

54. As a result, Plaintiff suffered injuries.

## COUNT II: RESPONDEAT SUPERIOR (as to Count I)
### Defendant CoreCivic

55. All allegations are incorporated herein.

56. Defendants Doe, Roe, Koehn, and all other officials at CCCC on June 12, 2018 were employees of Defendant CoreCivic and acted within the scope of their employment at the facility.

57. As to Count I, Defendant CoreCivic is vicariously responsible for the acts and omissions of its employees.

## COUNT III: CRUEL AND UNUSUAL PUNISHMENT
### Defendants Roe, Koehn, and CoreCivic

58. It is clearly established that prison officials have a duty to take reasonable measures to protect inmates from violence at the hands of other prisoners.

59. Plaintiff was incarcerated under conditions posing a substantial risk of serious harm.

60. Defendant Koehn created and implemented a policy and practice of permitting inmates to police each other, without any supervision by detention officers.

61. Defendant Koehn created and implemented a policy and practice of assigning cells to new inmates without employing any criteria to ensure that inmates are safely housed, or that keep-aways and co-defendants are not housed together.

62. The risks of violence associated with housing dozens of dangerous inmates, including gang members, violent criminals, and accused and convicted murderers, including co-defendants and "keep-aways," together in a general population pod, free to roam without any correctional officers present, and without any supervision at all, including even remote supervision or roving officers, would be obvious to any reasonable prison official.

63. A substantial risk of inmate attacks at CCCC was longstanding and pervasive.

64. Defendant Koehn, acted or failed to act despite knowledge of these risks and permitted the risks to remain unabated. In doing so, Defendant Koehn ratified and personally participated in the constitutional violations alleged in this Complaint and did so with deliberate indifference to Plaintiff's basic rights.

65. CoreCivic, through its official policymaker, Defendant Koehn, implemented and ratified an unconstitutional policy of: (i) failing to screen and safely house inmates at intake; and (ii) permitting pods at the jail to remain completely unguarded despite obvious risks of violence and

the potential need for resulting medical care. CoreCivic operated with deliberate indifference to Plaintiff's basic rights.

66.    If, in the alternative, any detention officer was assigned to supervise Unit 400-A, it was Defendant Roe. In that case, Defendant Roe ignored obvious risks of serious harm to Plaintiff when he abandoned the pod at Valencia's instruction.

67.    As a result, Plaintiff suffered injuries.

## CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this honorable court:

    A.  Award damages, including punitive damages, to make Plaintiff whole;

    B.  Award costs and attorney's fees for maintaining this suit;

    C.  Award pre- and post-judgment interest as permitted by law; and

    D.  Award all other relief this Court deems just and proper.

Respectfully submitted,

**IVES & FLORES, PA**

*/s/ Adam C. Flores*
Adam C. Flores
Laura Schauer Ives
*Attorneys for Plaintiff*
925 Luna Cir. NW
Albuquerque, NM 87102
(505) 364-3858
adam@nmcivilrights.com
laura@nmcivilrights.com