# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUBEN ROMERO,

    Plaintiff,

vs.

CORE CIVIC, INC.,
CORE CIVIC OF TENNESSEE, LLC.,
WARDEN BRIAN KOEHN, and
DETENTION OFFICERS JOHN DOE
And JOHN ROE,

    Defendants.

No. 21-cv-00544-KG-CG

## DECLARATION OF WARDEN NILIUS

Warden R. Nilius, the declarant herein states upon oath:

1. I am over the age of 18 years old and competent to testify to the matters set forth in this Declaration, which is made in support of Defendants' Response to Plaintiff's Motion to Compel.

2. I make the statements in this Declaration based upon my personal knowledge and a review of relevant documents referred to herein and maintained by CoreCivic, Inc. ("CoreCivic") at Cibola County Correctional Center ("CCCC") in the regular course of business. If called as a witness, I could competently testify to these facts.

3. The contents of this Declaration are true and correct to the best of my knowledge.

4. I am currently the Warden at CCCC, located in Milan, New Mexico and have held this position since March 2021.

5. As Warden of CCCC, I am familiar with the policies and procedures governing the operation of CCCC, including the policies listed in Plaintiff's Motion to

Compel.

6. Policy 01-15, Retention of Records, provides that CoreCivic is to maintain company records in compliance with state and federal law. The Policy further provides general information about CoreCivic's record retention periods for different types of documents, in addition to the preservation, storage, and destruction of records.

7. Policy 01-22, Audits, Inspections, and Corrective Actions, describes CoreCivic's commitment to engage in internal, external, and partner audits of its facilities to ensure CoreCivic's compliance with policies and procedures, contracts, and state and federal laws. The Policy provides additional information about documenting and reporting requirements for audits, in addition to the corrective action process to remedy any identified deficiencies.

8. Policy 03-03, CoreCivic Code of Ethics, provides that CoreCivic is committed to compliance with all laws and regulations applicable to its business and operations and expects its employees to conduct themselves ethically, and in a manner consistent with CoreCivic's values, in the discharge of their duties.

9. Policy 03-22, Internal Investigations, provides that all allegations of apparent or perceived misconduct by CoreCivic employees are to be handled, investigated, and where necessary, escalated to the Ethics Office. The Policy details the procedures used to investigate allegations of employee misconduct, including the investigation process and requisite forms, in addition to the documentation and maintenance of misconduct reports.

10. I am familiar with and have reviewed the Incident Report regarding the incident that occurred on June 12, 2018, which involved an inmate-on-inmate assault of Romero by Rudy Valencia, Matthew Wax, and Daniel Mariano. Because the incident did not involve a CoreCivic employee, the investigation procedures detailed in Policy 03-22 did not apply and were not employed.

11. Policy 05-01, Incident Reporting, provides information about reporting requirements for incidents at CoreCivic facilities involving an inmate and the requisite documentation to be completed for each incident. These are commonly referred to as 5-1 Reports. This Policy also describes reportable incidents.

12. Policy 05-01A, Incident Response, refers to the report that facility staff are required to complete following an incident involving an inmate/detainee—i.e., the "Incident Report."

13. Policy 08-14, Critical Incident Response Team, provides information about the facility's Critical Incident Response Team ("CIRT"), which may be used, when necessary, to respond to certain types of incidents to provide a quick and safe resolution. The Policy further provides information about the training of CIRT members, which includes de-escalation tactics and use of force tactics/equipment, and the activation and de-activation of the CIRT team.

14. The June 12, 2018 incident was not the type of incident that would require the involvement of the CIRT team, and because of this, the CIRT team did not participate in those events.

15. Policy 09-12, Security Threat Group Management, provides information about the management and control of Security Threat Groups ("STGs") within a facility. The Policy defines an STG as a group of individuals with a history, common interest, bond, affiliation, or motivation to engage in criminal or disruptive conduct, either collectively or individually. STGs are commonly known as prison gangs. Inmate STG members are identified during intake, when possible, and such affiliation is noted on the inmate's commitment summary.

16. I am familiar with and have reviewed the institutional files for detainees Romero, Valencia, Mariano, and Wax. None of these detainees were validated STG

3

members.

17. Policy 09-14, SORT Operations, provides information about a facility's Special Operations Response Team ("SORT"), which is a designated group of individuals with specialized training who respond to certain types of incidents within any CoreCivic facility—e.g., inmate cell extractions. The Policy provides information about the selection and training of SORT members, in addition to reporting requirements for instances involving the activation and deployment of a facility's SORT team.

18. Again, the incident that occurred on June 12, 2018 was not the type of incident that would require the involvement of the SORT team, and the SORT team did not participate in those events.

19. Policy 09-17, Duty Officers, delegates certain administrative and facility employees as duty officers, including Administrative Duty Officers ("ADO")—e.g., Warden, Assistant Warden, and Chiefs of Security and Unit Management—and Facility Duty Officers ("FDO")—i.e., facility employees designated to assist the ADO—to provide supervisory guidance and facility oversight. The Policy provides information about ADO's and FDO's orientation and training; scheduling; equipment; authority, including making calculated use-of-force decisions; and duties, including conducting unannounced Prison Rape Elimination Act ("PREA") rounds.

20. Policy 09-20, Entry-Exit Procedures, provides information about entry and exit requirements for CoreCivic/CCCC staff and visitors—i.e., identification requirements, documentation of staff and visitor entry and exit into the facility, and allowable items—but does not apply to inmates.

21. Policy 14-01, Communication of Information to Inmate-Residents, provides that all inmates are to be informed of facility rules, available services, and activities. The Policy requires each facility to develop an inmate handbook, to be provided to inmates

during intake/orientation, to ensure the communication of this information to inmates.

22. Policy 14-05, Inmate-Resident Grievance Procedures, provides that CoreCivic will provide a means for all inmates to address complaints regarding facility conditions, treatment, and policies and procedures. The Policy describes grievable versus non-grievable matters, remedies, the appeals process, and how records of inmate grievances are maintained.

23. Policy 17-100, Admission/Orientation Procedures, provides information about reception and orientation for Immigration and Customs Enforcement "ICE" detainees, including conducting an initial screening of detainees, personal property intake, medical screening, issuance of facility clothing and supplies, classification, and providing ICE detainees with an inmate handbook.

24. Policy 17-102, Admission and Orientation Procedures, provides information about arrival and processing procedures, issuance of property, intake screening, classification, and orientation for United States Marshals Service detainees.

25. Romero was a Cibola County detainee, therefore, Policies 17-100 and 17-102 would be inapplicable to him. Policy 17-101, Admission/Orientation Procedures–County Jail Detainees, provides information about reception and orientation procedures for County detainees such as Romero.

26. Policy CCA-GE1-01, General Emergency Information, provides information about facility operations in the event of certain delineated emergencies, including a fire, hazardous material/chemical spill, bomb threat, escape, hostage situation, assault from outside the facility, evacuation, and severe weather.

27. The June 12, 2018 incident did not constitute an emergency within the meaning of Policy CCA-GE1-01.

28. Policy 21-100, Detainee Release-Removal Transfer Procedures, provides

information about the procedures for the release or transfer of inmate/detainees to another facility.

29. Policy FAC-PO-150, Restricted Housing Unit, provides information about a facility's Restrictive Housing Unit ("RHU"). The Policy further provides information about RHU's count, observation, and search procedures; inspections; movement into and out of RHU; and general restraint procedures for detainees in RHU.

30. Romero was not housed in RHU on June 12, 2018. Romero was housed in Unit 400-A Pod, which is a general population pod for high custody detainees such as Romero.

31. Policy CCA-PG-07, PG – Count, provides information about count procedures generally and the preparation and documentation of counts. The Policy does not detail the time that counts must be conducted.

32. Policy CCA-PO-16, Housing Unit Officer, and Policy COR-PO-16, Housing Unit Officer, are duplicate policies.

33. Policy CCCC-PO-107, Reception & Diagnostic, was not in effect on June 12, 2018. The Policy has an effective date of November 2021.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Milan, New Mexico on February 16, 2022.

R. Nilius

6