**EXHIBIT 2**

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUBEN ROMERO,

    Plaintiff(s),

vs.                                                     No. 1:21-cv-00544-KG-CG

CORE CIVIC, INC.,
CORE CIVIC OF TENNESSEE, LLC.,
WARDEN BRIAN KOEHN,
ANA PADILLA and
GARRICK PETERSON ,

    Defendant(s).

DEPOSITION OF GARRICK PETERSON

MARCH 15, 2022
9:22 A.M.
VIA ZOOM

    PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, this deposition was:

TAKEN BY: ALYSSA QUIJANO, ESQ.
          ATTORNEY PLAINTIFF

## Page 10

1  hearing you.
2  A. Okay.
3  Q. Okay?
4  And was that summer job between school
5  semesters?
6  A. Yeah. In the summer.
7  Q. In the summer.
8  And it was between your school semesters
9  at UNM or when you were in high school?
10 A. In high school.
11 Q. Okay. And are you still at the CoreCivic jail?
12 A. No.
13 Q. Okay. Where do you work now?
14 A. I work at a hospital in Gallup.
15 Q. Okay. And when did you start there?
16 A. May 2020.
17 Q. And did you have any job in between CoreCivic
18 and the hospital?
19 A. Yeah, I did.
20 Q. Okay. What was that job?
21 A. Yeah, I was a -- water tech at -- on the
22 Navajo Nation -- a place called Navajo Nation Water
23 Management.
24 Q. Okay. And when did you start there?
25 A. I don't really know on the dates of that one

## Page 11

1  there.
2  Q. Okay. Do you know how long you worked there?
3  A. Six months.
4  Q. And do you know when you left?
5  A. No.
6  Q. Okay. Sometime before May 2020?
7  A. Yeah.
8  Q. Okay. And any job -- okay. So, I guess when
9  did you stop working at the CoreCivic?
10 A. It was six months after March, so in August or
11 September --
12 Q. Okay.
13 A. -- of that year, 2018.
14 Q. And why'd you leave?
15 A. Termination.
16 Q. Okay. Why were you terminated?
17 A. Falling asleep in one of the units.
18 Q. Do you remember which unit that was?
19 A. Unit 400.
20 Q. Do you know which pod?
21 A. No.
22 Q. Is Unit 400 the high security pod?
23 A. Yeah. County pod.
24 Q. Okay. You don't remember if it was R, B, C?
25 A. No.

## Page 12

1  Q. Okay. And when did that happen?
2  A. August 2018.
3  Q. And when that happened, was there some kind of
4  investigation into your behavior, or were you just
5  terminated after you were found falling asleep?
6  MR. BOJANOWSKI: I'm going to --
7  objection.
8  Go ahead and answer.
9  THE WITNESS: What was that?
10 Q (By Ms. Quijano) He objected, but you can go
11 ahead and answer.
12 A. Oh. Um, what was the question again?
13 Q. Was there any investigation into your behavior
14 when you fell asleep, or did they just terminate you
15 when they learned you had fallen asleep?
16 MR. BOJANOWSKI: Objection.
17 THE WITNESS: I think there might have
18 been an investigation, yeah.
19 Q (By Ms. Quijano) Okay. And do you know the
20 outcome of that investigation, if there was one?
21 MR. BOJANOWSKI: Same objection.
22 Go ahead.
23 THE WITNESS: No, I don't know.
24 Q (By Ms. Quijano) Were you --
25 A. Just terminated.

## Page 13

1  Q. Okay. Were you interviewed, at all, about the
2  incident?
3  A. No.
4  Q. Okay. How did they learn you had fallen
5  asleep?
6  A. One of the -- the lieutenants came and found
7  me.
8  Q. Okay. Had you slept on the job before that?
9  MR. BAJANOWSKI: Objection.
10 Go ahead.
11 (Court reporter clarification.)
12 MR. BOJANOWSKI: It's just an objection
13 for the record, form.
14 Q (By Ms. Quijano) Go ahead and answer.
15 A. Can you repeat the question?
16 Q. Yeah.
17 Had you ever fallen asleep on the job
18 before that?
19 A. No.
20 MR. BOJANOWSKI: Same objection.
21 Q (By Ms. Quijano) When the lieutenant found you
22 sleeping, what did he do?
23 A. Um, woke me up.
24 Q. And then walked away, or did he do anything
25 else after he woke you up?

1 A. Just walked away.
2 Q. Okay. Did you receive any like written -- like
3 any write-up?
4 A. Yeah. For that one, yeah.
5 Q. Okay. And then you were terminated afterwards?
6 A. Yeah.
7 MR. BOJANOWSKI: Same objection.
8 Q (By Ms. Quijano) You said for that one, were
9 there other incidents that you weren't -- that you were
10 in trouble but didn't get a write-up?
11 A. I don't know. I don't remember.
12 Q. Okay. Were you ever disciplined before you
13 were terminated, aside from falling asleep at that time?
14 A. Um --
15 MR. BOJANOWSKI: Objection.
16 Go ahead.
17 Q (By Ms. Quijano) Go ahead.
18 A. No.
19 Q. Okay. Okay. So, after you were terminated,
20 where did you work next?
21 A. At the water management branch.
22 Q. Okay. And that was the six-month stint before
23 you went to the hospital?
24 A. Yeah. No, no, I had another job.
25 Q. Okay.

1 A. Three more jobs after that.
2 (Court reporter clarification.)
3 Q (By Ms. Quijano) Three more jobs after that?
4 A. Yeah.
5 Q. Okay. What were --
6 (Court reporter clarification.)
7 MS. QUIJANO: Three more jobs is what I
8 think he said.
9 Q (By Ms. Quijano) Would you get closer to the
10 computer and speak up --
11 A. Yeah.
12 Q. -- because the court reporter is having a hard
13 time hearing you. It's going to make it really unclear
14 what you're testifying to. Okay?
15 A. Okay.
16 Q. Okay. You have three more jobs after that.
17 What other jobs did you have after you were
18 terminated -- or after the water tech job, what were
19 your other jobs?
20 A. After that I worked a month on the north side
21 of Gallup loading fireworks, that was one.
22 Q. Okay. How long --
23 A. That one was --
24 Q. How long did you do that?
25 A. For a day.

1 Q. Okay.
2 A. After that I was with a company, Desert Wall
3 Security, and I was working at the Gallup Wal-Mart. And
4 that was for two months.
5 Q. Okay. And why'd you leave the job at Wal-Mart?
6 A. To get the job at the hospital.
7 Q. Okay. Was the security job different than the
8 Wal-Mart job?
9 A. Oh, the same security at Wal-Mart.
10 Q. Okay. So, I have -- you said you had three
11 other jobs. So, I have loading fireworks for a day,
12 security at Wal-Mart.
13 A. Yeah.
14 Q. Is there another job?
15 A. No -- I mean, the water management branch.
16 Three jobs, that's three.
17 Q. Okay. There were three between the jail and
18 the hospital?
19 A. Yeah.
20 Q. Okay. And why did you leave the water tech
21 company?
22 A. To -- it was a contract for six months.
23 Q. Okay. Ever been fired from any other jobs?
24 A. No.
25 Q. Okay. Ever been disciplined in any other jobs?

1 A. No. Just the CoreCivic one.
2 Q. Okay. Any verbal reprimands, warnings at any
3 job?
4 A. No.
5 Q. Okay. So, when you started at CoreCivic, what
6 was your position?
7 A. Detention officer.
8 Q. Okay. And were you assigned to a specific pod?
9 A. Yeah. Unit 400.
10 Q. Okay. So, you always worked Unit 400?
11 A. Yeah. But some days I would be somewhere else.
12 Q. Where would you be?
13 A. I've been to 600, solitary, 500.
14 Q. Okay. And why were you working in those other
15 pods those times?
16 A. To relieve those officers. Because I guess
17 some of the officers didn't come in to relieve them for
18 their shift.
19 Q. Okay. So, it was a staffing issue that you
20 would cover?
21 A. Yeah.
22 Q. When you were working there, were you -- was
23 the facility understaffed?
24 MR. BOJANOWSKI: Objection.
25 Go ahead and answer.

Page 18

1                THE WITNESS: I don't know.
2       Q  (By Ms. Quijano) Do you know if there was
3  frequently officers that weren't coming in and shifts
4  needed to be covered?
5                MR. BOJANOWSKI: Same objection.
6                Go ahead and answer.
7                THE WITNESS: Yeah.
8       Q  (By Ms. Quijano) How often was that happening?
9                MR. BOJANOWSKI: Same objection.
10               Go ahead.
11               THE WITNESS: Often.
12      Q  (By Ms. Quijano) Sorry. Often?
13      A.  Yeah.
14      Q.  Okay. Did you end up having to cover lots of
15  shifts because people weren't showing up for their
16  assigned shift?
17               MR. BOJANOWSKI: Same objection.
18               THE WITNESS: Yeah.
19      Q  (By Ms. Quijano) Okay. Did that lead you to
20  working long hours at the jail?
21      A.  Yeah.
22      Q.  How many hours a week, on average, do you think
23  you worked when you were working at the jail?
24      A.  A week, probably 60 to 50.
25      Q.  And that was average for you?

Page 19

1       A.  Yeah.
2       Q.  Okay. Did you ever complain about the number
3  of hours that you were working?
4       A.  No.
5       Q.  No.
6           Were other guards working 50 to 60-hour
7  weeks as well?
8                MR. BOJANOWSKI: Same objection.
9                THE WITNESS: Yeah.
10      Q  (By Ms. Quijano) Were most of the staff working
11  50 to 60-hour weeks?
12               MR. BOJANOWSKI: Same objection.
13      Q  (By Ms. Quijano) Would you repeat your answer?
14      A.  Yeah.
15      Q.  Okay. Sorry, your answer was yes, other staff
16  were --
17      A.  Yeah.
18      Q.  Did anyone complain about the staffing levels
19  at the jail being inadequate?
20               MR. BOJANOWSKI: Same objection.
21               Go ahead.
22               THE WITNESS: They complained, but I don't
23  think they took it up to administration.
24      Q  (By Ms. Quijano) Do you know if the
25  administration knew that there weren't enough staff?

Page 20

1                MR. BOJANOWSKI: Objection.
2                Go ahead.
3                THE WITNESS: I don't know.
4       Q  (By Ms. Quijano) What were they complaining
5  about, if you know?
6                MR. BOJANOWSKI: Same objection.
7                Go ahead.
8                THE WITNESS: Long hours.
9       Q  (By Ms. Quijano) Were you able -- were each
10  shifts properly staffed? So, like when people were
11  working long hours, did you have enough people in the
12  jail at each time? That needed to be staffed in each
13  section of the jail?
14      A.  Yeah.
15               MR. BOJANOWSKI: Same objection.
16               Go ahead.
17               THE WITNESS: Yeah.
18      Q  (By Ms. Quijano) Okay. So, the problem was not
19  that there weren't enough people in the jail at one
20  time, but that everyone was tired. Is that accurate
21  or --
22               (Court reporter clarification.)
23               MS. QUIJANO: Sorry.
24      Q  (By Ms. Quijano) Everyone's tired and they're
25  overworked.

Page 21

1  Is that fair to say?
2                MR. BOJANOWSKI: Same objection.
3                Go ahead.
4                THE WITNESS: Can you repeat the question?
5       Q  (By Ms. Quijano) Yeah, sure.
6           I just am trying to get a sense of the
7  complaints. So, were the problems in the jail at that
8  time not that there weren't enough people at one time,
9  but that the people that were there were overworked and
10  tired?
11               MR. BOJANOWSKI: Same objection.
12               Go ahead.
13               THE WITNESS: Yeah.
14      Q  (By Ms. Quijano) What kind of training did you
15  get when you got to the jail?
16      A.  There's a book we go by and we have -- and we
17  got when we trained for -- and we just went by that
18  book.
19      Q.  Did someone train you on the book, or were you
20  given a book to read?
21      A.  Someone trained us.
22      Q.  Okay. Was that in a classroom setting?
23      A.  Yeah.
24      Q.  And how long was that training?
25      A.  Three weeks.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM 87102

1  Q. And did you get any on-the-job training?
2  A. Every other Friday. So, every Friday of those
3  three weeks.
4  Q. Okay. So, you'd go into the classroom Monday
5  through Thursday, and then Friday you'd be on the job?
6  A. Yeah. Shadowing another person.
7  Q. Were you trained on direct supervision versus
8  indirect supervision?
9  A. Yeah.
10 Q. What is the difference, to your knowledge?
11 A. Can you repeat the question?
12 Q. Yeah.
13    What is the difference, to your knowledge,
14 of indirect versus direct supervision?
15 A. Direct is when you're physically seeing what
16 they're doing, and indirect is you don't know what
17 they're doing.
18 Q. That you don't know what they're doing?
19 A. Yeah.
20 Q. Okay. Were there pods that required direct
21 supervision at all times, at the jail?
22 A. All the pods.
23 Q. All the pods needed direct supervision?
24 A. Yes. Yeah.
25 Q. Were there pods that needed direct supervision

1  all of the time?
2  A. No.
3  Q. Okay. So, the Unit 400, how often were you
4  trained that the supervision needed to happen in the
5  pod? You actually had to be in the pod looking at what
6  was happening?
7  A. My job -- there's two officers in that
8  Unit 400.
9  Q. Okay.
10 A. My job usually is on the computer in control
11 center. And the other one's a rover, that's his job of
12 going in the pods.
13 Q. Okay. So, usually you are on the computer
14 doing what?
15 A. Logging. Logging stuff. Logging inmates.
16 Watching the cameras. That's about it.
17 Q. When you're watching the cameras, are you
18 watching that at all times? Like constantly observing
19 the security footage?
20 A. Yeah.
21 Q. Okay. And so you can see into all of the
22 pods -- sorry, is someone in the room with you now?
23 A. Yeah. Well --
24    Okay, we're good.
25 Q. Okay. So, when you're supervising the pods on

1  the camera, you're looking into the security footage and
2  you can see what's happening at all times on the
3  footage?
4  A. Yeah.
5  Q. Okay. Is there always someone in the control
6  center looking at the cameras and someone roving the
7  pods?
8  A. Yeah.
9  Q. Okay. Were there times when that wasn't true?
10 A. What was that?
11 Q. Was there -- were there ever times that that
12 wasn't true, that there wasn't someone in control and
13 roving?
14 A. There's always got to be someone in control.
15 Q. Okay.
16 A. 100 percent.
17 Q. Okay. So, someone at all times should be
18 looking at the security footage in the jail?
19 A. Yeah.
20 Q. And my understanding on the day of the attack
21 that we're talking about today, you were actually roving
22 the pods.
23    Do you remember that day?
24 A. Yeah.
25 Q. Do you know why you were roving instead of in

1  control?
2  A. Um, no, I don't -- I don't know why.
3  Q. Do you know if someone else was in control that
4  day?
5  A. Yeah.
6  Q. Do you know who it was?
7  A. I had a different one in the daytime, because I
8  worked daytime. And then I got told to stay couple more
9  hours. And I don't know -- I don't know, I think it was
10 Torres.
11 Q. Do you know the first name?
12 A. No, I don't know his first name. He was on
13 nightshift; I was on dayshift.
14 Q. Okay. So --
15 A. And he came --
16 Q. Sorry, go ahead and finish what you were
17 saying. I interrupted you.
18 A. No, that -- that's it.
19 Q. So, he was on nightshift. You worked dayshift
20 that day.
21    What were the dayshift hours?
22 A. 6 a.m. - 6 p.m.
23 Q. Okay. And so on the day of the attack, on
24 June 12th, 2018, it's your memory that you worked 6 a.m.
25 to 6 p.m. and they asked you to stay for a few more

Page 26

1  hours to cover a shift?
2  A. Yeah.
3  Q. Do you remember how late you worked that night?
4  A. I think it was to 12.
5  Q. Okay. So, that day you worked 6 a.m. until
6  midnight?
7  A. Yeah.
8  Q. So, that's, what, an 18-hour day?
9  A. Yeah.
10 Q. Did you often work 18-hour days?
11 A. There was a couple of times, but not all the
12 times.
13 Q. So, my -- the attack -- I'm going to pull up
14 this incident report. I'm going to attach this as
15 Exhibit 1 to your deposition.
16     (Exhibit 1 marked for identification.)
17 Q (By Ms. Quijano) And let me know if you can see
18 this on your screen. Do you see this?
19 A. Yeah.
20 Q. Okay. There's a timeline here on the second
21 page, and here it says: (Reading)
22     9:57 the battery starts.
23     Do you see that line?
24 A. Yeah.
25 Q. So, just before 10 p.m. is when the attack

Page 27

1  started on that day?
2  A. Yeah.
3  Q. So, at that point you had been working
4  16 hours?
5  A. Yep.
6  Q. Sorry, what was your answer?
7  A. Yeah.
8  Q. Okay. At that point in the day, were you
9  tired?
10 A. I'm always tired.
11 Q. Okay. So, yes, you were tired at that point?
12 A. Yeah.
13 Q. Were you ready to go home at that point?
14 A. Yeah.
15 Q. Were you frustrated that you were asked to work
16 an extra shift?
17     MR. BOJANOWSKI: Objection.
18     Go ahead.
19     THE WITNESS: Yeah.
20 Q (By Ms. Quijano) So, the dayshift that you
21 worked from 6 a.m. to 6 p.m., were you roving the pods
22 or were you in control?
23 A. I was -- I think I was control.
24 Q. Okay. Then at 6 p.m., when your shift ended,
25 Torres came and took over control?

Page 28

1  A. Yeah.
2  Q. And then you were asked to cover the rover
3  pod -- the rover officer's shift?
4  A. Yeah.
5  Q. Okay. I'm sorry, that was yes, right?
6  A. Yeah.
7  Q. Sorry, I talked over you a little so I want to
8  be sure I'm clear.
9      The control center, where is that located
10 in the jail?
11 A. It's right in the middle of the four pods.
12 Q. Okay. Is there like -- are there -- so, my
13 knowledge of jails is -- so, are there -- I want to make
14 sure I'm understanding what this is.
15     Is the control center like a bubble? Like
16 you have windows --
17 A. Yeah.
18 Q. -- on it?
19     And so those windows look in to each pod?
20 A. Yeah.
21 Q. Okay. So, there's an officer at all times in
22 the middle of the four pods with windows all around?
23 A. Yeah.
24 Q. And there are also camera monitors --
25 A. Yeah.

Page 29

1  Q. -- in that control center?
2  A. Yeah.
3  Q. Okay. So, at all times the controls -- the
4  officer in control can see -- physically see the inmates
5  and can look at the security footage?
6  A. Yeah.
7  Q. Is there any point in time that an officer in
8  the control center should leave their post during their
9  shift?
10 A. No. It should be someone in there all the
11 time.
12 Q. And so if someone left the control center,
13 would that have been a policy violation?
14 A. Yeah.
15 Q. And if someone does leave, let's -- what
16 happens if you need to go to the bathroom, for example?
17 What are you supposed to do?
18 A. The rover's supposed to cover the -- the
19 control.
20 Q. Okay. So, if someone in the control center on
21 that night left the control center, they would have
22 asked -- they should have asked you --
23 A. Yeah.
24 Q. -- to please come cover control?
25 A. Yeah.

Page 42

1  Q. Okay. And you just don't remember?
2  A. I don't remember, yeah.
3  Q. Okay. So, I'm going to show you -- well, on
4  the same photo -- sorry, I didn't mean to stop sharing
5  it here.
6      Is this you on the top left here?
7  A. Looks like it, yeah.
8  ==Q. Okay. And do you see these coverings on the==
9  ==cell that you're at?==
10 ==A. Yeah.==
11 ==Q. Did you ask the inmates to take these coverings==
12 ==down, to your memory?==
13 ==A. Yeah.==
14 ==Q. Okay. You didn't take them down, though?==
15 ==A. No.==
16 ==Q. Did you make sure that they were taken down?==
17 ==A. Yeah.==
18 ==Q. And you knew that leaving them up caused the==
19 ==risk of not being able to see what was happening in that==
20 ==cell?==
21 ==A. Yeah.==
22     MR. BOJANOWSKI: I'm going to object to
23 form.
24     THE WITNESS: Yeah.
25 Q (By Ms. Quijano) How often were you supposed to

Page 43

1  be roving the cells? How often were you supposed to be
2  in each pod?
3  A. There's these buttons called watch tours
4  buttons, and they reset every hour. And in that hour
5  you have to go in there and, basically, just touch all
6  the watch tower buttons.
7  Q. Okay. So, once an hour you have to go through
8  and push a button on each -- in each pod?
9  A. Yeah. There's four buttons in each pod.
10 Q. Okay. So, the buttons are in four different
11 areas in the pod?
12 A. Yeah.
13 Q. Okay. I'm going to pull this -- actually pull
14 this photo up again. Would you be able to mark on this
15 photo where those buttons were?
16 A. Um, mark?
17 Q. Yeah. I can -- what I can do is give you
18 access of the controller, and you can actually draw on
19 this with your mouse pad. So, give me a second to do
20 that and I'll attach that as Exhibit 3 to your
21 deposition.
22     (Exhibit 3 marked for identification.)
23     MS. QUIJANO: I'm just going to take a
24 photo of this section and then -- it won't let me give
25 you control for some reason. It will allow me to give

Page 44

1  control to your lawyers and to Paul Baca Court
2  Reporters.
3      Belen, is there some control on your end
4  that will allow him to have remote control access?
5      (Discussion off the record.)
6      MS. QUIJANO: Okay. Let me try this
7  again. All right. It's not letting me give you access
8  to it. Let's take a quick break and see if we can
9  figure this out.
10     (Off the record 10:11 a.m. to 10:25 a.m.
11 Q (By Ms. Quijano) Okay. So, we can't figure out
12 how to get you remote access for some reason. You're
13 the only one I'm not able to give remote access to. So,
14 what I'm going to do is I have this little star stamp,
15 it's going to create like a blue stamp wherever I click.
16     So, you said there were four watch --
17 watch guard buttons?
18 A. Yeah.
19 Q. Okay. And I want to make sure we're clear, so
20 if you could say yes or no.
21     Yes, there are four?
22 A. Yes.
23 Q. Okay. And where is the first one?
24 A. Uh, the top railing on the right side.
25 Q. On the right side right here where my mouse is?

Page 45

1  A. Yeah.
2  Q. Okay.
3  A. And there'd be one on the bottom in the same
4  place.
5  Q. On -- like down here on this wall behind the
6  stairs?
7  A. The same place as the other one. Should be on
8  the other side. Yeah, right there.
9  Q. Okay. And then where is the third?
10 A. The -- you know what, I think this one has six.
11 Q. Okay.
12 A. Because some pods have -- because I'm -- I
13 think I remember where I'm at. I touched the button at
14 the watch tower right there.
15 Q. Okay. That's you pushing the button right now?
16 A. Yeah. Yeah.
17 Q. Okay. I'll put one right here at --
18 A. And then there's the one on the bottom, the
19 same place.
20 Q. Okay.
21 A. And the other side of the pods where the stairs
22 at, those were the same -- the same place as the other
23 side.
24 Q. Over here (indicating)?
25 A. Yeah.

Page 58

1 were in control?
2  A. Yes.
3  Q. Do you recognize these initials? Do you know
4 the person who was working with you that day?
5  A. Yes.
6  Q. Who was it?
7  A. Desiderio.
8  Q. Desiderio?
9   (Court reporter clarification.)
10   THE WITNESS: Desiderio.
11  Q (By Ms. Quijano) And that's D-E-S-D-I-R-I-O
12 (sic)?
13  A. Yeah.
14  Q. R-I-O? Okay.
15   Oh, is it here? D-O-D-S-R-D-E-R-O?
16  A. Yeah. That's it right there.
17  Q. I-O? Okay.
18   Okay. And so it looks like throughout
19 this day the handwriting's switching back and forth.
20 Was it common for you to switch back and forth between
21 control and rovering?
22  A. With this partner, yes.
23  Q. Was it different for other people you worked
24 with?
25  A. Yes.

Page 59

1  Q. Okay. Why was it different with her?
2  A. Because we both understood that we know how it
3 feels to sit in the control center all day and we just
4 gave each other breaks -- not breaks, but like breaks of
5 sitting down.
6  Q. Okay. And so did you prefer to be roving
7 instead of being in the control center?
8  A. I preferred we switch every now and then.
9  Q. Okay. Did other people not switch with you,
10 like Desiderio did?
11  A. Yeah. I was -- I -- with other people I was in
12 the -- in the control center all day.
13  Q. Were people -- was that because people didn't
14 want to be stuck in the control center to give you
15 breaks?
16  A. Yeah.
17  Q. And why is that, to your knowledge?
18  A. It's -- I don't know.
19  Q. Did people not like working in control?
20  A. Yeah.
21  Q. Why not?
22  A. Because to log everything down.
23  Q. Is it -- is it like boring, or do you know why
24 they didn't like logging everything down?
25  A. Probably boring --

Page 60

1   MR. BOJANOWSKI: Objection.
2   THE WITNESS: Yeah. Yes.
3  Q (By Ms. Quijano) Did people -- so, you
4 mentioned you were terminated for falling asleep.
5   Did people fall asleep on shift while you
6 were there?
7   MR. BOJANOWSKI: Same objection.
8   THE WITNESS: Yes.
9  Q (By Ms. Quijano) How often was that happening?
10   MR. BOJANOWSKI: Same objection.
11   Go ahead.
12   THE WITNESS: Often.
13  Q (By Ms. Quijano) Was it frustrating for you
14 for -- to be terminated when you knew that was happening
15 all the time at the jail?
16  A. Yes.
17   MR. BOJANOWSKI: Same objection.
18   Go ahead.
19  Q (By Ms. Quijano) Did you say anything about it
20 to administration when you were terminated?
21  A. No.
22  Q. How often were people sleeping on the job?
23   MR. BOJANOWSKI: Same objection.
24   Go ahead.
25   THE WITNESS: Often.

Page 61

1  Q (By Ms. Quijano) Was it everyone or was it a
2 select few?
3  A. Select few.
4   MR. BOJANOWSKI: Same objection.
5  Q (By Ms. Quijano) And were they people that were
6 frequently working control?
7   MR. BOJANOWSKI: Same objection.
8   Go ahead.
9   THE WITNESS: So, it was a mix, rover and
10 control.
11  Q (By Ms. Quijano) Okay. And was it a certain
12 shift that they were more likely to fall asleep on
13 shift?
14   MR. BOJANOWSKI: Same objection.
15   Go ahead.
16   THE WITNESS: Can you repeat the question?
17  Q (By Ms. Quijano) Yeah.
18   Was it -- was there a certain shift that
19 they were more likely to fall asleep on job?
20   MR. BOJANOWSKI: Same objection.
21   Go ahead.
22   THE WITNESS: Nightshift.
23  Q (By Ms. Quijano) And this is going to seem
24 obvious, but do you know why that was more often?
25   MR. BOJANOWSKI: Same objection.

Page 98

1   A. Yes.
2   Q. Do you remember, were his clothes covered in
3   blood?
4   A. Yes. His shirt.
5   Q. Okay. So, let me pull up a photo here. So,
6   this is on Bates number CCCC_18. So, there's a photo of
7   him here, I don't see any blood on his shirt.
8       Do you see any blood on his shirt?
9   A. No.
10  Q. Would this have -- photo been taken some time
11  after he had been given new clothes?
12  A. Yes.
13      MR. BOJANOWSKI: Objection.
14      Go ahead.
15  Q (By Ms. Quijano) Do you have any understanding
16  if this photo was taken before or after he was taken to
17  the hospital?
18      MR. BOJANOWSKI: Same objection.
19      Go ahead.
20      THE WITNESS: I don't know about that.
21  Q (By Ms. Quijano) Okay. When you found him, was
22  he covered in more blood than he is in this photo?
23      MR. BOJANOWSKI: Same objection.
24      Go ahead.
25      THE WITNESS: Yes.

Page 99

1   Q (By Ms. Quijano) Okay. Did you like working at
2   the jail?
3       MR. BAJANOWSKI: Objection.
4       Go ahead.
5       THE WITNESS: No.
6   Q (By Ms. Quijano) Why not?
7       MR. BOJANOWSKI: Objection.
8       Go ahead.
9       THE WITNESS: It feels like I'm
10  incarcerated with them.
11  Q (By Ms. Quijano) Okay. What do you mean by
12  that?
13      MR. BOJANOWSKI: Objection.
14      Go ahead.
15      THE WITNESS: The setting of a jail, it's
16  depressing. All I did was work and sleep. That's it.
17  Q (By Ms. Quijano) When you worked at the jail,
18  did you have any complaints about the way it was managed
19  by the supervisors at your jail?
20      MR. BOJANOWSKI: Objection.
21      Go ahead.
22      THE WITNESS: I did no formal complaints,
23  if that's what you're asking.
24  Q (By Ms. Quijano) Well, did you have any
25  informal complaints? Like did you dislike the people

Page 100

1   you worked for? That supervised you?
2       MR. BOJANOWSKI: Objection.
3       Go ahead.
4       THE WITNESS: Yes.
5   Q (By Ms. Quijano) What did you dislike?
6       MR. BOJANOWSKI: Objection.
7       Go ahead.
8       THE WITNESS: Hours.
9   Q (By Ms. Quijano) Okay. The long hours?
10  A. Yeah. And there's something called a draft.
11  Q. Okay.
12  A. When someone has to stay, the person who didn't
13  stay last time would have to stay. But it felt like I
14  stayed there most of the time instead of them spreading
15  out who stayed or not. It -- I felt like it was just me
16  that was staying most of the time.
17  Q. And was that frustrating to be called to stay
18  late, past your shift, that frequently?
19      MR. BOJANOWSKI: Objection.
20      Go ahead.
21      THE WITNESS: Yes.
22  Q (By Ms. Quijano) Sorry, was the answer yes?
23  A. Yes.
24  Q. And what other complaints did you have about
25  your job and the way --

Page 101

1       MR. BOJANOWSKI: Same objection.
2   Q (By Ms. Quijano) -- and the way you were
3   supervised?
4       MR. BOJANOWSKI: Go ahead.
5       Objection.
6       THE WITNESS: Mandatory days.
7   Q (By Ms. Quijano) What are mandatory days?
8   A. You have to come in no matter what. If you
9   don't come in, you get -- you get written up.
10  Q. Okay. Were all of your days that you were
11  scheduled mandatory days?
12  A. Yes.
13  Q. Okay. And -- and people -- based on your
14  testimony, it seems like people didn't show up to their
15  job pretty frequently.
16      Do you know if those people were getting
17  written up?
18      MR. BOJANOWSKI: Same objection.
19      Go ahead.
20      THE WITNESS: From my knowledge, I did not
21  know if they got written up or not.
22  Q (By Ms. Quijano) Did it seem like there were
23  some staff that were favored and given preferable
24  treatment over other staff in the jail?
25      MR. BOJANOWSKI: Same objection.

Page 102

1  Go ahead.
2  THE WITNESS: Yes.
3  Q  (By Ms. Quijano) And was that frustrating for
4  you as a staff?
5  MR. BOJANOWSKI: Objection.
6  Go ahead.
7  THE WITNESS: Yes.
8  Q  (By Ms. Quijano) And were those staff
9  allowed -- or what kind of preferential treatment did
10  they get?
11  MR. BOJANOWSKI: Objection.
12  Go ahead.
13  THE WITNESS: Get to go home early. They
14  get to work the unit they wanted to. Or they -- the
15  floater is a person who floats between units, that was
16  one of the good positions that I wanted but someone else
17  kept getting it.
18  Q  (By Ms. Quijano) And why is that a good
19  position?
20  A.  Because you don't have to stay in one unit all
21  the time.
22  (Court reporter clarification.)
23  THE WITNESS: Yeah. It's a floater, you
24  can go to any unit you want to and -- if they need help
25  or not. Restroom or need to be relieved for a second,

Page 103

1  you know what I mean.
2  Q  (By Ms. Quijano) Okay. So, the floater is
3  someone that's in all parts of the jail just based on
4  whoever needs help?
5  A.  Yes.
6  Q.  And is that job -- it's just more stim -- it's
7  less boring?  What's better about being able to be in
8  all parts of the jail?
9  A.  Less boring. You can, basically, do what you
10  want, you know. You don't have to sit there all day and
11  stare at the computer or the -- the windows and stuff
12  like that.
13  Q.  Were there any positions or pods that were the
14  least favored to be in? That people just didn't want to
15  be in unit whatever?
16  MR. BOJANOWSKI: Objection.
17  Go ahead.
18  THE WITNESS: Yes.
19  Q  (By Ms. Quijano) Sorry, your answer is yes?
20  A.  Yes.
21  Q.  What pods or units were those?
22  MR. BOJANOWSKI: Objection.
23  Go ahead.
24  THE WITNESS: Unit 400.
25  Q  (By Ms. Quijano) Okay. So, Unit 400 was the

Page 104

1  least favorite of pods or units to be working?
2  MR. BAJANOWSKI: Objection.
3  Go ahead.
4  THE WITNESS: Yes.
5  Q  (By Ms. Quijano) And why was that?
6  MR. BOJANOWSKI: Objection.
7  Go ahead.
8  THE WITNESS: To be honest, they don't
9  listen, all of them, at all.
10  Q  (By Ms. Quijano) "They" being the inmates?
11  A.  Yes.
12  Q.  And so it would cause problems for the staff?
13  MR. BAJANOWSKI: Objection.
14  Go ahead.
15  THE WITNESS: Yes.
16  Q  (By Ms. Quijano) Okay. So, did you dislike
17  working in Unit 400 when you were there?
18  MR. BOJANOWSKI: Objection.
19  Go ahead.
20  THE WITNESS: Yes.
21  Q  (By Ms. Quijano) Were you less motivated to do
22  your job because you disliked the unit you were
23  assigned?
24  MR. BOJANOWSKI: Same objection.
25  Go ahead.

Page 105

1  THE WITNESS: You kind of cut off.
2  ==Q  (By Ms. Quijano) Yeah. Were you less motivated==
3  ==to do your job well because you disliked the unit you==
4  ==were assigned?==
5  ==MR. BOJANOWSKI: Objection.==
6  ==Go ahead.==
7  ==THE WITNESS: Motivated or not, I still==
8  ==did my job.==
9  Q  (By Ms. Quijano) Okay. Did it make it more
10  difficult to do your job because you were frustrated
11  with the unit assignment?
12  MR. BOJANOWSKI: Objection.
13  Go ahead.
14  THE WITNESS: To be honest, I kind of
15  liked them because I would write complaints. That gave
16  me something to do.
17  Q  (By Ms. Quijano) Writing complaints because
18  inmates were not doing what they were told?
19  A.  Yes.
20  Q.  Okay. So, because they were poorly behaved,
21  you at least got to write them up and that was less
22  boring than sitting there?
23  MR. BOJANOWSKI: Objection.
24  Go ahead.
25  THE WITNESS: Yes.

Page 106

1  Q  (By Ms. Quijano) Okay. Are you glad to no
2  longer be working there?
3      MS. QUIJANO: Objection.
4      Go ahead.
5      THE WITNESS: Yes.
6  Q  (By Ms. Quijano) Were there any other things
7  that like your supervisor, the warden, sergeants,
8  lieutenants did that you thought were wrong or poorly
9  done?
10     MR. BOJANOWSKI: Objection.
11     Go ahead.
12     THE WITNESS: No.
13 Q  (By Ms. Quijano) Just the staffing? The
14 scheduling?
15 A.  Yes.
16     MS. QUIJANO: Objection.
17     Go ahead.
18     THE WITNESS: Yes.
19 Q  (By Ms. Quijano) Did you feel like policies and
20 procedures were enforced or monitored by the -- the jail
21 staff?
22     MR. BOJANOWSKI: Objection.
23     Go ahead.
24     You're asking him to testify as to what
25 other people are doing?

Page 107

1      MS. QUIJANO: If he felt they were --
2      MR. BOJANOWSKI: Well, what he feels isn't
3  really relevant, but --
4      MS. QUIJANO: That's fine. You can
5  object. But I'm going to --
6      MR. BOJANOWSKI: All right. Yeah, I
7  just -- I -- I am. It's just I want to be clear as to
8  the question you're asking. Are you asking him what
9  other staff has felt --
10     MS. QUIJANO: No.
11     MR. BOJANOWSKI: -- about working there?
12 Maybe just rephrase the question so I can better
13 understand.
14     MS. QUIJANO: Okay. I'll restate my
15 question.
16 Q  (By Ms. Quijano) Did you feel that policies and
17 procedures were properly enforced by jail staff?
18     MR. BOJANOWSKI: Same objection.
19     THE WITNESS: Yes.
20 Q  (By Ms. Quijano) Okay. Were the warden an
21 admin -- or assistant warden on-site frequently?
22 A.  Yes. She was frequently there.
23 Q.  What about the warden?
24 A.  Sometimes would be there, but not all the time.
25 Q.  Was he frequently not there?

Page 108

1      MR. BOJANOWSKI: Objection.
2      Go ahead.
3      THE WITNESS: He would come like two times
4  out of a month to, you know, 400.
5  Q  (By Ms. Quijano) So, you didn't -- did you see
6  him often?
7  A.  No.
8  Q.  Do you -- did you feel that he had any
9  understanding of what was happening in that facility
10 when you worked there?
11     MR. BOJANOWSKI: Objection.
12     Go ahead.
13     THE WITNESS: I do not know.
14 Q  (By Ms. Quijano) Do you think there was any way
15 for him to have known with how infrequently you saw him?
16     MR. BOJANOWSKI: Objection.
17     Go ahead.
18     THE WITNESS: I don't know.
19     MS. QUIJANO: Okay. Those are all of my
20 questions. I appreciate you taking your morning. I
21 know this is a frustrating process to make sure this is
22 clear, but I appreciate your patience with it.
23     And I pass the witness.
24     MR. BOJANOWSKI: Okay. We'll read and
25 sign. Thank you.

Page 109

1      (Deposition concluded at 11:46 a.m.)
2             ***********
3
4       DEPONENT SIGNATURE/CORRECTION PAGE
5      If there is any typographical errors to your
6         deposition, indicate them below:
7  PAGE          LINE
8  _____Change to _____
9  _____Change to _____
10 _____Change to _____
11 _____Change to _____
12    Any other changes to your deposition are to be
   listed below with a statement as to the reason for such
13 change.
14 PAGE LINE  CORRECTION     REASON FOR CHANGE
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21    I, GARRICK PETERSON, do hereby certify that I have
   read the foregoing transcript of my deposition taken
22 MARCH 15, 2022, as transcribed, and that it is a true
   and correct record of my testimony given at the time,
23 except as to any corrections submitted.
24
25 _____   _____