# Exhibit 3
Plaintiff's Deposition Transcript

```
               UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF NEW MEXICO


 RUBEN ROMERO,                    )
                                  )
      Plaintiff,                  )
                                  )
             vs.                  ) No. 21-cv-00544-KG-CG
                                  )
 CORE CIVIC, INC., CORE           )
 CIVIC OF TENNESSEE, LLC,         )
 WARDEN BRIAN KOEHN, ANA          )
 PADILLA and GARRICK              )
 PETERSON,                        )
                                  )
      Defendants.                 )
                                  )




    VIDEOCONFERENCE DEPOSITION OF RUBEN EMILIO ROMERO

                  Hobbs, New Mexico
                   May 27, 2022
                  10:00 a.m. MDT
```

REPORTED BY:
WILMA A. WEINREICH, CSR, RPR
Certified Stenographer
Certificate No. 50976

PREPARED FOR:
UNITED STATES DISTRICT COURT

(ASCII/COPY)

Page 10

1  Q. How old are you, Mr. Romero?
2  **A. I'm 22.**
3  Q. What's your date of birth?
4  **A. August 21, 1999.**
5  Q. And you're currently incarcerated, correct?
6  **A. Yes, ma'am.**
7  Q. Where are you incarcerated?
8  **A. Lea County Correctional Facility in Hobbs, New**
9  **Mexico.**
10 Q. In Hobbs?
11 **A. Hobbs. Yes, ma'am.**
12 Q. Before you were incarcerated, where were you from?
13 **A. Grants, New Mexico.**
14 Q. Were you born in Grants?
15 **A. Yes.**
16 Q. Did you go to elementary school there?
17 **A. Yes.**
18 Q. Junior high, I'm not sure if it's called middle
19 school?
20 **A. Just Milan Elementary.**
21 Q. Is Milan another town in New Mexico?
22 **A. Yeah, it's right near Grants. It's like the same**
23 **town, though.**
24 Q. It's still Grants?
25 **A. Yes.**

Page 11

1  Q. Did you go to middle or junior high school in
2  Grants?
3  **A. No.**
4  Q. Where did you go to junior high?
5  **A. I didn't go to junior high. I was home-schooled.**
6  Q. So did you go to high school then?
7  **A. No.**
8  Q. Did you complete your education?
9  **A. Yes, ma'am.**
10 Q. How did you do that?
11 **A. HiSET.**
12 Q. I'm sorry, what is that?
13 **A. High School Equivalency Test.**
14 Q. Is that a GED?
15 **A. It's like GED but it's high school equivalency.**
16 Q. Did you successfully complete that?
17 **A. Yes, ma'am.**
18 Q. Did you complete that after you were done being
19 home-schooled?
20 **A. Yes, ma'am.**
21 Q. Do you know what age you completed that?
22 **A. When did I complete it?**
23 Q. No. I apologize. What age?
24 **A. I was -- I believe I was 18.**
25 Q. Okay. Were you in Grants still when you completed

Page 12

1  that?
2  **A. No. I was incarcerated.**
3  Q. When you were living in Grants, who did you live
4  with?
5  **A. My mom and dad.**
6  Q. Are your parents from Grants?
7  **A. Yes.**
8  Q. Were they born there?
9  **A. Yes.**
10 Q. Did they go to school there?
11 **A. Yes. My dad did.**
12 Q. Did your mom go to school?
13 **A. No.**
14 Q. Are your grandparents from Grants?
15 **A. Yes.**
16 Q. So you have a long line of family from Grants it
17 sounds like?
18 **A. Yes.**
19 Q. Would you describe Grants as a small town?
20 **A. Yes.**
21 Q. Small enough that, say, everyone knows everyone?
22 **A. Yes.**
23 Q. And small enough that, say, if someone went to
24 jail you would probably know about it?
25 **A. Yes.**

Page 13

1  Q. Do you have any siblings?
2  **A. Yes.**
3  Q. How many?
4  **A. Five. Sisters.**
5  Q. What are their names?
6  **A. Emmaleen Chavez, Joeleen Romero, Melissa Romero,**
7  **Merlinda Romero, and Cherie Romero.**
8  Q. Where do they live?
9  **A. Cherie relives in Kansas City and everybody else**
10 **lives in New Mexico -- Merlinda lives in Nevada.**
11 Q. Have any of your family members ever been to jail
12 or prison before?
13 **A. My sister has been to jail before.**
14 Q. For what?
15 **A. I'm not sure. Probably like credit card fraud or**
16 **something. I don't know.**
17 Q. Do you currently have any friends or family in
18 jail or prison?
19 **A. My sister Melissa is currently in county jail.**
20 Q. For what?
21 **A. For absconding.**
22 Q. What was that?
23 **A. For absconding.**
24 Q. Do you know an individual by the name of Rudy
25 Valencia?

Page 14

1   A.  Yes, ma'am.
2   Q.  How do you know him?
3   A.  He was one of my friends growing up.
4   Q.  How long have you known him?
5   A.  I'm not sure.  Since 2012, 2013.
6   Q.  You were born in 1999, so since you were maybe
7   about ten years old you knew him?
8   A.  No.  Since I was like 14.
9   Q.  Is he from your hometown?
10  A.  No.
11  Q.  Where is he from, if you know?
12  A.  Wisconsin.
13  Q.  How did you meet him in 2012?
14  A.  I knew his mom.  His mom was dating my uncle.
15  Q.  When you met him, was he living in New Mexico at
16  that time?
17  A.  Yes.  He moved to New Mexico.
18  Q.  He had just moved to New Mexico?
19  A.  Yes, ma'am.
20  Q.  Did he go to school with you when he moved to New
21  Mexico?
22  A.  (Indicating).
23  Q.  You were just friends through his mom and your
24  uncle?
25  A.  Yes.

Page 15

1   Q.  Did you guys hang out together?
2   A.  Yes.
3   Q.  Were you friends on social media?
4   A.  Yes.
5   Q.  Facebook?
6   A.  I believe so.
7   Q.  How often would you say you would get together
8   with him?
9   A.  Every day.
10  Q.  Do you know an individual by the name of Daniel
11  Mariano?
12  A.  Yes.
13  Q.  How do you know him?
14  A.  He was a friend of my nephew's growing up.
15  Q.  How long have you known him?
16  A.  I'm not sure.  Longer than I have known Rudy,
17  though.
18  Q.  So you grew up with him?
19  A.  Kind of, yeah.
20  Q.  Did you guys go to school together?
21  A.  No.
22  Q.  Is he from your hometown?
23  A.  He's from Grants, yes.
24  Q.  Are you friends with him on social media?
25  A.  I don't know.  I'm not sure.  I don't believe so.

Page 16

1   I'm not sure.  I haven't had social media for a long time.
2   Q.  I understand.
3       Do you know an individual by the name of
4   Matthew Wax?
5   A.  I don't really know him other than the incident
6   that occurred.
7   Q.  Before you were incarcerated at Cibola for the
8   subject incident -- the subject of this lawsuit, did you
9   not know him?
10  A.  No.
11  Q.  He's not from your hometown?
12  A.  He's from San Mateo, but I know his family.  But I
13  don't know him.  He's related to Rudy.
14  Q.  How is he related to Rudy, do you know?
15  A.  Cousins.
16  Q.  So had you heard of him through Rudy?
17  A.  No.
18  Q.  You had never heard of him before the incident
19  that we are here to talk about?
20  A.  No.
21  Q.  Have you talked to any friends or family members
22  about this lawsuit?
23  A.  Kind of.
24  Q.  Who did you talk to?
25  A.  I talk to my mom and dad every day so they know I

Page 17

1   had a court date today.
2   Q.  I apologize.  I'm talking about the lawsuit today.
3   So not any criminal matters that you might have had?
4   A.  What is that?
5   Q.  You said you had a court date today.  So I'm not
6   sure if that's related to a criminal matter.  I was talking
7   about this civil lawsuit that we are talking about.
8   A.  Yes.  Yes.
9   Q.  So what have you told them about this lawsuit?
10  A.  Just that I had a video visit today.
11  Q.  But did you talk to them about the incident?
12  A.  In the past, yes.
13  Q.  What did you tell them?
14  A.  Well, they went and visited me and stuff while --
15  after the incident, so they knew all about it.
16  Q.  Where did they visit you?
17  A.  CoreCivic.
18  Q.  Did you tell them something about the incident?
19  A.  Yes.
20  Q.  What did you tell them?
21  A.  Just that they attacked me.  That's all.
22  Q.  Have you told anybody else about this lawsuit or
23  the incident?
24  A.  No.
25  Q.  I believe you disclosed your sister Joeleen Romero

Page 18

1  as a witness in this lawsuit, correct?
2      A.  I'm not sure I would say a witness because she
3  wasn't there at the time.
4      Q.  Good point.  You disclosed her as somebody who
5  might have information about this lawsuit?
6      A.  No.  She was not there.
7      Q.  Go ahead.
8      A.  I was locked up so there was no way for us to be
9  together or nothing.  She didn't witness anything or
10 nothing like that.
11     Q.  Right.  I understand what you're saying.
12         In this lawsuit you and your attorneys have
13 disclosed that your sister Joeleen Romero is somebody who
14 might have information about this lawsuit including your
15 damages, correct?
16     A.  Oh, correct.  Correct.
17     Q.  Did you talk to --
18     A.  Because she knows about my mental health issues
19 and stuff stemming from the incident.
20     Q.  Okay.  Did you talk to her about the incident?
21     A.  Yes.  Kinda sort of.
22     Q.  Could you tell me about that?  What did you say?
23     A.  Just that they attacked me.
24     Q.  That's it?
25     A.  Yeah.  Just that they attacked me.  Yes, ma'am.

Page 19

1      Q.  Have you talked to anyone else about this lawsuit?
2      A.  No, ma'am.
3      Q.  Are you currently dating anyone?
4      A.  No, ma'am.
5      Q.  I want to talk to you a little bit about your
6  medical history prior to your incarceration at Cibola,
7  okay?
8      A.  Yes, ma'am.
9      Q.  You have already talked about some medications you
10 are currently taking for some current mental health
11 conditions.
12         In the ten years prior to your incarceration
13 at Cibola, did you suffer from any mental health issues?
14     A.  Yes.
15     Q.  And what were those?
16     A.  Anxiety.
17     Q.  Do you know approximately what age you started to
18 suffer from anxiety?
19     A.  Sixteen, after -- after my criminal case.
20     Q.  Have you seen any medical records in this case?
21     A.  Have I seen medical records?
22     Q.  Yes.  Have you seen any medical records related to
23 this case?
24     A.  Oh, yes, ma'am.
25     Q.  If I were to represent to you that a medical

Page 20

1  record from Central New Mexico Correctional Facility stated
2  that you had suffered from anxiety since age 10-11, do you
3  have any reason to dispute that?
4      A.  No, I don't believe so.
5      Q.  So 10-11 sounds about right from when this
6  started?
7      A.  I suffered from anxiety from a younger age but it
8  wasn't as bad as until after my criminal case.
9      Q.  But you did suffer from anxiety?
10     A.  Yes, ma'am.
11     Q.  Were you experiencing any physical symptoms
12 related to your anxiety?  I can give you an example of
13 something if you need.
14     A.  I'm not sure.
15     Q.  What about sleeplessness?
16     A.  Yes.
17     Q.  What about headaches?
18     A.  Yes.
19     Q.  Nervousness?
20     A.  Yes.  I had migraines ever since I was a young
21 boy.
22     Q.  I'm sorry.  Those are awful.
23     A.  Yes, ma'am.
24     Q.  Did you suffer from any other mental health issues
25 other than your anxiety?

Page 21

1      A.  From what age?
2      Q.  Good question.  From still the ten-year time
3  period prior to your incarceration at Cibola.
4      A.  Did I suffer from any mental health issues?
5  That's what you're saying?
6      Q.  Yes.  Other than your anxiety.
7      A.  Yes.  Yeah, um, trouble eating.  Things like that.
8  Symptoms from anxiety.
9      Q.  Did you suffer from PTSD?
10     A.  Not until after my criminal case.
11     Q.  Were you diagnosed as suffering from PTSD?
12     A.  Yes, ma'am.
13     Q.  Do you know who diagnosed you with that condition?
14     A.  It may have been my family doctor, Arnold
15 Valdivia, or it could have been somebody afterwards.  I'm
16 not sure.
17     Q.  Does the Southwest Family Guidance Center &
18 Institute sound familiar?
19     A.  Yes.  Robert Green, yes.
20     Q.  And I'm sorry what was that name?
21     A.  Robert Green.
22     Q.  And he formally diagnosed you as suffering from
23 PTSD?
24     A.  I believe so.
25     Q.  And you said that was due to the murder in 2015,

Page 22

1 correct?
2 A. Yes, ma'am.
3 Q. Were you prescribed any medication for that
4 condition?
5 A. Yes.
6 Q. What was that?
7 A. There was a bunch of different medications they
8 gave me.
9 Q. Let's go through those. Do you remember what they
10 were called?
11 A. I don't remember most of them. I know they had me
12 on gabapentin.
13 Q. What does that do?
14 A. I think it's for anxiety.
15 Q. And this was related to your PTSD?
16 A. Yes.
17 Q. Any other medications for your PTSD?
18 A. At that time I don't remember exactly what.
19 Wellbutrin. Gave me a bunch of different medications.
20 They tried a bunch of different ones until I found a good
21 one. You know what I'm saying?
22 Q. What was the good one?
23 A. Gabapentin helped me with my anxiety a lot.
24 Q. Are you still taking that?
25 A. No, they do not prescribe that here.

Page 23

1 Q. Are you taking something in lieu of that?
2 A. Yes. The BuSpar.
3 Q. Do you have any -- did you have any side effects
4 from the gabapentin?
5 A. I don't remember. I don't think so. I think that
6 was one of the meds that really didn't give me too many
7 side effects.
8 Q. Did the Wellbutrin give you side effects?
9 A. Yes.
10 Q. Do you know what those were?
11 A. Well, at first it made me not be able to sleep and
12 then after that it made me sleep a lot.
13 Q. Have you had any physical injuries in the ten
14 years prior to your incarceration at Cibola?
15 A. Acute kidney injury.
16 Q. What was that in relation to?
17 A. I had taken too much acetaminophen.
18 Q. Why were you taking acetaminophen?
19 A. Just for pain and stuff like that, but I don't
20 know I -- I didn't know they were such a high milligram.
21 Q. Did you seek treatment for that injury?
22 A. Yeah. I was air lifted medevaced from Grants to
23 Albuquerque to UNM.
24 Q. Is UNM a hospital?
25 A. What was that?

Page 24

1 Q. Is UNM a hospital?
2 A. Yes, ma'am.
3 Q. Is that -- what does that stand for, University of
4 New Mexico?
5 A. I believe so.
6 Q. Do you know how long that hospitalization was?
7 A. I'm not sure, but it was at least I think a week
8 and a half, two weeks.
9 Q. Have you had any other hospitalizations in that
10 ten years prior to Cibola other than the kidney injury?
11 A. No.
12 Q. Any other physical injuries other than the kidney
13 injury?
14 A. No.
15 Q. Have you ever done any illegal drugs?
16 A. Yes.
17 Q. What have you done?
18 A. I used to use meth, and that's pretty much it.
19 Meth. And I tried other things but mostly just that.
20 Q. What else did you try?
21 A. Pills like oxycodone. Weed. I tried heroin I
22 think a time or two.
23 Q. How many times did you try the oxycodone?
24 A. Meth?
25 Q. I think you said oxycodone, correct? You tried

Page 25

1 that?
2 A. A couple of times, not too many times.
3 Q. How many times did you try weed?
4 A. A lot of times.
5 Q. So would you use that frequently, say, once a
6 week?
7 A. Yes.
8 Q. How do you use that? Do you smoke it?
9 A. Yes.
10 Q. How many times did you try heroin?
11 A. Just a couple times.
12 Q. Going back, I think you said you used to do meth,
13 correct?
14 A. Yes.
15 Q. And how do you use that?
16 A. I smoked it, snorted it, injected it.
17 Q. When you say inject, you mean an IV?
18 A. Yes.
19 Q. A needle?
20 A. Yes.
21 Q. And how often would you use meth?
22 A. Before I got locked up I would do it a lot.
23 Q. And can you quantify a lot? How many times per
24 week?
25 A. Probably once a day.

Page 34

1  Los Lunas.
2  Q. Is that also the Central New Mexico Correctional
3  Facility?
4  A. Yes. Central. There you go.
5  Q. And that was October of 2018 until when?
6  A. October 2018 -- I left in November.
7  Q. So you were only there for a short time?
8  A. Two weeks exactly.
9  Q. And then have you been in Lea County Correctional
10 Facility since 2018, November 2018?
11 A. Yes, ma'am.
12 Q. Let's talk a little bit more about the second
13 degree murder charge. You were ultimately convicted of
14 second degree murder for a murder that occurred on
15 September 30, 2013, correct?
16 A. Correct.
17 Q. And that was the murder of Walter Salazar?
18 A. Yes, ma'am.
19 Q. And you were 16 at the time?
20 A. Yes, ma'am.
21 Q. Can you talk to me a little bit about what
22 happened on September 30th? What were you doing that day?
23 A. Doing some yard work.
24 Q. Where?
25 A. San Mateo.

Page 35

1  Q. Were you at Walter Salazar's house doing yard
2  work?
3  A. No, it was at somebody else's house.
4  Q. Do you know whose house it was?
5  A. I don't recall the name. She's an older lady. I
6  forget her name.
7  Q. And who were you with?
8  A. Rudy Valencia.
9  Q. Were you engaged to help Mr. Salazar with the yard
10 work?
11 A. Yes.
12 Q. So was he the contractor performing the work?
13 A. I guess you could say that.
14 Q. Just explain to me in your own words why was
15 Mr. Salazar there if it was not his house.
16 A. Why was he at the other person's house?
17 Q. Yeah. You said you were doing yard work at an
18 older woman's house, correct?
19 A. Oh, yes. Yeah. She was paying him to cut
20 branches and mow the lawn and stuff like that.
21 Q. And then Mr. Salazar asked you and Rudy to help
22 him?
23 A. Yes.
24 Q. Were you told how much you were going to be paid
25 for that service?

Page 36

1  A. Yes.
2  Q. How much?
3  A. $20.
4  Q. Was that $20 each?
5  A. It was supposed to be but he only gave us $20
6  altogether.
7  Q. Did you finish the yard work?
8  A. Yes.
9  Q. What happened when you finished?
10 A. They were in town cashing the check to pay us and
11 we were just driving around waiting for him to return.
12 Q. Who's "they"?
13 A. Walter Salazar and Gilbert Salazar.
14 Q. So Walter Salazar and Gilbert -- who's Gilbert
15 Salazar?
16 A. His cousin.
17 Q. So Walter and Gilbert went into town to do what?
18 A. To cash a check that she had given him.
19 Q. And where were they returning to?
20 A. Where were they what?
21 Q. Where were they returning to?
22 A. San Mateo.
23 Q. Let me just finish my question. I apologize. It
24 was probably a bad one.
25     When you finished the yard work, were you

Page 37

1  still at the older woman's house?
2  A. No.
3  Q. Where were you?
4  A. Driving around San Mateo.
5  Q. And were you supposed to meet Mr. Salazar
6  somewhere to get paid?
7  A. At his house. We were waiting for him to return
8  back from Grants.
9  Q. And when Mr. Salazar returned to his house, what
10 happened?
11 A. He gave us $20.
12 Q. And then what happened?
13 A. And then we left and we went back.
14 Q. Why did you go back?
15 A. Because Rudy said that he was mad that he only
16 gave us $20 instead of $20 each.
17 Q. I know this is probably sensitive. If you need to
18 take a break, just let me know. I should have mentioned
19 that at the beginning.
20     But then what happened? What ultimately
21 happened?
22 A. Rudy shot Walter.
23 Q. And where were you?
24 A. In my vehicle.
25 Q. Where did you go after the murder?

Page 38

1  A.  I ran home.
2  Q.  Were you questioned by the police that day?
3  A.  Yes, ma'am.
4  Q.  Where were you questioned by the police?
5  A.  My mother and father's house.
6  Q.  Do you remember what time of day that was?
7  A.  I believe it was like 2:00 in the morning.
8  Q.  What did you say to the police?
9  A.  I just told them what happened.
10 Q.  Which was?
11 A.  That we went to do yard work, he only gave $20,
12 Rudy got mad, we went back, Rudy shot Walter.
13 Q.  Were you arrested that day?
14 A.  Yes, ma'am.
15 Q.  What jail were you taken to?
16 A.  McKinley County Juvenile Detention Center.
17 Q.  And I believe you said you were there for three
18 days?
19 A.  Yes, ma'am.
20 Q.  And you were released on your parents'
21 recognizance with an ankle monitor?
22 A.  Yes.
23 Q.  Were you charged at that time?
24 A.  Yes.
25 Q.  And again, did you say you were charged with an

Page 39

1  open count of murder?
2  A.  Yes, ma'am.
3  Q.  Do you know whether Rudy Valencia was arrested?
4  A.  Yes -- not immediately.  They didn't get him until
5  a few days later.
6  Q.  Do you know why that is?
7  A.  He took off.
8  Q.  Do you know where he went?
9  A.  To the mountains or something.  I don't know.
10 Q.  Did you know he took off?
11 A.  Yes.
12 Q.  But he was arrested a few days later?
13 A.  Yes.
14 Q.  Did you know he was arrested a few days later?
15 A.  Yes.
16 Q.  How did you know that?
17 A.  I seen him at the juvenile detention center.
18 Q.  Do you know what he was charged with?
19 A.  I believe the same thing, open count.
20 Q.  Was he released as well?
21 A.  No.
22 Q.  He was held?
23 A.  Yes.
24 Q.  How did you know that?
25 A.  I didn't know that immediately afterwards, but I

Page 40

1  knew because my uncle -- he lived with my uncle.
2  Q.  So your uncle told that you he was not released
3  from the McKinley County Juvenile Detention Center?
4  A.  Correct.
5  Q.  Did you end up going to trial for the murder?
6  A.  Yes, ma'am.
7  Q.  A jury trial?
8  A.  Yes, ma'am.
9  Q.  Were you convicted?
10 A.  Yes, ma'am.
11 Q.  What were you convicted of?
12 A.  Second degree murder.
13 Q.  Do you remember when that was?
14 A.  When I was convicted?
15 Q.  Yeah.
16 A.  2017.
17 Q.  Were you incarcerated during the trial?
18 A.  No.  Not until the last day of trial.  I absconded
19 so they arrested me.
20 Q.  And when you say abscond, did you not show up to
21 court?
22 A.  Yes.
23 Q.  Did that have to do with the escape from McKinley
24 County?
25 A.  No.

Page 41

1  Q.  This is different?
2  A.  Yes, ma'am.
3  Q.  So could you just explain this a little bit more
4  to me?  So my understanding from your testimony is that you
5  were arrested and picked up and taken to McKinley County
6  Detention Center, correct?
7  A.  Yes, ma'am.
8  Q.  I apologize.  I'm trying to get a timeline.  So
9  you were there for about three days, right?
10 A.  At first, yes.  When the accident occurred, yes.
11 Q.  So once the incident occurred you were there for
12 about three days and then you were released up until the
13 time of trial, correct?
14 A.  Yes, ma'am.
15 Q.  And then during the trial you did not show up for
16 one of your days of court?
17 A.  Yes.
18 Q.  And then you were held in custody because you did
19 not show up to court?
20 A.  Yes.  I turned myself in so they held me in
21 custody.
22 Q.  Where were you held at that time?
23 A.  McKinley County.
24 Q.  Thank you.
25     Was Rudy still there?

Page 42

1    A.  No.  He was already -- he's already 18 so they
2    wouldn't hold him in juvie, no, ma'am.
3    Q.  Do you know where he went?
4    A.  I wasn't sure.  I wasn't sure whether he had gone
5    to trial yet or not.
6    Q.  But you knew he wasn't released?
7    A.  Yes.
8    Q.  What day, if you remember, of your trial did you
9    abscond?
10   A.  I'm not sure what the date was.
11   Q.  But the trial continued?
12   A.  Yes.
13   Q.  And you said you were convicted of second degree
14   murder?
15   A.  Yes.
16   Q.  Did you testify against Rudy Valencia during your
17   trial?
18   A.  No.
19   Q.  And you said you don't know if his trial was
20   before or after yours?
21   A.  Yes, I was not sure.
22   Q.  Do you know if he went to trial?
23   A.  I don't believe he did.
24   Q.  Did he take a plea agreement?
25   A.  I think so.

Page 43

1    Q.  How do you know that?
2    A.  I'm not too sure.  That's just what I have heard
3    after the fact being locked up, people that were locked up
4    with him.
5    Q.  But you said during that time you said you know he
6    was locked up?
7    A.  Yes, ma'am.
8    Q.  After you were convicted, were you held in
9    custody?
10   A.  Yes.
11   Q.  Were you sentenced?
12   A.  Yes.
13   Q.  Do you know when that was?
14   A.  Ten years.
15   Q.  I'm sorry.  When?
16   A.  Oh.  It was right before I got -- it was the day I
17   got sent to the county jail.
18   Q.  If I represent to you that that's June 11, 2018,
19   does that sound correct?
20   A.  I believe so.  Somewhere around there.  Yes.  I'm
21   not sure of the exact date, but yes.
22   Q.  I think we are starting to talk over each other so
23   I will wait until you're done, and if you do the same thing
24   for me.
25       You said you were sentenced to ten years?

Page 44

1    A.  Yes, ma'am.
2    Q.  And you were sentenced to Cibola County
3    Correctional Center?
4    A.  Yes.
5    Q.  Did you sustain any mental health injuries because
6    of the murder?
7    A.  Yeah.  I would say yes.
8    Q.  What were those?
9    A.  I had nightmares, PTSD, things like that.
10   Q.  Trouble sleeping?
11   A.  Yes.
12   Q.  Loss of appetite?
13   A.  What was that?
14   Q.  Loss of appetite?
15   A.  No.
16   Q.  Just nightmares, PTSD, and trouble sleeping?
17   A.  Yes.  And anxiety, yes.
18   Q.  And anxiety?
19   A.  Yes, ma'am.
20   Q.  Did you seek treatment for those things?
21   A.  They really don't give you much treatment when you
22   are incarcerated, but yes, I did.
23   Q.  I will ask you about that a little bit later.  I
24   think now is a good stopping point.  Do you want to take
25   maybe about a ten-minute break?

Page 45

1    A.  Yes.  I need to use the restroom.
2        MS. ROOD:  Excellent.  Then ten minutes?  Is
3    that okay?
4        THE WITNESS:  Yes, ma'am.
5        (Recess taken 9:53 a.m. - 10:04 a.m.)
6    BY MS. ROOD:
7    Q.  Mr. Romero, I just want to follow up on a couple
8    questions I spaced before we move on.
9        You said Rudy was living with your uncle at
10   the time of the murder, correct?
11   A.  Yes, ma'am.
12   Q.  And you also mentioned that when you got to the
13   McKinley County Detention Center when you were picked up
14   right after the arrest that you saw Rudy there, correct?
15   A.  Yes, ma'am.
16   Q.  Where did you see him?
17   A.  Booking.
18   Q.  Working?
19   A.  Booking.  In the booking.
20   Q.  Booking.  Thank you.
21       Did you speak with him?
22   A.  No.
23   Q.  Do you remember when that was?
24   A.  Do I remember when what was?
25   Q.  When that was.

Page 54

1  And, I apologize, I am looking at Bates number
2  CoreCivic_Romero002286, and I'm looking at this third box
3  by the Classification on Page 5. Do you see that?
4  A. Yes, ma'am.
5  Q. Did you say something?
6  A. The caseworker was asking if I needed it to be
7  enlarged but I told her it was fine.
8  Q. I can zoom in if you need.
9  A. No, I can see.
10  Q. In the middle of this paragraph, the paragraph
11  reads: "If you have any special needs, you should advise a
12  staff member as soon as possible."
13     Did I read that correctly?
14  A. Yes.
15  Q. "Special needs include, but are not limited to,
16  drug/alcohol addictions, physical barriers/needs, history
17  of mental illness, gang affiliation, seperatee needs,
18  medical limitations, history of sexual victimization, or
19  any thoughts of harming yourself or others."
20     Did I read that correctly?
21  A. Correct.
22  Q. I will have a couple more questions for you a
23  little bit later on about the inmate handbook.
24     During the intake process, were you
25  classified at some point? Did you receive -- do you know

Page 55

1  what I'm talking about? Did you receive a classification?
2  A. Yes, I believe so.
3  Q. Do you remember who classified you?
4  A. No, I don't.
5  Q. Does Ana Padilla sound familiar?
6  A. Like I said, my memory is not too good.
7  Q. She is a named defendant in this matter.
8  A. Okay.
9  Q. Do you recall whether you were asked a series of
10  questions by Ms. Padilla during the classification process?
11  A. I don't really recall too much.
12  Q. Can you see my screen?
13  A. Yes.
14  Q. This document is called the Booking Observation
15  Report, Bates stamped CoreCivic_Romero000016. Have you
16  seen this document before?
17  A. Yes. My lawyer had shown it to me a while back.
18  Q. Is this your signature in the bottom left corner
19  of the document?
20  A. It looks like it.
21  Q. Yes?
22  A. It looks like it, yes.
23  Q. I just want to go through and ask you a couple
24  questions about this document, okay?
25  A. Yes, ma'am.

Page 56

1  Q. I'm looking at No. 10 here. It says: "Have you
2  been incarcerated before? List date, locations and
3  length."
4     Did I read that correctly?
5  A. Correct.
6  Q. And you answered yes, crossed out no, JDC,
7  correct?
8  A. Correct.
9  Q. And what is JDC? What were you referring to?
10  A. Juvenile detention center.
11  Q. I'm now looking at No. 30. The question reads:
12  "Are you aware of anyone at this facility that you have
13  problems with or cannot be housed with for any reason?
14  Specify reason and concerns."
15     Did I read that correctly?
16  A. Correct.
17  Q. You answered no, correct?
18  A. Correct.
19  Q. I'm looking at No. 35. The question you were
20  asked was: "Do you have problems with anyone incarcerated
21  at another jail or prison? If yes, list names, locations,
22  and issues."
23     Did I read that correctly?
24  A. Correct.
25  Q. You answered no, correct?

Page 57

1  A. Correct.
2  Q. I'm looking at No. 40. You were asked: "Are you
3  a co-defendant of anyone incarcerated at this facility or
4  any other jail or prison? If yes, list names and crimes."
5     Did I read that correctly?
6  A. Correct.
7  Q. You answered no, correct?
8  A. Correct.
9  Q. And to be clear, that question did not ask whether
10  Rudy Valencia was housed at Cibola, correct?
11  A. Correct.
12  Q. The question asked whether you had any
13  co-defendants incarcerated at any facilities, correct?
14  A. Correct.
15  Q. ==And at that time you previously testified that you==
16  ==knew Rudy Valencia was in jail somewhere, correct?==
17  A. ==Correct.==
18  Q. Did you know he was at Cibola?
19  A. I did not.
20  Q. I'm looking at 55. You were asked: "Have you
21  ever escaped or attempted to escape from a secure jail or
22  prison? If yes, list locations and dates."
23     Did I read that correctly?
24  A. Correct.
25  Q. You crossed out no and put yes, Gallop JDC,

1 correct?
2  A. Correct.
3  Q. And that was in reference to the escape after you
4 were convicted from the murder charge, correct?
5  A. Correct.
6  Q. I'm looking at 70 now. You were asked: "Do you
7 have any medical mental health problems and are you
8 currently taking medications?"
9      Did I read that correctly?
10  A. Yes, ma'am.
11  Q. And you crossed out no and you answered yes,
12 anxiety/bipolar/PTSD, correct?
13  A. Correct.
14  Q. And to confirm, you suffered from those symptoms
15 when you arrived at the facility, correct?
16  A. Correct.
17  Q. And I know you previously testified that you
18 suffered from anxiety. I don't believe you mentioned
19 bipolar. Were you diagnosed with bipolar previously?
20  A. Yes, ma'am.
21  Q. Who diagnosed you with that illness?
22  A. Dr. Susan Cave.
23  Q. Cave?
24  A. Yes. Susan Cave.
25  Q. So you sought treatment for that condition?

1  A. They gave me a psychiatric evaluation and that's
2 who evaluated me.
3  Q. Who gave you a psychiatric evaluation?
4  A. The State of New Mexico.
5  Q. And what time did the State give you that?
6  A. I'm not sure of dates and stuff. I'm not sure.
7  Q. Was this after you were charged with murder?
8  A. Yes.
9  Q. I'm going to show you another document now. It's
10 entitled ICAS Initial Custody Classification and it's Bates
11 stamped CoreCivic_Romero00014.
12      Have you seen this document before?
13  A. I believe my lawyer showed it to me maybe. Yeah,
14 I think so.
15  Q. And if I scroll to the second page, about middle
16 of the way down it says inmate/resident signature. Do you
17 recognize that signature?
18  A. Yes.
19  Q. Is that your signature?
20  A. I believe so.
21  Q. And it's dated June 12, 2018?
22  A. Right.
23  Q. So that was the day that you were classified?
24  A. It must have been, yes.
25  Q. And this was a document that was completed during

1 your classification process, correct?
2  A. Right.
3  Q. And I'm looking about middle of the way down the
4 page now at Section C. Do you see where my cursor is?
5  A. Yes.
6  Q. You were asked about history of escape or attempts
7 to escape in relation to your classification, correct?
8  A. Correct.
9  Q. And you stated that you had attempted to escape,
10 correct?
11  A. Correct.
12  Q. And it was within the past year, correct?
13  A. Right.
14  Q. And because of that you were given a score of 3?
15  A. Right.
16  Q. And you were also asked about prior felony
17 convictions at Section E, correct?
18  A. Right.
19  Q. And because of that you were given a score of 1?
20  A. Right.
21  Q. You were also asked about drug and alcohol
22 history, correct?
23  A. Correct.
24  Q. And your answer was occasional or recreational
25 use, correct?

1  A. Correct.
2  Q. And you were given a score of 1 because of that?
3  A. Correct.
4  Q. And based on your answers you were given a total
5 custody score of 12, correct?
6  A. Correct.
7  Q. And I will scroll to the second page. Based on
8 your total custody score, you were classified as high
9 custody level, correct?
10  A. Right.
11  Q. And you reviewed and signed off on this document
12 at the end of the classification process, correct?
13  A. Right.
14  Q. Which is indicated by your signature in the middle
15 of the page?
16  A. Correct.
17  Q. During the classification process, you did not
18 notify Ana Padilla who was the case manager classifying you
19 that you had any co-defendants, correct?
20  A. Right.
21  Q. And you did not notify Ms. Padilla who was the
22 case manager classifying you that you had any enemies,
23 correct?
24  A. Correct.
25  Q. Did you consider Rudy Valencia to be an enemy?

Page 62

1   A.  No.
2   Q.  And you did not notify Ana Padilla that you had
3   any seperatee requirements during the classification
4   process, correct?
5   A.  Correct.
6   Q.  And you did not notify her during classification
7   that there were any inmates that you could not be safely
8   housed, correct?
9   A.  Correct.
10  Q.  Did you consider Valencia someone with whom you
11  could not be safely housed?
12  A.  No.
13  Q.  Did you agree with your classification results?
14      MR. FLORES:  Hang on one second.  I will
15  object to the foundation.
16      Go ahead and answer, Ruben.
17      THE WITNESS:  I would say -- I don't know.  I
18  would say probably no because I never had prior violence in
19  the institutions and stuff like that.
20  BY MS. ROOD:
21  Q.  Did you intend to appeal them, the classification
22  results?  Did you intend to appeal them?
23  A.  I didn't know you could do that.  I didn't know
24  that back then.
25  Q.  So no?

Page 63

1   A.  No.
2   Q.  After classification, were you eventually moved to
3   a housing unit?
4   A.  Yes, ma'am.
5   Q.  Do you know what time of day that was?
6   A.  I don't remember.  I don't know.
7   Q.  If I ballpark it, was it before or after lunch?
8   A.  I'm not sure.  I don't remember.
9   Q.  I will ask one more time.  Do you think it was in
10  the morning?
11  A.  I don't remember really what time of day it was.
12  Q.  I understand this was a while back.  Do you know
13  which housing unit you were moved to?
14  A.  300, I believe.
15  Q.  If I represent to you that it was the 400 unit, do
16  you have any reason to dispute that?
17  A.  Oh, 400, correct.  400.
18  Q.  400 A-pod.  Does that sound correct?
19  A.  Correct.
20  Q.  And how did you get from the booking holding cell
21  to your housing unit?
22  A.  I walked over there.
23  Q.  Were you escorted?
24  A.  Yes.
25  Q.  When you arrived at unit 400 A-pod, did you

Page 64

1   recognize any inmates?
2   A.  Daniel Mariano.
3   Q.  So you saw Daniel Mariano?
4   A.  Yes.
5   Q.  Did you see Matthew Wax?
6   A.  I did see him but I didn't know him.  I never met
7   him before.
8   Q.  Did you see Rudy Valencia?
9   A.  No.
10  Q.  Were you greeted by the other inmates when you got
11  to the housing unit?
12  A.  By Daniel Mariano, yes.
13  Q.  Like hey, what's up?
14  A.  Correct.
15  Q.  Were inmates walking around the housing unit when
16  you got there or were they locked in?
17  A.  Yeah, I believe -- no.  They were not locked down.
18  Q.  They were walking around?
19  A.  Yes.
20  Q.  What did you do when you got to the housing unit?
21  Were you taken to a cell?
22  A.  Yes, I took my blankets and stuff to my cell.
23  Q.  Do you happen to know what cell you were in?
24  A.  I don't remember.  I don't know.
25  Q.  Can you just describe the setup of the housing

Page 65

1   unit for me?  Maybe I can figure out where your cell was.
2   Describe the setup of unit 400 A-pod to me.  Was there like
3   a dayroom in the housing unit?
4   A.  Right.  Yes.
5   Q.  What else do you remember about the housing unit?
6   A.  There were phones.  Top tier, bottom tier.
7   Q.  Tables and chairs in the middle of the dayroom?
8   A.  Yes.
9   Q.  Did the cells line the out -- like the exterior of
10  the housing unit?
11  A.  Correct.
12  Q.  So that all the cells you -- if you were standing
13  in the dayroom you could see all of the cells?
14  A.  Correct.
15  Q.  Was your cell on the bottom tier or the top tier?
16  A.  I believe it was on the bottom.
17  Q.  Did the cells have bars on them?
18  A.  Yes.
19  Q.  Did you spend time in the dayroom on June 12,
20  2018?
21  A.  Yes.
22  Q.  Did you see Rudy Valencia when you were in the
23  dayroom?
24  A.  I didn't.
25  Q.  Did you speak with Rudy Valencia in the dayroom on

Page 66

1  June 12th?
2  A.  No.
3  Q.  Did you sit with him at a table by chance in the
4  dayroom on June 12th?
5  A.  No.
6  Q.  Do you remember being interviewed by a CoreCivic
7  investigator after the June 12th incident that's the
8  subject of this case?
9  A.  I don't.
10  Q.  If I represent to you that they conducted an
11  investigation and spoke with you, do you have any reason to
12  dispute that?
13      MR. FLORES:  Object to foundation.
14      Go ahead, Ruben.
15      THE WITNESS:  Yes, I do, because I was so
16  beat up that I didn't know which way was up, which way was
17  down.  I didn't know where I was at, I didn't know what
18  time it was.  I didn't know nothing.
19  BY MS. ROOD:
20  Q.  Understood.
21      During that interview, do you recall that you
22  were asked why you did not tell the caseworker who
23  classified you that you had a co-defendant at the facility?
24  A.  No.
25      MR. FLORES:  Again, I will just object to the

Page 67

1  content of the interview questions.
2      Go ahead, Ruben.  You can answer.
3      THE WITNESS:  No.
4  BY MS. ROOD:
5  Q.  And you answered I did not think that was
6  important, correct?
7  A.  I don't know.  I don't recall that.
8  Q.  You were also asked why when you saw your
9  co-defendant in the pod you did not tell the officer,
10  correct?
11  A.  What was that?
12  Q.  During this interview you were also asked why,
13  when you saw your co-defendant in the pod, you did not tell
14  the officer.  Does that sound familiar?
15  A.  I don't recall that.
16  Q.  And your answer to that question was you thought
17  it would be okay?
18  A.  I don't recall that.
19  Q.  Did you see Daniel Mariano while you were in the
20  dayroom before the incident on June 12th?
21  A.  Yes.
22  Q.  Did you speak with Daniel Mariano?
23  A.  Yes.
24  Q.  What did you say to him?
25  A.  Nothing.  I asked him what's up, how he was doing,

Page 68

1  how was his family.
2  Q.  Did he tell you that Rudy Valencia was in that
3  housing unit?
4  A.  No.
5  Q.  Did you speak with Matthew Wax in the dayroom
6  before the incident on June 12th?
7  A.  Yes.
8  Q.  What did you say to him?
9  A.  Nothing.  He just came up to me and asked me how
10  long they gave me and I told him.
11  Q.  Did you meet him for the first time in that
12  housing unit?
13  A.  Correct.
14  Q.  How did you meet him?  Did you just introduce
15  yourself?
16  A.  He walked up to me.
17  Q.  And do you recall what he said to you?
18  A.  Yeah.  He just asked me how long they gave me.
19  Q.  Is that something inmates commonly ask each other
20  when you are new to the housing unit?
21  A.  Yes, ma'am.
22  Q.  Do you recall whether you ate lunch in the housing
23  unit that today?
24  A.  I don't.
25  Q.  While you were at Cibola, do you remember where

Page 69

1  they served lunch for inmates?
2  A.  Where did they serve lunch?
3  Q.  Yeah.  Was it in the housing unit?
4  A.  I don't know.  I would say yes, but just because I
5  know that because of being housed in a different unit
6  afterwards.  I knew they brought lunch to the pods.
7  Q.  And did inmates eat in the dayroom?
8  A.  Yes.
9  Q.  Were you allowed to eat in your cell?
10  A.  Yes.
11  Q.  So inmates would come out into the dayroom at
12  lunchtime to eat their food?
13  A.  Yes.
14  Q.  There was a detention officer assigned to unit 400
15  A-pod on June 12th, correct?
16  A.  Right.
17  Q.  When you got to your housing unit on June 12th,
18  did you notify him you had any co-defendants?
19  A.  No.
20  Q.  Did you notify him that you had any enemies that
21  you could not be safely housed with?
22  A.  No.
23  Q.  Did you notify him that you had any seperatee
24  requirements?
25  A.  No.

Page 70

1  Q. Do you recall being informed at intake that you
2  could bring any concerns to any member of like -- of the
3  housing unit staff?
4  A. Like I said, I really don't recall too much of the
5  intake process.
6  Q. I want to talk to you a bit about the incident
7  itself, okay?
8  A. Okay.
9  Q. Where were you located prior to the incident?
10 Were you in the dayroom?
11 A. Yes.
12 Q. Where did the incident take place?
13 A. In one of the cells on the top tier.
14 Q. Do you know whose cell that was?
15 A. I don't know what the number was. I don't know.
16 Q. Who. Not the number.
17 A. What is it?
18 Q. I say who's cell was it, not the number.
19 A. I don't know. I don't know whose cell it was. I
20 know that Daniel took me in there, though.
21 Q. If I represent to you that that was Daniel
22 Mariano's cell, do you have any reason to dispute that?
23 A. No.
24     MR. FLORES: Foundation.
25

Page 71

1  BY MS. ROOD:
2  Q. If you were in the dayroom, was that on the bottom
3  floor of the housing unit?
4  A. Yes.
5  Q. And you said Daniel Mariano's cell was on the
6  second tier?
7  A. Yes.
8  Q. How did you get up to his cell? Did he call you
9  up there?
10 A. Yes.
11 Q. And you voluntarily went up there?
12 A. Yes.
13 Q. Why did you go up there?
14 A. Because he was a longtime friend of mine.
15 Q. Understood.
16    Were his cell bars covered by anything?
17 A. What was that?
18 Q. Were the bars of his cell covered by anything?
19 A. Yes.
20 Q. What were they covered by?
21 A. I believe it was towels, and I say that only
22 because I had seen the pictures of them hanging towels up.
23 Q. And you saw that the bars were covered before you
24 entered the cell?
25 A. I did not. At the time I did not. After the fact

Page 72

1  when I seen the pictures I could see they did that, but at
2  the time I didn't.
3  Q. So you don't recall seeing the bars covered?
4  A. No.
5  Q. Were you permitted to go into other inmates' cells
6  at Cibola?
7  A. I'm not sure. I believe so.
8  Q. Was anyone else in Daniel Mariano's cell when you
9  went in there?
10 A. No.
11 Q. What happened when you went inside his cell?
12 A. Oh, I don't remember, Miss. I just know they beat
13 the hell out of me. I know that.
14 Q. Do you recall whether another inmate joined --
15 came into the cell after you?
16 A. I don't.
17 Q. Do you recall what happened inside the cell?
18 A. I don't.
19 Q. I think you -- I apologize. I think you just
20 testified that they beat you. Is that accurate?
21 A. Yes.
22 Q. And do you know how long that lasted?
23 A. I know that it was a while, but just because of
24 the papers that I got.
25 Q. What papers were those?

Page 73

1  A. Whenever my lawyer, when he seen me, he brought me
2  those papers and stuff.
3  Q. Do you recall what the papers were? Are they
4  papers from CoreCivic?
5  A. Yes.
6  Q. And do they describe the incident? Or what do the
7  papers say?
8  A. Yes. They just described the incident, yes.
9  Q. And you are not sure how long it lasted?
10 A. No.
11 Q. Do you remember whether you tried to fight back?
12 A. No. All I know is it felt like a long time.
13 Q. How did you get out of the cell? Do you remember?
14 A. I don't.
15 Q. Do you remember where you went after you left the
16 cell?
17 A. I don't.
18 Q. Do you recall going to the sally port of the
19 housing unit after the incident?
20 A. I don't.
21 Q. Do you recall whether someone called for help?
22 A. Do I recall if somebody called for help?
23 Q. Yes. Like a CoreCivic employee? Did a CoreCivic
24 employee call for help if you recall?
25 A. No, I don't recall that.

Page 78

1   Q. I am going to bring up one of the medical records
2   from the hospital, and that was produced by your attorneys.
3   Can you see my screen?
4   A. Yes.
5           MS. ROOD: Adam and Mike, for your reference
6   that was produced by plaintiff. This is Bates stamped
7   ROMERO 000314.
8   BY MS. ROOD:
9   Q. Mr. Romero, do you see the top left corner it says
10  Cibola General Hospital Emergency Record?
11  A. Yes.
12  Q. And then on the top right corner it says Romero,
13  Ruben, E. Is that you?
14  A. Yes.
15  Q. And is that your date of birth, 8-21-1991?
16  A. 1999, yes.
17  Q. Thank you for catching that.
18          And then about middle of the way down it
19  says: "Impression. There is no CT evidence of
20  intracranial traumatic injury."
21          Did I read that correctly?
22  A. Yes.
23  Q. Do you know if they provided you any treatment for
24  your injuries?
25  A. I don't remember, Miss. I really don't.

Page 79

1   Q. Were you discharged from the hospital?
2   A. I believe so.
3   Q. Do you happen to know what date or how long you
4   were there?
5   A. I don't. I have no idea how long I was there.
6   Q. Are you claiming any of the injuries you obtained
7   from the incident are permanent?
8   A. Yes.
9   Q. Did a medical provider tell you that your injuries
10  were permanent?
11  A. Not physical injuries. But mental injuries, yes.
12  Q. A medical provider told you that your injury was
13  permanent?
14  A. Oh, no -- yeah, no, they said that it would
15  probably be like that, yes, for the rest of my life, yes.
16  Q. I'm sorry, who's "they"?
17  A. He doesn't work here no more, but he was a mental
18  health guy. I don't know what it was. Mental health
19  something, though.
20  Q. When you say "here," you are talking about where
21  you are currently incarcerated, Lea County Correctional
22  Facility?
23  A. Yes, ma'am.
24  Q. And someone told you what was permanent?
25  A. That probably the nightmares and things that I

Page 80

1   have and not being able to breathe at night.
2   Q. Okay. A medical provider at Cibola General
3   Hospital. Did one of those providers tell you that your
4   injuries were permanent?
5   A. I don't know. I don't remember anything about
6   that.
7   Q. Did a medical provider at the RDC Central New
8   Mexico Correctional Facility tell you you had permanent
9   injuries?
10  A. No.
11  Q. Other than the individual that you just mentioned,
12  did someone else at Lea County Correctional Facility tell
13  you your injuries were permanent?
14  A. No.
15  Q. Do you have any medical records saying that the
16  injuries you sustained were permanent?
17  A. No, I don't believe so.
18  Q. What do you allege that you cannot do now as a
19  result of the incident?
20  A. I can't sleep at night sometimes. When I sleep I
21  have dreams that I'm dying at night. I have dreams that
22  I'm being tortured. And I have a lot of pain in my sleep.
23  I have a lot of -- everything in my dream feels real pain.
24  You know what I'm saying?
25  Q. Vivid dreams?

Page 81

1   A. Yes.
2   Q. I know we mentioned a little bit about the
3   investigation into the incident that CoreCivic conducted,
4   correct?
5   A. Right.
6   Q. And I believe you stated you do not recall the
7   investigation?
8   A. I don't.
9   Q. Were you asked to provide an incident statement by
10  the facility after the incident?
11  A. I don't know, Miss.
12  Q. Do you recall refusing to provide an incident
13  statement?
14  A. I don't.
15  Q. Where were you housed after the incident at
16  Cibola?
17  A. That's when I was housed in 300.
18  Q. And what's 300?
19  A. A different housing unit.
20  Q. Do you want to take a break, Mr. Romero? Are you
21  okay to keep going?
22  A. I'm okay.
23  Q. After Cibola, where were you moved?
24  A. After Cibola County?
25  Q. Yes.

```
1  GRIFFIN GROUP INTERNATIONAL -ERRATA SHEET - CHANGES IN TESTIMONY
2  3200 East Camelback Road Suite 177 Phoenix, Arizona 85018
3  Romero vs Core Civic-Ruben Emilio-Romero-May 27, 2022
4  Errata & Signature due no later than the July 8, 2022.
5
7     PAGE  LINE  FROM                              TO
8     ____  ____  _____   _____
9     ____  ____  _____   _____
10    ____  ____  _____   _____
11    ____  ____  _____   _____
12    ____  ____  _____   _____
13    ____  ____  _____   _____
14    ____  ____  _____   _____
15    ____  ____  _____   _____
16    ____  ____  _____   _____
17    ____  ____  _____   _____
18    ____  ____  _____   _____
19    ____  ____  _____   _____
20    ____  ____  _____   _____
21    ____  ____  _____   _____
22    ____  ____  _____   _____
23    ____  ____  _____   _____
24    [signature]                                   7-6-22
25          SIGNATURE OF WITNESS                    DATE
```

```
STATE OF ARIZONA    )
                    )    ss.
COUNTY OF MARICOPA  )
```

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[X]  Review and signature was requested; any changes made by the witness will be attached to the original transcript.
[ ]  Review and signature was waived/not requested.
[ ]  Review and signature not required.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

DATED at Phoenix, Arizona, this 2nd day of June, 2022.

/s/ Wilma A. Weinreich_
WILMA A. WEINREICH
Certified Stenographer
Arizona CR No. 50976

\*     \*     \*     \*     \*

I CERTIFY that GRIFFIN GROUP INTERNATIONAL has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

/s/ Pamela A. Griffin_
GRIFFIN GROUP INTERNATIONAL
Registered Reporting Firm
Arizona RRF No. R1005