Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RUBEN ROMERO,

                Plaintiff,

-vs-               NO: 1:21-cv-00544-KG-CG

CORE CIVIC INC., et al.,

                Defendant.


REMOTE ZOOM DEPOSITION OF CHARLES KEETON

July 20, 2022
9:00 a.m.


    PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  ALYSSA QUIJANO
          ATTORNEY FOR PLAINTIFF

REPORTED BY:  Jan Gibson, CCR, RPR, CRR
             Paul Baca Court Reporters
             500 Fourth Street, NW - Suite 105
             Albuquerque, New Mexico 87102

**EXHIBIT 1**

Page 6

1  before you answer so we're not speaking over each
2  other because it makes the record a little
3  confusing, okay?
4      A.  Yes.
5      Q.  And you had a little bit of an internet
6  connection issue when you first joined.  You froze
7  on my end.  I don't know if it was my internet or
8  yours, but if that happens again, if I freeze on
9  your end, my audio cuts out, wave me down.  I will
10  do the same.  We want to make sure that we're not
11  talking when no one can hear us, okay?
12      A.  Yes.
13      Q.  And then your lawyer from time to time or
14  Mr. Jahner may object.  You're also an expert for
15  Mr. Jahner.  He may object to the questions I ask,
16  either to the form or foundation for the questions.
17  Those are for the record.  They aren't meant to stop
18  you from answering or influence your testimony, so
19  I'll ask you to answer my question unless your
20  lawyer explicitly tells you not to answer, okay?
21      A.  Yes.
22          MR. JAHNER:  Ms. Quijano, speaking of that
23  and just to keep things moving, are you comfortable
24  with any objection that is interposed by Mr. Lee
25  also applying to me?

Page 7

1          MS. QUIJANO:  Yeah, that's fine, Mike.
2          MR. LEE:  And vice versa, just so that
3  we're not both needing to object.
4          MR. JAHNER:  Thank you.
5          MS. QUIJANO:  Fine.
6          MR. LEE:  You read my mind, Mike.
7      Q   (By Ms. Quijano) And I do expect this will
8  take some time today.  I will try to give you a
9  break every hour.  Every hour we will take about a
10  ten-minute break.  At 10:00 o'clock we will break
11  until 10:10 and so on throughout the day, but if you
12  need a break on top of that, let me know.  We can
13  take a break any time.  The only caveat is if I've
14  asked you a question, answer the question and then
15  we will take a break, okay?
16      A.  Yes, understood.
17      Q.  Okay.  I want to talk to you a little bit
18  about the previous depositions that you have taken.
19  How many times, if you know, have you been deposed?
20      A.  The only one that comes to mind was some
21  years back and it was in a -- I was a fact witness
22  in an employment case that involved the U.S.
23  Marshals Service when I was warden at Central
24  Arizona Detention Center.  And that deposition was
25  taken actually at our attorney's firm there in

Page 8

1  Chandler, Arizona.  It was in person.
2      Q.  This is when you were warden of that
3  facility?
4      A.  Yes.  It would have been, gosh, 2014
5  somewhere, '15 somewhere, somewhere in that time
6  frame.
7      Q.  Okay.  And were you named as a defendant
8  in that lawsuit or were you only a fact witness?
9      A.  I was not named.  I was only a witness.
10      Q.  And you didn't testify as an expert in
11  that case?
12      A.  I did not.
13      Q.  Have you ever testified as an expert
14  witness before?
15      A.  No.
16      Q.  So I'm going to ask, but it seems obvious,
17  so you've never been qualified as an expert in
18  court?
19      A.  No.
20      Q.  What, if anything, have you reviewed in
21  preparation for your deposition today?
22      A.  I reviewed a file furnished to me by our
23  attorney, by Mr. Lee.  That included the
24  classification records for Mr. Romero,
25  classification records for the other inmates

Page 9

1  involved in this incident, and it had also the
2  plaintiff's expert witness statement and the
3  investigation report, and I reviewed the relevant
4  post orders that were in place at the time for both
5  Intake and for the housing unit along with the
6  review of the general orders.  And that's what's
7  coming to mind right now.  What was included was a
8  pretty substantial file.
9      Q.  Have you reviewed any security footage
10  related to the incident?
11      A.  I did, yes, the video of the incident.
12      Q.  Anything else that comes to mind that you
13  have reviewed in preparation for your deposition or
14  your testimony?
15      A.  I reviewed Mr. Peterson's transcript from
16  his deposition and Ms. Padilla's transcript from her
17  deposition.
18      Q.  Okay.  Have you reviewed Mr. Romero's
19  deposition transcript?
20      A.  I have not.
21      Q.  And have you formed opinions in this case?
22      A.  Yes.
23      Q.  And are those -- I'm going to share my
24  screen.  If you can't see this at any time, let me
25  know.  I'm going to share my screen and attach the

3 (Pages 6 to 9)

Page 10

1  Defendant's Expert Disclosure Statement as Exhibit 1
2  to your deposition.
3         (Note: Exhibit 1 marked.)
4     Q.  Can you see that?
5     A.  I can.
6     Q.  Okay. Have you reviewed this document?
7     A.  I have.
8     Q.  Okay. And are the opinions that you hold
9  in this case reflected in this document?
10    A.  They are.
11    Q.  Are there any opinions that you intend to
12 testify about that aren't reflected in this
13 document?
14    A.  No.
15    Q.  Okay. So I want to go through this
16 statement with you piece by piece in just a minute
17 and go through each of your opinions, but I want to
18 get a little bit of a background from you. Some of
19 this is contained in this report. I understand that
20 you have been employed at CoreCivic for 19 years?
21    A.  That's correct, yes.
22    Q.  I'm going to stop sharing and go back to
23 it so I can see you a little better. What was your
24 first position within CoreCivic 19 years ago?
25    A.  Warden.

Page 11

1     Q.  Of which facility?
2     A.  Dawson State Jail in Dallas, Texas.
3     Q.  I'm sorry, say that one more time because
4  it cut out.
5     A.  Sure. Dawson State Jail in Dallas, Texas.
6     Q.  And how long were you the warden of that
7  facility?
8     A.  From 2003 until 2009.
9     Q.  Okay. Did you hold any other positions in
10 that jail?
11    A.  No.
12    Q.  And why did you leave Dawson State Jail?
13    A.  I was asked to move by the company to
14 become warden of Central Arizona Detention Center in
15 Florence, Arizona in 2009.
16    Q.  Okay. How long were you the warden of
17 that facility?
18    A.  From 2009 until 2016.
19    Q.  Any other positions held with that
20 facility?
21    A.  No, ma'am.
22    Q.  And then after 2016, why did you leave
23 that facility?
24    A.  I was asked to go to the La Palma
25 Correctional Center in Eloy, Arizona as warden.

Page 12

1     Q.  And how long were you the warden of that
2  facility?
3     A.  From 2016 to 2019.
4     Q.  And in 2019 why did you leave that
5  position?
6     A.  I was promoted to managing director, the
7  position I'm currently in, in late 2019. I believe
8  it was in November. And I have been in that
9  position since with the company.
10    Q.  You've held the position of managing
11 director just under three years?
12    A.  That would be correct, yes.
13    Q.  And before you worked for CoreCivic where
14 were you working?
15    A.  I worked for the Texas Department of
16 Criminal Justice prior. I began as a correctional
17 officer, worked up through the ranks -- sergeant,
18 lieutenant, captain, major, then warden.
19        I was promoted to warden in 1994 of a
20 500-bed state prison facility in Breckenridge,
21 Texas. In 1995 I was promoted to a larger facility
22 in Lubbock, Texas, the Monford facility. And in
23 1998 I was again promoted to a maximum security
24 state prison in Beaumont, Texas called the Stiles
25 Unit.

Page 13

1     Q.  Okay.
2     A.  I left the state in 2000, went to work for
3  MTC for a brief time as warden of Dawson State Jail.
4  MTC is another company, private prison provider.
5     Q.  I just want to clarify, Management
6  Training Corporation is the --
7     A.  That's correct, yes. Management Training
8  Corporation is correct.
9     Q.  And you were warden of their facility for
10 how long?
11    A.  For three years until I came to work for
12 CoreCivic, at that time CCA.
13    Q.  Have you ever -- I'm sorry, repeat for me
14 again, where did you work as a warden for MTC?
15    A.  At Dawson State Jail.
16    Q.  Okay.
17    A.  In Dallas.
18    Q.  So was that facility taken over by
19 CoreCivic in 2003?
20    A.  It was. CoreCivic actually won the
21 contract for that facility and hired me and left me
22 there as warden.
23    Q.  Okay. And so for three years you worked
24 for MTC. At that time CCA won the contract and kept
25 you onboard as warden?

4 (Pages 10 to 13)

Page 82

1  Q. And what information did Ms. Padilla rely
2  upon in making her classification decision?
3  A. To my understanding, what I just listed.
4  Q. Sorry, what was it that you listed? I
5  thought that was a general statement but what did
6  she rely upon?
7  A. She had the information, the booking
8  sheets and face sheets, she had the listings on that
9  and she had the interview with the party being
10 classified and then there was the availability of
11 newmexicocourts.gov.
12 Q. Did she review the newmexicocourts
13 information?
14 A. I believe so.
15 Q. I don't remember her testifying to that so
16 let me just pull up her deposition. Give me just
17 one second.
18     MR. LEE: I think what you are looking for
19 is Pages 58 and 59 where she testified that the
20 practice of Cibola was to look someone up on
21 nmcourts, and that was done every time.
22     MS. QUIJANO: I found that. I don't see
23 testimony that she actually did it.
24 Q. Did you see testimony, Mr. Keeton, that
25 Ms. Padilla did actually look at nmcourts in

Page 83

1  classifying Mr. Romero?
2  A. I don't remember verbatim that being
3  stated. I just know that is part of the practice
4  that's done.
5  Q. If she doesn't remember looking at
6  nmcourts specifically when classifying Mr. Romero,
7  would that have been a violation of policy?
8      MR. LEE: Object to form.
9  A. It would have been a violation of the
10 process. If she does not recall, I can't answer for
11 her whether she did specifically in this case or
12 not.
13 Q. But if she hadn't. If she testified or
14 testifies at trial she did not look at nmcourts or
15 doesn't know, if she failed to look at nmcourts
16 would that have been a violation of policy for
17 classification of inmates?
18     MR. LEE: Object to form.
19 A. Yes.
20 Q. And if she relied only on Mr. Romero's
21 reporting, would that have been up to the standards,
22 up to standard practice to only rely on Mr. Romero's
23 answers to the questionnaire?
24 A. As I've stated several times, she had the
25 information available to her in conjunction with

Page 84

1  Mr. Romero's statements. Mr. Romero's statements
2  are an important part but not the whole picture. I
3  don't know how to answer that any differently.
4  Q. I'm not asking what she had. But if her
5  classification decision was made only on reliance of
6  Mr. Romero's statements to her, would that have been
7  a violation of policy?
8      MR. LEE: Object to form.
9  A. It would not have been according to
10 practice, policy and procedure, no.
11 Q. And why is that?
12 A. Because of the need to look at the
13 information available, the need to have a discussion
14 and ask the questions of the person being classified
15 and base the decision on the picture gained by the
16 whole process, not just one component or the other.
17 Q. So safety and security of the institution
18 really relied on looking at the whole picture, not
19 just what the inmate gives them?
20 A. Everyone relies on us doing the initial
21 classification consistently with the applicable
22 standard.
23 Q. And in this case, of course, Mr. Romero
24 was housed with the co-defendant; is that right?
25 A. Yes.

Page 85

1  Q. And that co-defendant wasn't identified by
2  Defendant Padilla during classification?
3  A. Yes.
4  Q. Yes, he was not identified?
5  A. It's the way you asked the question,
6  ma'am.
7  Q. I just want to clarify for the record. He
8  was not identified as a co-defendant of Mr. Romero,
9  Mr. Valencia was not?
10 A. No.
11 Q. Okay. Based on a review of the
12 information, was any co-defendant noted in
13 Mr. Valencia's file?
14 A. I would like to look at the file. I
15 don't --
16 Q. Have you reviewed Mr. Valencia's file?
17 A. I have. I don't -- I'm not able -- I've
18 reviewed a lot of documents in the last, you know,
19 few hours, yesterday and today, so I don't remember
20 specifically the answer to that question. I'll be
21 happy to look and see.
22 Q. Absolutely. I can pull that up. I'm just
23 trying to clarify what you reviewed. When is the
24 first time you reviewed Mr. Valencia's file?
25 A. Yesterday.

Page 86

1  Q. Did you review his file prior to your
2  attorney's disclosure of your expert statement and
3  the testimony that you're expected to give?
4  A. I discussed the particulars with the
5  attorney, but no, I did not get a chance to review
6  the files until yesterday.
7  Q. Did you review any information prior to
8  the disclosure of the expert statement by your
9  attorney?
10  A. No.
11  Q. And so this statement that we're looking
12  at in Exhibit 1, this is not based on your
13  independent review of the information available?
14  A. It is based on my review of the facts as
15  described to me, and then subsequently after
16  reviewing the information in the files that I have
17  had a chance to review, my statement is my
18  statement.
19  Q. Okay. This statement, I just want to
20  clarify, is based on the information provided to you
21  by your attorney?
22  A. Yes.
23  Q. So you came to the conclusion that
24  Defendant Padilla classified Mr. Romero
25  appropriately prior to reviewing the classification

Page 87

1  information in her deposition?
2      MR. LEE: Object to form.
3  A. I came to the conclusions that I'm stating
4  this morning, that she reviewed him appropriately
5  per policy and standard through discussion and a
6  review of the information as I had time to review
7  it.
8  Q. So I'm sorry for my question. Your
9  opinion, as stated in the disclosure statement, that
10  opinion is one you came to before reviewing any
11  documents about the adequacy of the classification
12  by Defendant Padilla?
13  A. I did not get to review it all prior to
14  the statement being prepared.
15  Q. And the opinions that you hold as to the
16  conduct of Defendant Peterson, you came to those
17  conclusions as stated in the expert disclosure prior
18  to reviewing any of the evidence yourself?
19      MR. LEE: Object to form.
20  A. Yes. Prior to having it all reviewed,
21  yes.
22  Q. I would like to give you an opportunity to
23  review Mr. Valencia's file. This is labeled as
24  "Confidential" and "Attorney's Eyes Only" so we have
25  two options. One, I can send it to you and you can

Page 88

1  review it, I won't put it on the record or the
2  screen and I'm not going to attach it as an exhibit
3  to the deposition. Or we can take a quick break and
4  you can review it. We can just stay on and be off
5  the record. But I can either send it to you to
6  review off camera while we have questions or we can
7  go off record and just sit on the computer and let
8  you review it to refresh your memory. What would
9  you prefer? It's about 50 pages.
10      THE WITNESS: Mr. Lee?
11      MR. LEE: I think it would probably be
12  best to take a short break and give Mr. Keeton a
13  chance to look through that.
14      MS. QUIJANO: I will e-mail it to you,
15  Jacob, is that fine? Or do you want me to share the
16  screen and go off the record?
17      MR. LEE: Yeah, go ahead and E-mail it to
18  me.
19      MS. QUIJANO: Let's go off the record.
20      (Note: The deposition stood in recess at
21  11:35 to 11:47).
22  Q  (By Ms. Quijano) Back on the record. Now
23  that you have reviewed Mr. Valencia's file, do you
24  see a note that he had a co-defendant in this case?
25  A. I do not.

Page 89

1  Q. Is that something important for
2  classification staff at CoreCivic to note in his
3  file if there is a co-defendant?
4      MR. LEE: Object to form.
5  A. It would be important to note.
6  Q. And in this case Mr. Romero was
7  Mr. Valencia's co-defendant; is that right?
8  A. That's what I've learned, yes.
9  Q. And after Mr. Romero was booked into the
10  CoreCivic facility in Cibola County, he was attacked
11  by Mr. Valencia and other inmates?
12  A. Yes.
13  Q. And is that the kind of security risk
14  that -- or one of the kinds of security risks that
15  CoreCivic aims to avoid by understanding if there is
16  a co-defendant in the case?
17      MR. LEE: Object to form.
18  A. That is what CoreCivic attempts to avoid,
19  yes.
20  Q. So knowing if someone has a co-defendant
21  could avoid violence in the facility?
22      MR. LEE: Object to form.
23  A. Could.
24  Q. In your review of Mr. Valencia's
25  institutional file and other evidence in this case,

23 (Pages 86 to 89)

Page 138

1    Do you remember that in his testimony?
2       A.   Yes.
3       Q.   Do you, in your experience, in your
4    20-some years of experience in corrections,
5    recognize certain formations or congregations by
6    inmates to be an indication that something is going
7    to happen, that there is a security concern in
8    regards to an inmate?
9       A.   Yes.
10          MR. LEE:  Object to form.
11      Q.   So if someone in Unit Control or the pod
12   officer saw inmates congregating in that way, should
13   they have intervened to ensure the security of the
14   pod?
15          MR. LEE:  Object to form.
16      A.   If they determined that there was a
17   congregation that was a concern, yes, they should
18   have investigated.
19      Q.   And if they failed to investigate that
20   after seeing something that was concerning, a
21   concerning congregation by inmates, that would have
22   been a violation of the policy and standards?
23      A.   Yes.
24      Q.   Okay.  Are you being compensated in any
25   way additional to your salary by CoreCivic for your

Page 139

1    testimony in this case?
2       A.   No.
3       Q.   Is there anything that is contained in the
4    expert disclosure statement provided by the
5    defendant or anything outside of what we talked
6    about today and what's in the disclosure statement
7    that you plan to testify to at trial?
8       A.   No.
9       Q.   I want to take just about ten minutes to
10   review my notes.  I don't believe that I have any
11   other questions.  I want to make sure I asked
12   everything I need to ask today, so let's take a
13   ten-minute break and come back at 1:27.
14          (Note: The deposition stood in recess at
15   1:18 to 1:28).
16      Q   (By Ms. Quijano) I just have a few more
17   questions.  You testified earlier that you reviewed
18   the plaintiff's expert's report?
19      A.   Yes.
20      Q.   When did you review that?
21      A.   I reviewed it again yesterday.
22      Q.   When was the first time you reviewed it?
23      A.   I believe I got that one in advance of
24   some of the other documents to review.
25      Q.   Did you review that in advance of the

Page 140

1    disclosure statement being submitted by the
2    defendants?
3       A.   I don't think so.
4       Q.   Do you know Shannon McReynolds at all from
5    your work in corrections in New Mexico?
6       A.   No.
7       Q.   Do you have any opinion on his expertise
8    in this field?
9       A.   No.
10      Q.   Are there any parts of Mr. McReynolds'
11   opinion that you agree with?
12      A.   No.
13      Q.   Do you agree with his assessment of what
14   the ACA standards state?
15      A.   I don't agree --
16          MR. LEE:  Object to form.
17      A.   No.  I don't agree with his application of
18   the standards and some of the claims made about our
19   failure in this situation to be in compliance with
20   those standards.
21      Q.   Sorry, my question is a little more
22   specific.  Do you agree with what he in his reports
23   states the standards state?
24      A.   I don't disagree with the standards.  I do
25   not disagree with the standards, no.

Page 141

1       Q.   Do you agree he accurately relayed what
2    the standards state, what the actual standards are
3    in his report?
4       A.   Yes.
5           MR. LEE:  Object to form.
6       Q.   I do not have any further questions.  I
7    appreciate your time.  I pass the witness.
8                 EXAMINATION
9    BY MR. LEE
10      Q.   I have just a few follow-ups.  Mr. Keeton,
11   you have been asked earlier about the timeline when
12   you reviewed documents in relation to the disclosure
13   statement.  I just want to clarify.  Did you feel
14   like you had an understanding of the facts of the
15   case at the time you reviewed the disclosure
16   statement before it was served?
17      A.   Yes.
18      Q.   And you did review the disclosure
19   statement and confirm that those were opinions that
20   you held?
21      A.   Yes.
22      Q.   And was that based on your understanding
23   of the facts at that time?
24      A.   Yes.
25      Q.   Since that disclosure statement came out,

36 (Pages 138 to 141)

Page 142

1  have you had a chance to review in detail the
2  underlying documents about the incident?
3      A.  Yes.
4      Q.  Did that review change any of the opinions
5  that are stated in that disclosure statement?
6      A.  No.
7          (Note: Exhibit 5 marked.)
8      Q.  I'm going to share my screen with you
9  briefly when I get the right document.  So you
10 should have up in front of you Rudy Valencia's ICAS
11 form dated September 24, 2017.  Do you see that?
12     A.  Yes.
13     Q.  And you were asked a question just for the
14 record from Bates No. CoreCivic_Romero 1404 and
15 1405.  You were asked a question about this
16 "unassigned" here at the top for his most serious
17 current charge or offense, and you agreed before
18 that that ideally should have been filled in with a
19 statement of what his most serious current charge
20 was, correct?
21     A.  Yes.
22         MS. QUIJANO:  Objection to form.
23     Q.  Was Mr. Valencia, even though that was
24 left unsigned, was he given a score for severity of
25 current offense?

Page 143

1      A.  Yes.
2      Q.  What was that score?
3      A.  A 7.
4      Q.  Are you aware of any information that
5  suggests that 7 is an improper score for that
6  category?
7      A.  No.
8      Q.  And in the Section 2D, History of
9  Institutional Violence, was Mr. Valencia given a
10 score in that category?
11     A.  Yes.
12     Q.  What was that score?
13     A.  5.
14     Q.  Meaning that he had some prior behavior
15 not involving a weapon or resulting in serious
16 injury, correct?
17     A.  Yes.
18     Q.  Have you seen any information that would
19 suggest that that score is not correct?
20     A.  No.
21     Q.  What was the subtotal score -- what was
22 his total high-custody score based on this
23 evaluation?
24     A.  12.
25     Q.  And so under the scoring system, does a

Page 144

1  score of 12 mean that he should be housed in high
2  custody?
3      A.  Yes.
4      Q.  If you look down here, he received a total
5  custody score that was actually higher; is that
6  right?
7      A.  Yes.
8      Q.  At a score of 14 for his total custody
9  score, what custody level should Mr. Valencia have
10 been classified as?
11     A.  High.
12     Q.  And was he classified as high?
13     A.  Yes.
14     Q.  You also got some questions about the
15 population assignment not being filled in, and I
16 believe you testified that that's technically a
17 policy violation because that should have been
18 filled in; is that right?
19         MS. QUIJANO:  Form.
20     A.  Yes.
21     Q.  And similarly, with regard to the custody
22 level, is that a technical violation in that that
23 should have been filled in?
24     A.  Yes, the form should have been completed
25 there.

Page 145

1      Q.  To your knowledge and understanding, where
2  was Mr. Valencia housed at the time of the subject
3  incident?
4      A.  In high custody.
5      Q.  Was he housed appropriately according to
6  his computed custody level?
7      A.  Yes.
8      Q.  So do you see anything to suggest that
9  these technical policy violations resulted in
10 Mr. Valencia being housed somewhere he should not
11 have been?
12     A.  No.
13     Q.  You also got some questions about this
14 Final Population Assignment and Custody Level.  Do
15 you see that area down here at the bottom?
16     A.  Yes.
17     Q.  When is that area supposed to be filled
18 in?  Under what circumstances?
19     A.  Only in case of an override, and that is
20 the final determination that was made after an
21 override has been recommended.
22     Q.  So you had discussed with plaintiff's
23 counsel earlier what those non-discretionary and
24 discretionary override factors are, correct?
25     A.  Yes.