# EXHIBIT 1

**Declaration of C. Keeton**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

RUBEN ROMERO,

    Plaintiff,

vs.

CORE CIVIC, INC.,
CORE CIVIC OF TENNESSEE, LLC.,
WARDEN BRIAN KOEHN, ANA PADILLA,
and GARRICK PETERSON,

    Defendants.

No. 21-cv-00544-KG-KRS

## **DECLARATION OF CHARLES C. KEETON**

I, Charles C. Keeton, state the following based upon my personal knowledge.

1. I am over the age of 18 years old and competent to testify to the matters set forth in this Declaration.

2. I make this Declaration in support of CoreCivic Defendants' Response to Plaintiff's Motion to Exclude Testimony of Charles Keeton.

3. I make the statements in this Declaration based upon my personal knowledge and a review of relevant documents referred to herein and maintained by CoreCivic, Inc. ("CoreCivic") at the Cibola County Correctional Center ("CCCC") in the regular course of business. If called as a witness, I could competently testify to these facts.

4. The contents of this Declaration are true and correct to the best of my knowledge.

5. I am currently a Managing Director–Operations for CoreCivic and have held this position since November 2019.

6. I have been employed by CoreCivic since 2003 for approximately 20 years.

7. As a Managing Director, the Wardens/Facility Administrators of several correctional and detention facilities report directly to me, including CCCC.

8. My primary responsibility as Managing Director is to ensure that each facility in my division is operated in a safe, secure, and humane manner in compliance with the applicable contracts and federal, state, and local law.

9. Prior to becoming a Managing Director, I held multiple facility-level leadership positions with CoreCivic, including most recently as the Warden of La Palma Correctional Center ("LPCC").

10. Prior to joining CoreCivic, I spent 19 years with the Texas Department of Criminal Justice ("TDCJ"), during which time I was the Warden of three TDCJ facilities.

11. In total, I have spent over 25 years in corrections as Warden of six different facilities, three of which were CoreCivic facilities.

12. As a Managing Director and as a former Warden of both CoreCivic and TCDJ facilities, I am very familiar with the American Correctional Association ("ACA") and ACA standards.

13. As a Warden at various CoreCivic facilities, I worked hands-on with ACA standards daily, weekly, and/or monthly to ensure that CoreCivic's policies and procedures complied with those standards.

14. The Warden does the heavy lifting concerning ACA standards, as the Warden is required to be familiar with all applicable ACA standards, understand how those standards are implemented at the facility, and ensure that the facility continuously complies with those standards.

15. Part of my job responsibility as a Warden was to review changes to applicable ACA standards and review CoreCivic's policies and procedures to ensure that

the policies and procedures complied with the ACA's changes and/or implement changes to CoreCivic's policies and procedures so they complied with the ACA's changes.

16. Additionally, I was required to discuss any changes to policies and procedures with facility staff to ensure that those changes were known and, to the extent they required modifications of CoreCivic's policies and procedures at that facility, any changes were appropriately communicated to staff and implemented at the facility.

17. I also reviewed CoreCivic's policies and procedures in anticipation of a facility reaccreditation and/or audit.

18. Specifically, and as to audits, each facility is audited by ACA professionals every three years to ensure continued compliance with ACA standards.

19. Prior to each audit, the facility conducts a mock audit. Prior to mock and actual audits, I reviewed all applicable ACA standards and ensured the facility's policies and procedures were in compliance with ACA standards.

20. I also accompanied ACA auditors on audits through the facility and answered any questions the auditors had about facility operations and the facility's compliance with ACA standards.

21. I also voluntarily attended ACA panels (which meet twice per year) during my time as a CoreCivic Warden where I attended workshops, meetings, and events to further develop my knowledge of ACA standards and how best to ensure continued compliance with those standards at CoreCivic facilities.

22. Based on my experience in corrections and as a Warden, if a facility did not comply with ACA standards, the ACA would not accredit that facility.

23. Since 2001, CCCC has been accredited by the ACA.

24. If CCCC did not comply with ACA standards, it would not be accredited by the ACA.

25. But, because of its continuous implementation of policies and procedures that comply with ACA standards, CCCC has maintained its ACA accreditation for approximately 22 years.

**Plaintiff's Motion to Exclude Testimony of Charles Keeton**

26. I have reviewed and am familiar with Plaintiff's Motion to Exclude Testimony of Charles Keeton.

27. I am aware that Plaintiff alleges that, "[w]hen CoreCivic submitted its expert disclosure, Mr. Keeton had not yet seen or reviewed anything" and that I testified during my deposition that I "had not reviewed any relevant documents until the day prior to [my] deposition."

28. While the substantive discussions with CoreCivic's attorneys are privileged, in May 2022, I discussed the factual basis of this matter and the allegations pled in Plaintiff's First Amended Complaint with CoreCivic's attorneys.

29. Based on those discussions, I formed my own opinions in this case concerning CoreCivic Defendants' conduct. The opinions I formed were based on my understanding of the facts in this case. In forming those opinions, I relied on my 25 years of corrections experience and understanding of CoreCivic policies and ACA standards to analyze CoreCivic Defendants' conduct to determine whether their conduct complied with the relevant standard of care.

30. I then reviewed CoreCivic's Expert Disclosure Statement and confirmed that the opinions contained within the Statement were the opinions that I had formed following my discussions with counsel.

31. In preparation for my deposition, which was taken July 20, 2022, I reviewed relevant documents, including, but not limited to, Plaintiff's Amended Complaint; CoreCivic's Expert Disclosure Statement; Plaintiff's Expert Disclosure Statement and

4

Expert Report; CCCC Investigative Report; Plaintiff's Institutional File; Plaintiff's, Rudy Valencia's, Daniel Mariano's, and Matthew Wax's Initial Custody Classification forms; CCCC's 2018 ACA accreditation report; CoreCivic policies; Plaintiff's, Ana Padilla's, and Garrick Peterson's deposition transcripts; Milestone video and photos from the incident; training transcripts; and training materials.

32. My expert opinions concerning CoreCivic Defendants did not change after reviewing the above documents, especially where I was already aware of the factual basis of those opinions through my discussions with counsel.

## Shannon McReynolds' Opinions

33. I have reviewed and am familiar with the Declaration of Shannon McReynolds filed in support of Plaintiff's Motion to Exclude Testimony of Charles Keeton.

34. I am aware that Shannon McReynolds states that I "lack necessary understanding of the ACA standards required to be an expert in the field or [am] intentionally misstating the ACA standards."

35. As I previously stated, I am very familiar with ACA standards, CoreCivic's implementation of those standards at various CoreCivic facilities, including CCCC, and the facilities' continuous compliance with those standards as I worked hands-on with those standards daily, weekly, and monthly as a Warden and now as a Managing Director.

36. I am aware that Mr. McReynolds states that my opinion that "ACA standards would not require a classification review when an inmate commits an assault on another inmate" demonstrates "poor knowledge or clear misstatement" of ACA standard 4-ALDF-2A-31.

37. Contrary to Mr. McReynolds' opinion, ACA standard 4-ALDF-2A-31 does not require an inmate to be reclassified after an inmate assault.

5

38. ACA standard 4-ALDF-2A-31 provides: "The inmate classification process ensures periodic review of inmates' status, and revision of inmate status as needed in response to changes in inmate behavior or circumstances."

39. ACA standard 4-ALDF-2A-31 does not state that an inmate needs to be re-classified after an assault on another inmate. The standard provides only that the inmate classification process must ensure periodic reviews of inmates' classification status and revisions *as needed* based on inmate behavior or circumstances.

40. CoreCivic's policies and procedures comply with this, as CoreCivic conducts periodic reviews of inmates' classification statuses based on CoreCivic's contracts with its respective contracting agencies—e.g., Cibola County.

41. CoreCivic's policies and procedures also provide for periodic reviews and revisions of inmate classification statuses based on inmate behavior or circumstances.

42. An automatic review and/or reclassification of an inmate is not warranted each time there is an inmate-on-inmate assault.

43. One instance of an inmate-on-inmate assault does not necessarily trigger a review and/or reclassification of inmate classification status.

44. Reclassifications occur when the facility believes that an inmate is not classified in the correct custody level.

45. For example, if an inmate who is classified as low custody is involved in an inmate-on-inmate assault, then a review and/or reclassification of that inmate as moderate custody may be warranted, as he may need to be housed with a higher custody level.

46. However, if an inmate is properly classified, then a review and/or reclassification of that inmate's classification status may not be warranted, where he is already properly classified and housed in the correct custody level housing unit.

47. For example, if an inmate is properly classified as high custody and he is involved in an inmate-on-inmate assault, a reclassification may not be warranted where he is already appropriately classified as high custody and there is no higher custody level than high custody.

48. Moreover, a high custody inmate who is involved in an inmate-on-inmate assault would not be rehoused in segregation in lieu of general population.

49. The ACA has provided clear guidance that an inmate should not be housed in segregation long-term where the inmate can be managed in general population.

50. Just because an inmate is classified as high custody does not mean that he cannot be appropriately managed in general population. Indeed, that is why there is a high custody housing unit.

51. The bottom line is that if an inmate is appropriately classified, then the facility likely will not review and/or reclassify that inmate following every inmate-on-inmate assault.

52. The inmates at issue in this matter, Valencia and Wax, who were involved in one prior inmate-on-inmate assault, were not reclassified following the prior incident, as they were already appropriately classified as high custody at that time.

53. In accordance with ACA guidance, CCCC staff would not have housed Valencia or Wax in segregation long-term following that incident.

54. Once Valencia and Wax completed their time in disciplinary segregation, they were appropriately moved back to general population in the high custody housing unit for Cibola County male inmates, as they were properly classified as high custody, and there is no higher custody status than high custody.

55. CoreCivic's policies and procedures concerning inmate classification and reclassification were reviewed by the ACA during its initial accreditation and subsequent

audits, including in 2018, and ACA auditors found those policies and procedures to be in compliance with ACA standards, which necessarily includes standard 4-ALDF-2A-31.[1]

56. I am aware that Mr. McReynolds states that my opinion that "ACA standards do not require [National Crime Information Center ("NCIC")] searches to be conducted upon admission of a new inmate during the classification process" demonstrates "poor knowledge or clear misstatement" of ACA standard 4-ALDF-2A-21.

57. Contrary to Mr. McReynolds' opinion, ACA standard 4-ALDF-2A-21 does not require CoreCivic to conduct NCIC searches of inmates upon admission.

58. ACA standard 4-ALDF-2A-21 provides: "Admission processes for a newly admitted inmate include, but are not limited to," "[r]ecording basic personal data and information to be used for mail and visiting list"; "[c]riminal history check"; "[p]hotographing and fingerprinting, including notation of identifying marks or other unusual physical characteristics"; "[a]ssignment of a registered number to the inmate"; "[s]creening to detect signs of drug/alcohol abuse"; and "[i]nventory of personal property."

59. The plain language of ACA standard 4-ALDF-2A-21 does not require CoreCivic to conduct NCIC searches of inmates upon admission to its facilities.

60. ACA standard 4-ALDF-2A-21 requires only that the facility conduct a criminal history check, generally.

61. Mr. McReynolds, who has never worked in a private correctional facility, likely misunderstands that the NCIC criminal records database is available only to law enforcement agencies.

62. Because CCCC is a private correctional facility owned and operated by CoreCivic, CCCC staff do not have access to the NCIC database.

---

[1] In fact, the ACA found CCCC to be in compliance with 100% of mandatory standards. (Dkt. 168-2 at 5, ¶ 25.)

8

63. CoreCivic staff cannot conduct NCIC searches at any facilities throughout the entire county, yet all facilities are accredited by the ACA.

64. That is because each facility conducts a criminal history check of each inmate upon arrival to its facilities in accordance with ACA standards.

65. CCCC conducts a background check on Cibola County inmates by reviewing the nmcourts.gov portal, which provides information about an inmate's criminal history.

66. CCCC also conducts a background check by reviewing all paperwork provided by the arresting agency on the inmate, which may include information concerning the crime for which the inmate is incarcerated.

67. CCCC also conducts a background check by asking the inmate a series of questions concerning his prior criminal convictions.

68. These policies and procedures were reviewed by the ACA during CCCC's initial accreditation and subsequent audits, including in 2018, and ACA auditors found those policies and procedures to be in compliance with ACA standards, which necessarily includes standard 4-ALDF-2A-21.

69. I am aware that Mr. McReynolds also states that "[t]he purpose of taking fingerprints required by this standard is necessary precisely for the purpose of conducting NCIC background check. There would be no other legitimate reason to collect fingerprints if not for requesting an NCIC check."

70. However, there are numerous legitimate reasons to collect an inmate's fingerprints other than requesting an NCIC check, and the plain language of ACA standard 4-ALDF-2A-21, as described above, does not require CoreCivic to collect an inmate's fingerprints for the sole purpose of requesting an NCIC check.

71. Upon arrival to a facility, CoreCivic staff fingerprint an inmate through CoreCivic's fingerprint system as an identification tool.

72. Specifically, CoreCivic collects an inmate's fingerprints so that the facility can verify that an inmate is who he claims to be upon intake into a facility and during his assignment to a particular facility.

73. CoreCivic also collects an inmate's fingerprints so that CoreCivic can determine whether an inmate has previously been housed at any of its facilities, and, if he has, CoreCivic can collect information about that inmate to appropriately and safely classify and house that inmate.

74. Again, CoreCivic's policies and procedures concerning inmate intake into its facilities, including fingerprinting, were reviewed by the ACA during CCCC's initial accreditation and subsequent audits, including in 2018, and ACA auditors found those policies and procedures to be in compliance with ACA standards, which necessarily includes standard 4-ALDF-2A-21.

75. I am aware that Mr. McReynolds states that my opinion that "comingling inmates of different custody levels is incompliance [sic] with ACA standards" demonstrates "poor knowledge or clear misstatement" of ACA standard 4-ALDF-2A-30.

76. Contrary to Mr. McReynolds' opinion, my opinion is not based on a misunderstanding or misstatement of that standard.

77. ACA standard 4-ALDF-2A-30 provides: "There is a formal classification plan that starts at admission for managing and separating inmates, and administering the facility based upon the agency mission, classification goals, and inmate custody and program needs. The process uses verifiable and documented data about inmates. The classification system is used to separate inmates into groups that reduce the probability of assault and disruptive behavior. At a minimum, the classification system evaluates the following: [m]ental and emotional stability; [e]scape history; [h]istory of assaultive behavior; [m]edical status; [a]ge; and [n]eed to keep separate."

78. ACA standard 4-ALDF-2A-30 does not require that inmates be housed with inmates of the same custody level, only.

79. Rather, the standard requires that facilities develop a classification system that is used to separate inmates into groups that reduce the probability of assault and disruptive behavior.

80. CCCC complies with this requirement.

81. Specifically, the facility has developed a housing plan that is both approved by the facility Warden and in compliance with ACA standards (as evidenced by the fact that CCCC is accredited by the ACA).

82. CoreCivic's housing plan allows low custody inmates to be housed with either low or moderate custody inmates. High custody inmates may be housed with either high or moderate custody inmates. Low and high custody inmates are not permitted to be housed together.

83. Such a plan was designed to accommodate physical plant limitations and the various contracts of inmates/detainees that are housed at CCCC.

84. This model is utilized at numerous CoreCivic facilities across the country, all of which are accredited by the ACA.

85. This is also a standard practice across corrections agencies to house inmates of different custody levels—i.e., low with low or moderate and high with high or moderate—together.

86. As to CCCC, facility staff conduct individualized assessments to comply with ACA standard 4-ALDF-2A-30 to ensure that inmates are housed in such a way as to reduce the probability of assault and disruptive behavior, taking into account an inmate's mental and emotional stability, escape history, history of assaultive behavior, medical status, age, and need to keep separate.

87. Indeed, CoreCivic's initial classification assessment reviews an inmate's current and prior criminal offenses, escape history, institutional violence history, drug and alcohol use, age, education, and employment, all of which are used to determine an inmate's custody level and where to safely house that inmate.

88. Those factors are also viewed in conjunction with other restrictions that may bear on an inmate's custody level and where to house that inmate, including if the inmate is a sex offender, held without bail, has a high bail amount, has five or more years left to serve, has a felony detainer or warrant, has known management problems, suspected drug trafficker, current escape threat, serious violence threat, known gang affiliation, has threatened a government official, has prior good institutional conduct, or has isolated prior institutional misconduct.

89. These individualized assessments are used to determine whether inmates can be housed together or if there are any inmates with whom a particular inmate cannot be safely housed for any known reason.

90. The above factors dictate an inmate's custody level and where they can be appropriately and safely housed.

91. CoreCivic's policies and procedures concerning inmate classification and housing were reviewed by the ACA during its initial accreditation and subsequent audits, including in 2018, and ACA auditors found those policies and procedures to be in compliance with ACA standards, which necessarily includes standard 4-ALDF-2A-30.

92. I am aware that Mr. McReynolds states that my opinion that "ACA standards do not require emergency situations be documented in a permanent logbook, but permit they be documented 'through other means'" demonstrates "poor knowledge or clear misstatement" of ACA standard 4-ALDF-2A-11.

93. ACA standard 4-ALDF-2A-11 provides: "Correctional staff maintain a permanent log and prepare shift reports that record routine information, emergency situations, and unusual incidents."

94. Contrary to Mr. McReynolds' assertion, this standard does not require CoreCivic to document emergency situations in a housing unit logbook. Rather, it allows the facility to document emergency situations in a permanent log and/or shift reports.

95. A housing unit logbook is a book that contains handwritten entries by staff assigned to housing unit control rooms.

96. The main purpose of a housing unit logbook is to document all movement into and within a housing unit, any inmate codes, count, watch tours, and any notes necessary for the oncoming shift to review and be apprised of all relevant information for their shift.

97. CoreCivic utilizes an electronic incident reporting system to document all incidents, including emergency situations.

98. All incidents and emergency situations are documented in a 5-1 incident packet and maintained on the electronic incident reporting system, creating a permanent record of those incidents and situations.

99. The electronic incident reporting system allows for much more detailed reporting than housing unit logbooks.

100. The level of detail required to document and describe in detail an emergency situation is more appropriately recorded in the electronic incident reporting system, as it is a more secure system of maintaining sensitive information as opposed to handwritten notes in a housing unit logbook that are accessible by any staff who have access to the housing unit control room.

101. CoreCivic's policies and procedures concerning incident reporting were reviewed by the ACA during its initial accreditation and subsequent audits, including in 2018, and ACA auditors found those policies and procedures to be in compliance with ACA standards, which necessarily includes standard 4-ALDF-2A-11.

102. In any event, the subject incident was recorded in both CoreCivic's electronic incident reporting system and Unit 400-A's logbook.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

EXECUTED this 23rd day of March, 2023 in Brentwood, Tennessee.

_____
Director Charles C. Keeton