UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| RUBEN ROMERO, | ) | CASE NO:  1:21-cv-00544-KG-DLM |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Las Cruces, New Mexico |
| | ) | |
| CORE CIVIC, INC, ET AL, | ) | Friday, September 8, 2023 |
| | ) | |
| Defendants. | ) | (8:28 a.m. to 9:21 a.m.) |


MOTION HEARING


BEFORE THE HONORABLE DAMIAN L. MARTINEZ,
UNITED STATES MAGISTRATE JUDGE



<u>APPEARANCES</u>:          SEE PAGE 2


Court Reporter:          Recorded; LCR Digital

Clerk:                   IM

Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988






**Proceedings recorded by electronic sound recording;
transcript produced by transcription service.**

2

**APPEARANCES:**

For Plaintiff:              ALYSSA D. QUIJANO, ESQ.
                           Ives & Flores
                           925 Luna Cir. NW
                           Albuquerque, NM 87102
                           505-364-3858

For Defendants:             JACOB B. LEE, ESQ.
                           Struck Love Bojanowski & Acedo
                           3100 West Ray Rd.
                           Suite 300
                           Chandler, AZ 85226
                           480-420-1600

                           MICHAEL S. JAHNER, ESQ.
                           YLAW
                           4908 Alameda Boulevard NE
                           Albuquerque NM 87113

3

1      __Las Cruces, New Mexico, Friday, September 8, 2023; 8:28 a.m.__

2                              --oOo--

3              **THE COURT:**  Counsel, this is Judge Martinez on

4      21-cv-544, *Romero versus Core Civic, et al*.

5              First of all I'd like to thank you for allowing me to

6      move this hearing up a little bit.  I had something that came

7      up yesterday afternoon that requires me to leave the courthouse

8      in a while.

9              Ms. Rood, are you going to be arguing today?

10             **MS. ROOD:**  Good morning, Your Honor.  No, my

11     colleague, Jacob Lee, will be arguing today.

12             **THE COURT:**  Okay.  That was the only reason I was

13     asking to see if your camera was on.  If you're not arguing,

14     you don't need to have your camera on.

15             **MS. ROOD:**  No, I'm not and thank you, Your Honor.

16             **THE COURT:**  All right.  So Mr. Lee, you're here on

17     behalf of Core Civic and Ana Padilla.  Is that correct?

18             **MR. LEE:**  Correct, Your Honor.

19             **THE COURT:**  And Mr. -- I don't want to mispronounce

20     your name.  Is it Jahner (pronunciation)?

21             **MR. JAHNER:**  Your Honor, it's pronounced Jahner.

22             **THE COURT:**  Jahner.  Close but no cigar.

23             You're here on behalf of Mr. Peterson, correct?

24             **MR. JAHNER:**  I am, Your Honor.

25             **THE COURT:**  And Ms. Quijano, good morning.  You're

4

1  here on behalf of Romero?

2        **MS. QUIJANO:**  Good morning, Your Honor, I am.

3        **THE COURT:**  Counsel, the reason I called this hearing

4  is you may know Judge Gonzales referred this particular motion

5  to my chambers for proposed findings and recommended

6  disposition because one of the relief requested by Plaintiff is

7  a default judgment.  So I had a few questions related to the

8  briefing.  Hopefully it won't take long and we can get out the

9  PFRB to Judge Gonzales here within -- hopefully within the next

10  few days.

11        Ms. Quijano, I have some questions for you based on

12  my review of your briefs and they're really simple.  There's

13  maybe about seven questions I have.

14        **MS. QUIJANO:**  Yes, Your Honor.

15        **THE COURT:**  Could you articulate the exact prejudice

16  that your client has suffered, first as it relates to

17  Mr. Peterson and then as to Core Civic.  I don't want them put

18  together.  The briefing seems to put them in the same basket

19  but I see that there's two issues here.  One is Peterson's

20  testimony -- which is to me in my mind right now different than

21  the document issue.  So what prejudice has your client suffered

22  as it relates to Peterson's testimony?

23        **MS. QUIJANO:**  Yes, Your Honor, it's related

24  specifically to Defendant Peterson's false testimony produced

25  in his deposition.  That testimony, just to be clear on the

1    facts, was also produced as responsive to interrogatory answers

2    by Mr. Peterson that confirms the testimony that he provided in

3    the deposition.  And so the false answers and the false

4    testimony that he produced put Plaintiff at a disadvantage that

5    prevented Plaintiff from, one, following up on the discipline

6    that occurred prior to the attack.  All three instances of

7    discipline happened prior to the attack.  Plaintiff was not

8    able to ask questions about those instances such as to get

9    detail about the instances of discipline, all of which occurred

10   while Mr. Peterson was assigned to the pod in which he was

11   working on the day Mr. Romero was attacked in Unit 400.

12            And the inability for Plaintiff to follow up on that

13   information has, first, caused delay; and second, has prevented

14   Plaintiff from getting deposition testimonies, additional

15   discovery as needed from Mr. Peterson about his conduct, the

16   other instances in which he admitted in his -- in the

17   investigation that he fell asleep while on staff.  We have no

18   details of what those instances were, when they were, and if

19   those instances were on the day of the attack.  That is the

20   specific prejudice that Plaintiff has suffered related to

21   Defendant Peterson's dishonesty in this case.

22            **THE COURT:**  Okay.  And correct me if I'm wrong but

23   prior to that deposition, Judge Sweazea had ruled on a motion

24   to compel that Core Civic didn't have to produce Peterson's

25   personnel file, correct?

1         **MS. QUIJANO:**  Yes, Your Honor.  And at that time --

2    this case has been reassigned a couple of times.  It was Judge

3    Garza that ruled on that motion to compel.  And you're correct,

4    Your Honor, that decision happened I think exactly one week

5    prior to Mr. Peterson's deposition.  And without the benefit of

6    the personnel records, we didn't have any information about his

7    history of discipline, the date of his termination, and other

8    information related to Mr. Peterson's personnel file and

9    history at Core Civic, which is why it's difficult to untangle

10   the prejudice suffered by Mr. Peterson's actions and Core

11   Civic's actions.  A lot of it occurred in tandem when they were

12   both represented by the same counsel and at the same time.  But

13   you're correct, Your Honor, I had no information about his

14   personnel records, which as it also turns out from the

15   briefing, I understand the disciplinary records do not exist in

16   the personnel file --

17        **THE COURT:**  Right.

18        **MS. QUIJANO:**  -- they're maintained in a separate

19   place.  And so I don't know if I would have had that

20   information at his deposition.

21        **THE COURT:**  Okay but it wasn't until after Peterson

22   testified that he was terminated for falling asleep but that

23   was a time later than this incident that is the subject of the

24   litigation.  Then Judge Sweazea allowed you to get the

25   disciplinary records -- correct?  -- for Peterson, other people

working that day, going a year back to present.  Isn't that

correct?

        **MS. QUIJANO:**  It is, Your Honor.

        **THE COURT:**  Okay so --

        **MS. QUIJANO:**  And --

        **THE COURT:**  So at that time you had the records that

show that Peterson -- and an email you eventually get -- that

Peterson said that he fell asleep several times, that he was

disciplined.  I'm going to call it "disciplined" because it

says in the -- in Level 2 warning.  I'm not going to split

hairs, that's discipline.

        And then you received that.  You now have those

records.  How are you prejudiced in moving forward in a trial

now that you have records that establish that Mr. Peterson was

less than truthful in his deposition?  How does that prejudice

you moving into trial?

        **MS. QUIJANO:**  Your Honor, moving into trial we're

without the benefit of additional discovery on the practices

that Core Civic had.  We didn't have the opportunity to follow

up on important discovery related to the management at Core

Civic, the disciplinary procedures, what information that Core

Civic knew at the time of the attack related to Mr. Peterson,

other staff's conduct that they were aware of this, what others

in the case have testified to be a pervasive problem of

sleeping on the job.  That without this information that

1   confirms that there instances of written discipline, we were

2   unable to accomplish other discovery to build claims against --

3   one, against Mr. Peterson but most importantly against Core

4   Civic for their negligence that overlooked -- I'm sorry --

5   resulted in Mr. Romero being attacked on June 12th, 2019.

6   And --

7          **THE COURT:**  So then why isn't the more reasonable

8   avenue for the Court to take is to allow a re-deposition of

9   Mr. Peterson, should you choose -- it's up to you -- and a

10  deposition of 30(b)(6) witnesses of Core Civic so you can ask

11  those questions -- which I guess would be the subject of your

12  Monell claim within your 1983 claim -- whether there was a

13  custom or practice of allowing detention officers to sleep on

14  the job or not show up to work or go not be in the pod.  Why

15  wouldn't that be more adequate than the ultimate penalty of a

16  default judgment?

17         **MS. QUIJANO:**  Your Honor, the reason that that is not

18  a viable option is we have spent a better part of two years

19  trying to get this information out of Core Civic.  And at every

20  turn we have been given false information about what

21  information exists, when the records we're talking about were

22  produced, were created, when the instances of discipline

23  happened, and we have this has led us to nearly two years of

24  litigation where we are now unable to trust the information

25  that we're obtaining from the Defendants, from their corporate

1    witnesses that is accurate.  Plaintiff time and time again has

2    uncovered information that evidence --

3        **THE COURT:**  If you can't trust it and you put it

4    forward to a jury all these discrepancies -- and I'm not trying

5    to tell you how to practice or try your case -- but doesn't

6    that work for you in front of a jury?

7        **MS. QUIJANO:**  Your Honor, juries are fickle.  It may

8    work for us that this is -- this misinformation that's been

9    produced appears they're hiding information, perhaps we get an

10   adverse instruction at trial; however, it makes it difficult to

11   create a clean case to present to the jury about that

12   mismanagement.  We don't have the information that we need,

13   we'd have to rely on the jury really -- you know the jury

14   buying in on the idea that a corporation would do such conduct,

15   which is absolutely possible, I agree.

16       **THE COURT:**  Even if they turned over the information

17   on day one in their initial disclosures, you still have to rely

18   on what the jury is going to buy in the box when you try the

19   case, correct?

20       **MS. QUIJANO:**  Correct, Your Honor.

21       **THE COURT:**  Okay.  But my understanding is Core Civic

22   complied with Judge Sweazea's order to turn over those

23   disciplinary records.  That -- you know they were scattered

24   about the digital universe is a different story but they

25   complied with what Judge Sweazea told them to do, right?  They

1    turned them over.

2         **MS. QUIJANO:**  They did turn them over.  And during

3    that process, Your Honor, it took several months to turn over

4    the documents.  And during the process it appeared that records

5    were missing, we had to continually confer with counsel about

6    what records appeared to be missing based on other records.

7    They were not initially giving a complete compliance.  We

8    actually filed a motion with the court about their

9    noncompliance which we later withdrew after they finally

10   complied in completion with Judge Sweazea's order.  But by the

11   date that was before the Judge Sweazea's order and months

12   later, we still have not achieved a complete set of records

13   that were responsive to the order, which of course puts into

14   question whether we at this date have a full copy of all of the

15   records that exist.  And that has been the struggle throughout

16   this litigation.  We've conferred ad nauseum with counsel about

17   records that we believe to be responsive and relate relevant to

18   Plaintiff's claims, argued that they are not.  We have gone

19   through multiple rounds of motions to compel; and rather than

20   comply with their discovery obligations of records,

21   specifically related to discipline that Judge Sweazea in his

22   order determined are relevant to Plaintiff's claims against the

23   organization have at every turn attempted to hide them from us

24   which puts us at (inaudible) disadvantage.

25         **THE COURT:**  Well, time out.

1          **MS. QUIJANO:**  Yes?

2          **THE COURT:**  Hide.  What do you mean by "hide"?  I

3    mean sometimes it takes a while to get records, having

4    represented government entities in the past.  And sometimes a

5    lot of times in litigation there's this, you know, "We think

6    there might be this record here," and the other side says, "I

7    don't think there is but we'll go check."  Is that the type of

8    thing that's going on here?

9          **MS. QUIJANO:**  Your Honor --

10          **THE COURT:**  I mean you're saying "hide".  That shows

11    that somebody has the intent to actively not produce something.

12    So when you say they're actively hiding it, what evidence,

13    other than they complied and it might have taken them a little

14    bit longer than we would have liked with Judge Sweazea's order.

15    I mean is there some smoking gun evidence that says, "Shred all

16    of Peterson's PSNs."  And maybe not Peterson but something that

17    I can, other than argument, that I can look to to say that

18    counsel on this video and their clients actively, intentionally

19    hid records?

20          **MS. QUIJANO:**  Well Your Honor, the information that

21    is -- it goes back to March of 2022.  In argument to Judge

22    Garza, Core Civic and Peterson asserted that there -- he would

23    testify that there was no discipline.  He later testified he

24    was disciplined, and this happened months later, it was an

25    isolated incident, this is totally unrelated, it's irrelevant.

1    The records demonstrate that that was not true.

2           **THE COURT:**  Right.  And that --

3           **MS. QUIJANO:**  And information actually predated

4    (inaudible) Your Honor.

5           **THE COURT:**  And that's where counsel for Core Civic

6    and Peterson at the time said something to the effect, "Upon

7    information and belief, our client is going to testify

8    consistent with Ms. -- what is it?  -- Ms. Padilla that he has

9    never been disciplined."  If that's what you're talking about,

10   I have a whole line of questions for Defense Counsel on that

11   issue.  But other than Defense Counsel saying, "We believe --

12   or Mr. Peterson is going to say he was never disciplined or at

13   least not for this issue," is there anything else that you

14   have?

15          **MS. QUIJANO:**  Well later on in the briefing, Your

16   Honor, the Defendant corresponded between counsel.  They

17   continued to state well there was one instance of discipline

18   but it happened months later, it was an isolated event.  It

19   actually was three instances that we know of that occurred

20   prior to the event, which it appears from their briefing that

21   they acknowledged what happened relevant and responsive to

22   Plaintiff's discovery requests.  But they continued to push

23   forward a narrative that these were isolated incidents, they

24   happened after, they're totally irrelevant.

25          A simple review of the documents for their client

1   would have revealed that that was untrue.  And so Plaintiff did

2   have to spend months, more than a year trying to get

3   information related to something that should have been a simple

4   review of PSN's that would have discovered that, first,

5   Mr. Peterson was lying in his deposition; and second, that

6   relevant responsive information to Plaintiff's discovery

7   requests existed, rather than fight tooth and nail to withhold

8   them from Plaintiff until ordered by the Court to produce them.

9           This was an issue that should have been resolved by a

10  simple review of the documents in compliance with their

11  good-faith discovery obligations to review the information,

12  make reasonable efforts to ensure they produced relevant

13  documents.  They refused to do so and pushed forward this

14  narrative of a, you know, an isolated incident that happened

15  months later, there's nothing responsive, nothing predates

16  this, we don't have any information that is relevant to

17  Plaintiff's claims, when it's clear they haven't looked at the

18  documents and buried their head in the sand.  Refusing to look

19  at the documents to ensure nothing is relevant is different

20  than, "We looked at it and we missed it."

21          THE COURT:  Right.

22          MS. QUIJANO:  It's intentional refusal to even look

23  at the documents to ensure what they're addressing to Plaintiff

24  and to the Court is true.  And until ordered by the Court to

25  look at their own documents, they refused to produce anything.

1    And that puts us now outside of discovery with information that

2    had to be combed through.  They said, "This is all that

3    exists," and I said, "I have to communicate back because it

4    appear that this is all exists, here's some evidence that there

5    are more documents."  And to their credit, reviewed more

6    documents and produced more until I think February of this

7    year.

8             **THE COURT:**  And I understand that you say now it's

9    outside of discovery, the discovery window because it is but

10   again, I can open that discovery window.  And you're not

11   running up against a trial date because there's no trial date

12   in this matter.

13            **MS. QUIJANO:**  Yes, Your Honor, we are not running up

14   against a trial date but Mr. Romero was attacked at that

15   facility more than five years ago.  Reopening discovery will

16   take at least another year where --

17            **THE COURT:**  I don't see how it would --

18            **MS. QUIJANO:**  -- (inaudible)

19            **THE COURT:**  I don't see how it takes another year

20   when opening discovery would consist of a re-deposition of

21   Mr. Peterson, documents related to disciplinary records of

22   individuals and maybe policies related to discipline within

23   that facility, or within that corporation, and a 30(b)(6)

24   deposition.  Because this isn't reopening discovery from day

25   one, this is targeted reopening discovery on issues that you

1    think -- that you believe are critical to your case.

2           **MS. QUIJANO:**  Yes.  Your Honor and in experience in

3    this case, we've had to push discovery deadlines many times in

4    fights over that type of discovery.  We've already had --

5           **THE COURT:**  And Ms. Quijano, you know my policy about

6    discovery fights.  It's "call me on the phone and we will

7    decide what's going to happen instead of having to wait for

8    briefing".  You know that's my policy.

9           **MS. QUIJANO:**  I do, Your Honor, and we did do that

10   many times.  If the Court has (inaudible) the motion to compel

11   Plaintiff filed in March, that was after several months of

12   phone calls, emails, meetings with counsel for Core Civic, at

13   that time also Defendant Peterson.  It was months of

14   conferring, going through records, following up, having

15   exchanges of emails.  We did make many attempts to confer.

16   Call you up on the phone and resolve this but that has not been

17   a productive method in this case.  And I am worried that

18   reopening discovery will lead to more of the same, that we will

19   end up in a position where there's clearly relevant information

20   and we will go through the same types of fights about

21   information, what is relevant to Plaintiff's claim, will lead

22   to more briefing, more waste of the Court's time and motions to

23   compel briefing, hearings, informal discovery conferences with

24   the Court and will ultimately leave us in the same position

25   where we are not able to trust that Core Civic has produced the

1  documents that we are -- are relevant to our claims, are

2  responsive to the documents and clearly within their possession

3  and control.

4            And the courts of the Tenth Circuit, in particular,

5  looks at that as specific evidence of prejudice where

6  Plaintiff, after receiving false information from -- or parties

7  receiving false information from the opposing side, are now in

8  a position where they are unable to trust the discovery

9  process, and that is the real core of the prejudice that

10 Plaintiff has suffered in this case.  We are now in a position

11 where we are unable to trust Defendant Peterson's testimony and

12 the information that we're receiving from Core Civic is

13 actually responsive and complete.

14           **THE COURT:**  Okay.  Thank you, Ms. Quijano.  I'm going

15 to pivot to the Defendants.  Oh wait, one last question,

16 Ms. Quijano.

17           **MS. QUIJANO:**  Yes.

18           **THE COURT:**  Interrogatory Number One where you ask

19 about discipline -- I think it's (4)(f)-- you attached it as an

20 exhibit to your motion.

21           **MS. QUIJANO:**  Yes, Your Honor.

22           **THE COURT:**  It says where they refer his disciplinary

23 issue to "See my depo".

24           **MS. QUIJANO:**  yes.

25           **THE COURT:**  Did that ever get supplemented once the

1   records were produced that showed that Mr. Peterson admitted to

2   falling asleep on the job, had been written up several times?

3          **MS. QUIJANO:**  No, Your Honor.

4          **THE COURT:**  Okay, thank you.

5          So then my first question is going to be to counsel

6   for Mr. Peterson.  Sir, why has that not been supplemented?

7          **MR. JAHNER:**  Your Honor, I have -- my efforts to

8   reach Mr. Peterson in the wake of my entry have failed until

9   very recently.  I only spoke to him very recently, actually was

10  finally able to make contact with him and to discuss with him

11  the serious nature of this and his needing to be -- based on my

12  review of the hearing notice, he was going to be -- need to be

13  present at trial or at this hearing.  And so I can't supplement

14  discovery when I can't reach the client to execute a

15  verification or to confer with him.  I've done that now.  I

16  would like to be allowed to supplement and will do so

17  posthaste, Your Honor, now that I have actually finally reached

18  him.

19         **THE COURT:**  Okay.  When exactly did you become --

20  when exactly did you enter your appearance for Mr. Peterson?

21         **MR. JAHNER:**  I entered my appearance April 28th of

22  2022, Your Honor.

23         **THE COURT:**  2022?

24         **MR. JAHNER:**  Umm ... yes.

25         **THE COURT:**  2-0-2-2?

18

1          **MR. JAHNER:**  I believe that's right, yes.

2          **THE COURT:**  So like a year and --

3          **MR. JAHNER:**  Am I mistaken --

4          **THE COURT:**  -- five months ago?

5          **MR. JAHNER:**  I believe I entered on -- is it April

6    28th, 2022?  I'd have to pull --

7          **THE COURT:**  Sir, it's 2023.

8          **MR. JAHNER:**  I understand.

9          **THE COURT:**  2022 is what the docket shows.  So a year

10   and five months ago, you entered your appearance and you've

11   just now gotten ahold of your client?

12         **MR. JAHNER:**  Yes, Your Honor.  I've been unable -- I

13   was unable to reach him.

14         **THE COURT:**  Where is he?

15         **MR. JAHNER:**  I believe he is out in the Four Corners

16   area, in the Pinetop New Mexico area.

17         **THE COURT:**  Okay.  Well I have some questions for you

18   and I recognize that you were not at the deposition but you did

19   incorporate the entirety of Core Civic's motion -- or response

20   to the motion.  Do you recall that?

21         **MR. JAHNER:**  I -- yes, I was constrained to do that,

22   Your Honor, based on my circumstance.

23         **THE COURT:**  Well in that motion that counsel for Core

24   Civic filed -- or that response, my apologies -- it states that

25   "Plaintiff's counsel failed to ask critical follow-up

1    questions."  And that's in reference to your client's

2    disciplinary history.

3            In what way did they fail to ask critical follow-up

4    questions?  They asked if he had ever been disciplined and they

5    asked if he had ever fallen asleep before.  So in those two

6    questions, how -- what would be the critical follow-up

7    question?

8            **MR. JAHNER:**  Well he testified, I think he was very

9    candid with them about falling asleep.  He did not --

10           **THE COURT:**  Wait a second, wait a second.  You just

11   stated he was very candid to counsel when he -- regarding

12   falling asleep.  This is the question on page 13 of his

13   deposition, line 17.

14           "Had you ever fallen asleep on the job before that?"

15   And the "before" was the reason he was fired.

16           And your client said no.

17           How is that being candid when your client worked for

18   four months for Core Civic; and right before he got fired, they

19   investigated him, and he testified -- or he at least stated, at

20   Core Civic Romero Bates Stamp 004046:

21           "Officer Peterson admitted that he had fallen asleep

22           a few times at work."

23           How is that being candid?

24           **MR. JAHNER:**  Your Honor, all I can say is this.  We

25   have a young man who was 19 who worked four months, had a --

1    worked for four months, was terminated, was not deposed until

2    four years later.  He -- the only evidence that I think is

3    existing on this record is that he was not recalling clearly,

4    which is understandable after a four-month stint that was

5    probably unpleasant for him and a termination that was

6    unpleasant for him as a teenager and trying to put everything

7    behind him and move on.  And then four years later sit as a

8    nervous young man at a deposition and do his best to answer the

9    questions placed before him, misremembering dates clearly but

10   telling -- telling counsel that, "Yes, I fell asleep on the

11   job."

12         **THE COURT:**  And do you know if Mr. Peterson was

13   prepared for his dep -- prepped for his deposition or did he

14   just walk in cold?

15         **MR. JAHNER:**  Your Honor, I was not present.

16         **THE COURT:**  But you don't have any information that

17   you've gained in the transfer of the file on whether he was --

18   he sat down -- somebody sat down with him and prepared him for

19   his deposition?

20         **MR. JAHNER:**  I did not make specific inquiry into

21   that.

22         **THE COURT:**  Okay.

23         **MR. JAHNER:**  I recognize my colleagues on the other

24   side are very skilled and I'm sure that that happened.

25         **THE COURT:**  Okay.  I'm going to talk to -- is it

1   Mr. Lee?

2           **MR. LEE:**  Yes, Your Honor.

3           **THE COURT:**  Mr. Lee, your team there that you have I

4   think four lawyers on this case -- or at least that's what my

5   records show --  how many times has that team, that group of

6   attorneys represented Core Civic and its employees?

7           **MR. LEE:**  I couldn't give you a number, Your Honor.

8           **THE COURT:**  Is it more than five?

9       **MR. LEE:**  Yes.

10          **THE COURT:**  More than 10?

11          **MR. LEE:**  Yes.

12          **THE COURT:**  How many lawsuits in the state of New

13  Mexico, the District of New Mexico?

14          **MR. LEE:**  Many.

15      **THE COURT:**  Twenty-one?

16          **MR. LEE:**  Certainly more than that.

17          **THE COURT:**  Okay so -- and that's Core Civic as a

18  corporation and their employees?

19          **MR. LEE:**  Yes.

20          **THE COURT:**  Sometimes just the employee by themself?

21          **MR. LEE:**  Sometimes.

22          **THE COURT:**  So when they get sued, I would assume

23  you're familiar with personnel files that are maintained by

24  Core Civic in that representation?

25          **MR. LEE:**  You know I thought I was, Your Honor.  And

1   when I requested the personnel files, I assumed that if there

2   was disciplinary, it would include that.  And when we got Mr.--

3          THE COURT:  So you'd never heard of this separate PSN

4   file that exists?

5          MR. LEE:  At the time we were requesting these files,

6   no, I wasn't aware of that, Your Honor.

7          THE COURT:  So where were disciplinary records before

8   that?  Were they just always in the personnel file?

9          MR. LEE:  I don't recall a case in which I'd had that

10  particular issue come up, Your Honor.

11         THE COURT:  Do you know what a "shadow file" is?

12         MR. LEE:  I mean I could probably guess as to what it

13  is.  I'm not aware of any --

14         THE COURT:  Law enforcement, they generally have

15  personnel files all over the place.  There's one within the

16  department, it's not the official one, and there's one at HR.

17  And then IA has sort of a personnel file that has discipline.

18  And all those three different places is where you find all the

19  information on the officer.

20         Does Core Civic have a similar type of desk file,

21  shadow file, if you will, a unit that does internal affairs

22  investigations maybe because somebody gets injured at the

23  facility and then the official home office HR file?  Is there

24  different places where all this information is?

25         MR. LEE:  So as I -- as I learned here, the personnel

1    file that's maintained by HR doesn't necessarily include the

2    disciplinary files.  Those are stored separately and have to be

3    requested specifically.  But as far as incident investigations,

4    those are generally stored with the incident packet when an

5    incident occurs.  So if an inmate were to allege that, for

6    example, a staff member had assaulted them, there would be an

7    investigation file for that incident that wouldn't -- that

8    wouldn't, to my knowledge, be a part of the personnel file, it

9    would be stored separately.  But in that type of a situation,

10   typically the lawsuit would be about that alleged assault.  And

11   so we would be specifically requesting any incident

12   investigation materials that existed before that incident.

13           **THE COURT:**  And so when you -- and I'm going to

14   paraphrase this -- when you represented to the Court that it

15   was based -- or your team represented to the Court that you

16   believed that your client, Mr. Peterson, would testify

17   consistent with Ms. Padilla, in that he had never been

18   disciplined or at least not disciplined as it relates to the

19   incident where Mr. Romero was assaulted, what did you base that

20   on?

21           **MR. LEE:**  Well that was based on my discussions with

22   Mr. Peterson in preparation for his deposition.  I did prepare

23   him for the deposition, Your Honor.

24           **THE COURT:**  Did you review his personnel file before

25   his deposition?

1          **MR. LEE:**  No.  Because at the time there was not a

2    negligent hiring, training, retention or supervision claim

3    alleged in the complaint.  I did ask him if he had been

4    disciplined for this incident and that was why I clarified my

5    statement at the hearing when I first said he would testify he

6    wouldn't be disciplined, I realized what I had asked him was if

7    he was disciplined for this incident.  And so I included the

8    additional -- or at least "not for this incident".  And he was

9    not disciplined as a result of this incident.

10         **THE COURT:**  But you made an affirmative defense at

11   five that your client's conduct was not negligent, it didn't

12   violate any applicable standard.  And then you make another

13   affirmative defense at 27 that says that there isn't -- "Core

14   Civic didn't have a custom, policy, practice, was a moving

15   force behind a constitutional violation."

16         Now, would you agree with me that one way to show a

17   Monell claim -- a municipal liability claim -- which is what

18   your Affirmative Defense 27 is to -- is for a Plaintiff to be

19   able to show that, for instance, this entity turns a blind eye

20   every time a police officer chokes somebody who is Hispanic.

21   Would you agree with me that's a way to -- and that that

22   person's disciplined but there's no further training.  Would

23   you agree with me that that's one way Plaintiff can show a

24   Monell claim?

25         **MR. LEE:**  I would agree with that if there had been

1    evidence that Mr. Peterson had fallen asleep at his post on the

2    date of the incident, and that that was at least a cause of the

3    incident.

4        THE COURT:  But --

5        MR. LEE:  But --

6        THE COURT:  But isn't -- if you look at the

7    complaint, isn't Plaintiff saying -- and I'm just going to use

8    this term -- the employees to include Padilla and Romero were

9    asleep at the wheel?

10       MR. LEE:  Well Plaintiff claims in the complaint that

11   there was improper supervision but the -- and I don't have the

12   complaint in front of me right now.  My recollection from the

13   complaint is that the basis for that claim is that there

14   weren't enough staff members assigned, not that staff members

15   were sleeping on the job.  And there's been no evidence that

16   anybody was asleep at their post in Mr. Romero's unit on the

17   date of the incident.  And so that was why we objected

18   production --

19       THE COURT:  Well how did you know that if you didn't

20   look in these PSN records?  How did you know that there was no

21   evidence that no one was asleep on that day if you didn't even

22   know that these PSN records were in digital world in Core

23   Civic?

24       MR. LEE:  Well because we had produced the

25   investigation materials for that incident and there was no

1    indication in there that that had happened.

2         **THE COURT:**  Would disciplinary records be included in

3    the investigation materials?

4         **MR. LEE:**  No.

5         **THE COURT:**  Could somebody -- could there be an

6    investigation that says, Jail Guard One used excessive force on

7    Inmate Two or Jail Guard One grabbed and shook Inmate Two.

8    That's the investigation.  And then would that possibly lead to

9    discipline, depending on how hard the shake was?

10         **MR. LEE:**  If that had been a finding of the

11    investigation, that would have been stated in the incident

12    investigation report.  And if that had been -- if something to

13    that effect had been in the report here, we would have followed

14    up on that to get those disciplinary records.  But there was no

15    such finding.

16         **THE COURT:**  Well isn't it a better practice to not

17    believe everything your client tells you and go get their

18    personnel and disciplinary records just to make sure you're not

19    put in this position?

20         **MR. LEE:**  In hindsight perhaps it would have been but

21    I didn't have any information to suggest that there was any of

22    that type of information out there.  And once we produced the

23    PSNs, it corroborated the testimony or my statement at the

24    argument that he wasn't disciplined as a result of this

25    incident.  Yes, there were additional PSNs that I wasn't aware

1   of at the time but none of them were on the date of the

2   incident and none of them were arising out of the subject

3   incident.  They were all (inaudible).

4         **THE COURT:**  Don't you -- would you agree with me that

5   the fact that Mr. Peterson said he has fallen asleep several

6   times, that prior to being terminated that he fell asleep in

7   May.  I mean his deposition is -- and my understanding is for

8   at least a short time -- the standard that Core Civic was

9   carrying was that the discipline, the action that led to his

10  termination was after Mr. Romero was assaulted.  But in fact,

11  if you look at those records, he fell asleep in May.  And he

12  was asked to excel elsewhere in July which was like shortly

13  after this incident.

14        So why weren't -- why would you take that position

15  and not look at those records?  Why would you choose to stick

16  your head in the sand like an ostrich with the hopes that

17  hopefully there's nothing bad in there?

18        **MR. LEE:**  Well it wasn't a decision to stick my head

19  in the sand and hope there's nothing there, Your Honor.  It was

20  that the termination letter that was included in the personnel

21  file that we got from Core Civic was dated after the incident

22  and appeared on its face to be consistent with what he had

23  testified, that he wasn't disciplined or that the falling

24  asleep wasn't as a result of this incident.

25        **THE COURT:**  So what are the --

1              MR. LEE:  In hindsight --

2              THE COURT:  What are the critical --

3              MR. LEE:  I apologize.

4              THE COURT:  -- questions that I assume as Ms. Quijano

5      who was at the deposition -- what's a critical follow-up

6      question that you believe should have been asked?

7              MR. LEE:  She could have gotten more specifics as to

8      when he had fallen asleep, when he was disciplined?  His answer

9      might have been "I don't know" but there was no -- there was no

10     attempt to pinpoint when that happened.

11             THE COURT:  How about, "Had you ever fallen asleep

12     prior to that?"  And he said, "No."  How is that not a critical

13     follow-up question?  He said he fell asleep before and that's

14     why he got fired.  And she said, "Had you ever fallen asleep

15     prior to that?"  And his answer was, "No."

16             Is it -- do you think he misunderstood that question?

17             MR. LEE:  I --

18             THE COURT:  Because that's your other argument that

19     he misunderstood it.

20             MR. LEE:  Well the argument was that he may have

21     misunderstood other -- other questions, other terms, and may

22     not necessarily that particular question but even if --

23             THE COURT:  Discipline.  He misunderstood

24     "discipline," right?

25             MR. LEE:  I could only --

1          **THE COURT:**  That's what your motion says.

2          **MR. LEE:**  I could only guess.

3          **THE COURT:**  You could only guess that he

4    misunderstood it.  So there's no --

5          **MR. LEE:**  No, I --

6          **THE COURT:**  There's no record evidence that you can

7    point me to that Mr. Peterson misunderstood the common meaning

8    of "discipline".

9          **MR. LEE:**  Correct.  There's no record evidence.  But

10   still, follow-up questions could have been asked about specific

11   disciplinary infractions.  I mean if I'm taking a deposition of

12   somebody and he had already said in that line of questioning,

13   "I don't know" or "I don't remember," I'm going to ask at least

14   some more-detailed questions, just to confirm that he doesn't

15   have the information I'm looking for before I move on.

16         **THE COURT:**  And when --

17         **MR. LEE:**  But I think --

18         **THE COURT:**  And when I practiced law a short six

19   months ago, every single police shooting that I defended, I

20   asked for disciplinary records, personnel files, IA files, Blue

21   Team (phonetic) files.  So when you're saying Ms. Quijano could

22   have done something one way, everybody practices law

23   differently.  I'm not criticizing you for not getting those

24   records but for you to say she should have asked a different

25   question.  When we're in the deposition, I don't even look at

1   my outline, or I didn't look at my outline.  So questions can

2   come out different ways and you can say, "Oh I guess I could

3   have followed that up" but she didn't need to follow it up,

4   your client needed to answer truthfully.  And it's clear --

5   because there's no evidence that he misunderstood anything --

6   that he was less than candid with his responses to her

7   questions, correct?

8          **MR. LEE:**  Well I will agree that he was incorrect.  I

9   can't say that he was intentionally not candid.  What it seems

10  to me to be is a case of faulty memory.  As Mr. Jahner pointed

11  out, he was being asked four years after the fact to provide

12  dates and incidents that happened at a job that he only worked

13  for four months when he was 19 years old and fresh out of high

14  school.

15         **THE COURT:**  Which is all the more reason to know how

16  bad it was for a short period of four months that you got in

17  trouble several times for not showing up to work, for telling

18  them that you fell asleep at work.  I could see if it was a

19  22-year -- person who worked there for 22 years and say, "I'm

20  sure I did but I don't know when," but this gentleman worked

21  for four months.  I've been on this job for six months.  I can

22  tell you if I've gotten in trouble in six months.

23         So why keep not Core Civic, Mr. Peterson.  Is it your

24  position that default should not be granted against just

25  Mr. Peterson because memories fade and it wasn't intentional

1    that he made this misrepresentation?  Would that be the

2    argument?

3            **MR. LEE:**  That, among other things.  Also that as we

4    know from the documents now, apparently there was some verbal

5    counseling about being late to work.  I don't think that that

6    is particularly probative of the job you do at work.  It is

7    very clear he did not fall asleep on the post on the date and

8    on the date of the incident.  In fact I believe there's video

9    tape of the whole incident.  There are logs, there are a

10   variety of -- a variety evidence, material evidence respecting

11   the date of the incident in question which has been laid out in

12   the pending summary judgment motions as well so I'm not --

13           **THE COURT:**  So with respect --

14           **MR. LEE:**  -- I'm not excusing the conduct, Your

15   Honor, --

16           **THE COURT:**  With respect --

17           **MR. LEE:**  -- and I --

18           **THE COURT:**  With respect to the sleeping on the

19   discovery side -- I'm not weighing in on motions for summary

20   judgment --

21           **MR. LEE:**  Understood.

22           **THE COURT:**  With respect to the sleeping incidents,

23   the five, would you agree with me that him falling -- at least

24   admitting that he fell asleep on the job several times or a few

25   times -- whatever it says in that email --

1          **MR. LEE:**  A few I think is what the email reflects.

2          **THE COURT:**  Wouldn't you agree that that is

3     proportional and relevant in the discovery realm to Plaintiff's

4     claim?  That he was negligent in what he did that day?

5          **MR. LEE:**  I think it's something that could be very

6     uncomfortable on cross examination to impeach on cross exam.

7          **THE COURT:**  Which means it's discoverable, right?

8          **MR. LEE:**  But it's not of such a nature or magnitude

9     to invoke the death sentence of default judgment, Your Honor.

10         **THE COURT:**  And I'm agreeing with you on that but it

11    at least is something that somebody could probe into for

12    discovery purposes, right?  And the jury can believe it if they

13    want or not, determine whether he was a bad actor or not, based

14    on that info.

15         **MR. LEE:**  I think the jury should consider any

16    evidence that's admitted as relevant but I don't know that it's

17    probative of the actual incident on June 12th, 2018 when we

18    have all the evidence in real time, including a video that

19    would demonstrate he was not derelict in his duty that day.

20         **THE COURT:**  Okay.  Mr. Lee, I assume Core Civic is

21    paying for Mr. Peterson's defense?

22         **MR. LEE:**  That's correct, Your Honor.

23         **THE COURT:**  Okay.  Here's what I'm inclined to do.

24         I am not inclined to grant default judgment against

25    either defendant at this point; and the reason being is I think

1    there are other measures that can remedy what has occurred to

2    date.

3              With respect to who's more culpable amongst the two

4    defendants for having to have this hearing and these motions, I

5    believe it's Mr. Peterson.  I think that Core Civic, Mr. Lee,

6    and his team complied with the order to turn over the

7    disciplinary records.  I might not agree of how long it took

8    them to get there but, like I said, people practice how they

9    practice.  But in light of where we're at, here's what I'm

10   likely going to recommend just so you guys want to maybe start

11   formulating how you want to object to it.

12             I am going to recommend that the -- Mr. Peterson or

13   his insurer, I guess, Core Civic -- Mr. Peterson and/or Core

14   Civic is going to pay for the first deposition.  And what I

15   mean by "pay for the first deposition," I'm talking about the

16   setup fee and the transcript which is probably about 1500 bucks

17   or something like that.

18             Mr. Peterson is going -- if Plaintiff's counsel wants

19   to, she can re-depose Mr. Peterson, and Mr. Peterson and Core

20   Civic are going to pay for that deposition.  There's not going

21   to be any payment for time getting ready for the depo, it's

22   just the cost of the depo.

23             With respect to Core Civic, I will allow a 30(b)(6)

24   deposition and discovery related to disciplinary practices to

25   be taken by Plaintiff.  That's not going to be at Core Civic's

34

1    cost, that'll be at Plaintiff's costs as far as the cost for

2    the deposition.  And Mr. Peterson needs to know that if he does

3    not answer truthfully, that if this comes up again and the fact

4    that he's now being admonished to testify truthfully will be

5    taken into consideration.

6         Look, I understand these things happen as far as

7    timing of getting discovery.  It's all the more complicated

8    when you're dealing with large entities and these spiderwebs of

9    where stuff is placed but I offer to all the parties if you

10   guys get a bump in the road on discovery moving forward or if

11   there's some issue with setting depositions, call my chambers

12   and we'll help get to the decision.  I want you guys to move

13   forward on this case and get it resolved.

14        And finally, because a motion had to be filed for

15   purposes of reopening discovery, I am going to award

16   Ms. Quijano -- or I'm going to recommend, I'm sorry, that

17   Ms. Quijano be awarded her reasonable fees for filing the

18   motion.

19        All right, counsel, one last thing before we go.

20        You guys did a settlement, like I think January 2022;

21   is that correct, Ms. Quijano?  Settlement conference?

22        **MS. QUIJANO:**  I believe that's correct, Your Honor.

23        **THE COURT:**  2023?  Look.  Generally most cases can be

24   settled.  I don't know if this one can be settled but I like to

25   think most of them can be settled.

1            You don't have a trial date.  I don't know when

2  you'll get a trial date.  That's Judge Gonzales' chambers call.

3  As you-all know, the district does set priorities for their

4  district judges to handle the criminal matters so they have

5  more criminal trials than jury trials but there are options for

6  you-all.

7            You guys can always, if you can agree to a United

8  States magistrate judge to act as the presiding judge -- I

9  think it's AO 89 is the form.  If that's what you want to do

10  and you guys can agree to one, let me know.  I'll go talk to

11  Judge Gonzales.  It can be any judge you want, I'm not saying

12  for me, you know, it's any judge you want except probably Judge

13  Sweazea because he knows a little bit too much about the

14  discovery but any other judge.  If you guys can agree to that,

15  get me the form.  I can go talk to Judge Gonzales.

16            And the reason I offer you that is a magistrate judge

17  will, in short order, get on a conference call with you guys

18  and ask you guys to bring your calendars and see when we can --

19  when they can set that up for an actual trial.  Like I said, in

20  my experience, going the district judge way often takes years.

21  And I know you've stated, Ms. Quijano, that this has been going

22  on a long time.  So it's just an offer.  You don't have to --

23  you know you guys certainly don't have to do it but that's just

24  an option you have.

25            The second thing is, if you guys want to have another

settlement conference after you complete this round of

discovery or if you choose not to do discovery and just move

forward and use the documents you have, that's fine also.  But

if you guys want to have another settlement conference, I'd be

happy to try to facilitate a settlement.  I don't know anything

about the last settlement conference.  I don't know what the

offers and the last numbers were but if you guys want to try

that, just let me know.

**MS. QUIJANO:**  Thank you, Your Honor.  The plaintiff

is always happy to take another stab at resolving the case

informally so if the defendants are willing, we can schedule a

settlement conference.

**THE COURT:**  Yeah.  I mean if you guys want, look.  I

can set a status conference like in two months and we can see

if you guys want to go to a settlement conference.  And if you

don't, again, you're not going to hurt my feelings.  I'm just

giving you the opportunity.

And one last thing that I forgot to say with respect

to what I'm going to recommend.

The opening of the discovery window, it's not going

to be for a year, it's probably going to be like six months

from -- if Judge Gonzales accepts it, my recommendation is

going to be six months from the entry of his order so just so

you know.

So Mr. Lee, do you have anything?

37

1          **MR. LEE:**  No, Your Honor.

2          **THE COURT:**  Mr. Jahner?

3          **MR. JAHNER:**  Nothing, Your Honor.

4          **THE COURT:**  All right.  Thank you for your

5    appearance.  We will hopefully get our report and

6    recommendation out in the next few days to Judge Gonzales.

7    Then you guys will have -- each party will have 14 days to

8    object to my recommendation but essentially what I told you is

9    what I'm going to recommend.  So if you guys want to object,

10   you now have a head start.  And then the other party gets 14

11   days from that to respond to any objection.

12          So you guys have a safe weekend.  Again, thank you

13   for allowing me to start this hearing a little bit early and

14   we'll be off the record.

15          **MS. QUIJANO:**  Thank you, Your Honor.

16      **(Proceeding adjourned at 9:21 a.m.)**

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    September 12, 2023

        Signed                                     Dated


*TONI HUDSON, TRANSCRIBER*

EXCEPTIONAL REPORTING SERVICES, INC