IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RUBEN ROMERO,

    Plaintiff,

v.                                                          Case No. 21-CV-544-KG-KRS

CORE CIVIC, INC., CORE CIVIC OF
TENNESSEE, LLC, WARDEN
BRIAN KOEHN, ANA PADILLA,
and GARRICK PETERSON,

    Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

    This case concerns an assault suffered by Plaintiff Ruben Romero at the hands of fellow inmates while incarcerated at the Cibola County Correctional Center (CCCC). Mr. Romero brings Section 1983 claims alleging violations of the Eighth Amendment's proscription against cruel and unusual punishment and tort claims against CCCC's operator, CoreCivic, and two prison staff, Garrick Peterson and Ana Padilla. Amended Complaint (Doc. 35).

    This matter is now before the Court on Defendants' motions for summary judgment. CoreCivic and Ms. Padilla filed a Motion for Summary Judgment (Doc. 168), which is fully and timely briefed, *see* (Docs. 183, 192). Mr. Peterson filed his own Motion for Summary Judgment (Doc. 170), which is also fully and timely briefed, *see* (Docs. 184, 196). Because the facts proffered are identical and the issues argued are substantially the same—indeed, Mr. Peterson incorporates the statement of facts and largely incorporates arguments from CoreCivic and Ms. Padilla with limited additions—the Court considers the Motions jointly and generally refers only to the briefing on the first Motion unless Mr. Peterson adds something relevant. The Court,

having considered the briefing, the evidence, and the relevant law, grants the Motions in part and denies them in part.

I.    *Summary Judgment Standard*

Summary judgment should be granted if the movant establishes that there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020); Fed. R. Civ. P. 56(a). A fact is considered material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Id.*

The parties must support factual allegations with evidence and the Court is free to consider materials such as depositions, documents, and affidavits. Fed. R. Civ. P. 56(c)(1)(A). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–52.

In applying this standard, the Court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the nonmovant, and draws all reasonable inferences in favor of the nonmovant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). That said, the nonmovant still bears the burden to produce real evidence. The nonmoving party cannot rely upon conclusory allegations, contentions of counsel, speculation, suspicion, or conjecture to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649

(10th Cir. 1988); *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022). A

"plaintiff's version of the facts must find support in the record." *Koch v. City of Del City*, 660

F.3d 1228, 1238 (10th Cir. 2011) (citation omitted). "Unsubstantiated allegations carry no

probative weight in summary judgment proceedings." *GeoMetWatch Corp.*, 38 F.4th at 1200

(quoting *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019)).

II.    *Factual Background*

On June 12, 2018, Mr. Romero was transferred to CCCC, where he was processed, and

classified to Unit 400-A Pod by Ms. Padilla. (Doc. 168) Statement of Material Facts ("SMF")

39; (Doc. 183) SMF 38. [1]  Mr. Romero arrived having just been convicted of second-degree

murder and sentenced to 10 years in custody. (Doc. 168) SMF 38; (Doc. 183) SMF 38. The

underlying murder was committed by Mr. Romero's co-defendant, Rudy Valencia—a crime to

which Mr. Romero admitted and which he described to the police. (Doc. 168) SMFs 35–36;

(Doc. 183) SMFs 35–36. At the time he was processed into CCCC, Mr. Romero was 18 years

old and weighed 130 pounds. Inmate Commitment Summary (Doc. 168) at 50.

Though not necessarily material, the Court notes for the readers' sake that Unit 400

consists of four pods, and the A Pod is a general population unit containing 19 cells and 38

inmates sleeping two in a cell. (Doc. 168) SMF 12. The A Pod houses mostly "high custody"

males in cells with open "grill"-type doors on two floors which surround an open common area.

(Doc. 168) SMFs 13–14.

Unbeknownst to Mr. Romero, Mr. Valencia was already incarcerated at CCCC in the

same unit to which Mr. Romero had just been assigned. (Doc. 168) SMF 61; (Doc. 183) SMF

---

[1] Except where otherwise noted, the facts in this section are either undisputed or stated in the light most favorable to
the nonmovant Plaintiff. *See supra,* Section II. To the extent proffered facts have been omitted, the Court deems
them immaterial to the Motion.

61; (Doc. 183) Additional Material Facts ("AMF") Q.  Before the day was done, Mr. Romero was assaulted by Mr. Valencia and two confederates, Matthew Wax and Daniel Mariano.  (Doc. 168) SMFs 62–63; (Doc. 183) SMF 62–63.

As it happened, Mr. Romero sat watching TV in the common area, when he was approached by Mr. Mariano, who asked him to go to his cell on the second floor.  (Doc. 168) SMFs 59, 61; (Doc. 183) SMFs 59, 61.  The view into Mr. Mariano's cell had been obscured by a blanket hanging on the bars.  (Doc. 168) SMF 61; (Doc. 183) SMF 61.  After Mr. Romero entered, Mr. Wax and Mr. Mariano began to beat him.  (Doc. 168) SMF 62; (Doc. 183) SMF 62.  Soon after, Mr. Valencia—Mr. Romero's co-defendant—entered the cell and joined the assault.  (Doc. 168) SMF 63; (Doc. 183) SMF 63.

In all, the four men were in the cell for about one and one-half minutes.  (Doc. 168) SMF 65; (Doc. 183) SMF 65.  Mr. Romero lay on the floor of the cell for nearly 10 minutes, unconscious for at least part of that time.  (Doc. 168) SMF 67; (Doc. 183) SMF 67.  Eventually, Mr. Romero crawled out of the cell and struggled, unable to stand, to the top of the stairs, where he faltered and leaned against the wall.  (Doc. 168) SMF 69; (Doc. 183) SMF 69.  In the meantime, inmates cleaned up Mr. Romero's blood from the floor.  (Doc. 183) SMF 19.  Mr. Romero made his way, haltingly, down the stairs and to the door of the unit, where he was met by a prison guard.  (Doc. 168) SMF 70; (Doc. 183) SMF 69–70.  Mr. Peterson, the roving guard assigned to Unit 400, had been conducting rounds in B Pod and had not been physically present in A Pod during the assault.  (Doc. 168) SMF 57; (Doc. 183) SMF 57.

Mr. Romero was taken out of the unit, met by medical personnel, and then transferred to a local hospital. (Doc. 168) SMFs 70–72; (Doc. 183) SMF 70–72.[2] The parties dispute the nature of Mr. Romero's injuries, but it is not necessary for purposes of these Motions to clarify his exact damages. Whether the injuries were closer to those described by Defendants ("bruise to scalp and face," "fractured nose," and "laceration," (Doc. 168) SMF 73) or those described by Mr. Romero ("multiple hematomas," "head trauma," "ecchymosis in his eyes and nose," and "multiple lacerations," (Doc. 183) SMF 73), the Court is satisfied that the assault was serious.

From here, the Court notes important disputes. The parties disagree whether Ms. Padilla properly processed Mr. Romero and appropriately assigned him to a unit with his co-defendant. *Compare* (Doc. 168) SMFs 40–49 *to* (Doc. 183) SMFs 40–49. The Court addresses that dispute below in Section III(B)(2). The parties also clash over whether Mr. Peterson ordered Mr. Mariano to remove the cell coverings prior to the assault and whether such an order was sufficient. *Compare* (Doc. 168) SMF 56 *to* (Doc. 183) SMFs 23, 56. The Court addresses that dispute below in Section III(B)(3). Finally, the parties argue over whether two other CoreCivic Employees—Catalina Dominguez-Molina and Restituto Torres—were present and attentive in the control room overseeing A Pod at the time of the assault. *Compare* (Doc. 168) SMFs 60, 65, 66, 70, 95, 98 *to* (Doc. 183) SMFs 60, 65, 66, 70, 95, 98. The Court addresses that dispute below in Section III(B)(4).

---

[2] The Court notes that Mr. Romero disputes certain parts of these factual contentions related to the timing and personnel involved, but the Court determines the basic facts asserted here are undisputed.

III.    *Analysis*

A.    *Section 1983 Constitutional Claims*

In a § 1983 claim, Mr. Romero alleges violations of his Eight Amendment rights.  The

Eighth Amendment prohibits cruel and unusual punishment, which encompasses deliberate

indifference to harm by prison officials.  *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).  "[P]rison

officials have a duty to protect prisoners from violence at the hands of other prisoners."  *Farmer*

*v. Brennan,* 511 U.S. 825, 833 (1994) (internal quotation and alteration omitted).  "It is not,

however, every injury suffered by one prisoner at the hands of another that translates into

constitutional liability for prison officials responsible for the victim's safety."  *Id.* at 834.  Rather,

prison officials must be *deliberately indifferent* to a substantial risk of harm.  Deliberate

indifference describes a state of mind more blameworthy than negligence.  *Farmer v. Brennan*,

511 U.S. at 835.  Eighth Amendment liability requires "more than ordinary lack of due care for

the prisoner's interests or safety."  *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

An Eighth Amendment deliberate indifference claim in the context of failure to prevent harm has

three requirements.

First, in the objective component, a prisoner must show that the conditions of his

incarceration presented a "substantial risk of serious harm."  *Id.*  Defendants do not challenge

that Mr. Romero was, in fact, seriously assaulted.  The Court concludes the first prong is

satisfied.  *See, e.g.*, *id.* at 834 ("Being violently assaulted in prison is simply not part of the

penalty that criminal offenders pay for their offenses against society.") (text only).  Second, the

prisoner must show that prison officials had subjective knowledge of the risk of harm.  *Id.* at 837.

This means a prison official "must both be aware of the facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id.*

This subjective knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citation omitted). An official's failure to alleviate a significant risk of which he was unaware, no matter how obvious the risk or how gross his negligence in failing to perceive it, is not an infliction of punishment and therefore not a constitutional violation. *Id.* at 844. And, third, the prisoner must show that the prison official failed to take reasonable precautions. *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008). That is, even if a prison official has knowledge of a substantial risk of serious harm to inmates, he is not deliberately indifferent to that risk unless he fails to take reasonable steps to alleviate that risk. *Id.*

The Court concludes that the facts, even taken in the light most favorable to Mr. Romero, cannot support a finding of deliberate indifference amounting to an Eighth Amendment violation. Mr. Romero alleges constitutional violations by Mr. Peterson individually and by CoreCivic institutionally. The Court takes each in turn.

1. *Mr. Peterson*

Defendants challenge the evidence against Mr. Peterson on the second and third prongs of deliberate indifference. They meet their initial burden by pointing out that no facts show Mr. Peterson had any knowledge of any risk of harm to Mr. Romero. *See* (Doc. 168) at 13–15; (Doc. 170) at 1–2. Defendants next argue that Mr. Peterson could not infer from Mr. Mariano covering his cell door that an assault was imminent or even likely, and certainly not directed at Mr. Romero. (Doc. 168) at 14. Defendants also contend that Mr. Peterson had no knowledge of Mr. Mariano being a threat to any other inmates in general, especially given that Mr. Mariano apparently had no history of assault. *Id.* Finally, Defendants point out that there is no evidence

7

that Mr. Peterson knew Mr. Romero had been placed in a pod with his co-defendant, that his co-defendant posed any threat to him, or that his co-defendant was violent and posed a threat generally. *Id.* at 15–16.

The Court agrees with Defendants that no facts in the record establish that Mr. Peterson knew that Mr. Romero was housed with his co-defendant, that he was at risk of being targeted by his co-defendant, or that Mr. Mariano, Mr. Wax, and Mr. Valencia were planning an assault against anyone. Thus, the only remaining way to arrive at subjective knowledge would be to show that the risk of harm was "obvious."

To create a genuine dispute of material fact about Mr. Peterson's subjective knowledge, Mr. Romero points to Mr. Peterson's testimony that he knew that cell door coverings can potentially hide illicit or even violent behavior. (Doc. 183) at 29. He relies on the rule that the risk of harm need not be to a particular inmate to satisfy subjective knowledge. (Doc. 184) at 4. But under the facts of this case, such a general understanding of potential harm is insufficient to show that a risk to Mr. Romero or even of a risk of assault generally in the pod was obvious.

Obviousness tends to be imputed where risks are universal in a prison unit, and evidence of that risk is easily ascertained by prison officials. It is true that in *Farmer*, the Supreme Court reasoned that an official's knowledge of risk need not be knowledge of a substantial risk to a *particular* inmate nor "whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." 511 U.S. at 843. But this reasoning was not an invitation to imply liability for all individual assaults; rather it left open the possibility that obvious systemic dangers could trigger liability. The Court described, for example, that if

> prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep [but] instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Id.* (text only). One cell door being covered by blankets is not analogous to open and uncontrolled prison rape, however. Here, the allegations depict a one-off assault very specific to the attackers and victim. This scenario is not akin to widespread assaults or a total collapse of prisoner safety which would permit an inference that threats were systemic and obvious.

Though it may be legally possible to impute subjective knowledge to a prison official who lacks knowledge of a specific, named threat to an inmate, that rule is not availing here. An analogous Circuit decision to which both parties cite, *Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008), is instructive here. In *Howard*, the Court found Eighth Amendment allegations of corrections officers' failure to prevent harm sufficient to survive summary judgment. *Id.* Mr. Peterson distinguishes it, arguing that the facts of this case amount to something far less, and that it stands for the rule that officers must know of a threat by a named inmate to act on it. (Doc. 170) at 2. Mr. Romero goes the other way, contending that *Howard* stands for the proposition that an officer need not know of a threat by a specific person, but that knowledge of a general risk of harm is sufficient. (Doc. 184) at 4. The Court determines the case does not support either of those interpretations exactly, but does lead to the conclusion that the allegations related to Mr. Peterson in our case fall short of proving subjective knowledge of a threat.

In *Howard*, the plaintiff was openly gay and slight of build. *Howard*, 534 F.3d at 1230. In prison, a notorious and well-known prison gang began extorting him for money, and eventually sexually assaulted him and forced him into prostitution. *Id.* After the plaintiff notified the prison of his assaults, he was transferred to a different unit for his safety. *Id.* at

1231. Except that plaintiff soon found there were members of the same gang in his new unit who resumed threatening him. *Id.* He reported this to the prison, but for fear of retaliation, refused to name specific inmates. *Id.* at 1232. The prison took no steps to protect him, and he was again raped on multiple occasions. *Id.* at 1233.

Plaintiff's refusal to name names became a flashpoint. And the Circuit Court explained that if

> a prisoner faces a threat from a specific individual or individuals, it may well be impossible for prison officials to respond without knowledge of their identities. Likewise, if a prisoner's refusal to name names leaves prison officials without knowledge that the prisoner is actually in danger, *Farmer*'s actual knowledge prong would not be satisfied.

*Howard*, 534 F.3d at 1242. But that reasoning was not determinative. Ultimately the Court held that prison officials had sufficient of knowledge of threats to the plaintiff regardless of his refusal to name specific names. *Id.* at 1239, 1242. The prison was passively aware of the prison gang and its conduct, it was directly aware of plaintiff's first assaults from his complaints, and it was directly aware that he had been spotted and threatened again. *Id.*

In our case, Mr. Peterson had none of the passive or direct knowledge which corrections officers had in *Howard.* He had no passive understanding that Mr. Romero's co-defendant was present or that Mr. Romero faced any threat from that co-defendant or anyone else, nor did he have any direct communication from Mr. Romero that he was in danger, even without naming the specific source of the threat. According to Mr. Romero, Mr. Peterson had the general knowledge that covering cell doors could hide violence. While that may be true, it is simply not enough to create subjective knowledge of any real threat to Mr. Romero or anyone else.

Dangers lurk in any setting, but especially in prisons, and guards are not constitutionally required to anticipate and prevent every possible potential harm—as welcome as that might be.

Rather, Eighth Amendment liability attaches when an officer actually knows of a significant risk of substantial harm or the risk is obvious. Because Mr. Romero does not show any facts proving Mr. Peterson had any knowledge of a risk of assault nor that the risk of harm was obvious on its own, he has failed to raise any genuine dispute of fact which could amount to deliberate indifference. The Court grants summary judgment on the constitutional claim against Mr. Peterson.

2.    <em>CoreCivic</em>

Under *Monell*, a plaintiff may sue local governing bodies directly for constitutional violations pursuant to the body's policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Further, *Monell* liabiltiy has been extended to "private entities acting under color of state law," such as medical contractors or prison operators. *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); see *also Carr v. El Paso Cnty., Colo.*, 757 F. App'x 651, 655 (10th Cir. 2018) (unpublished).

Section 1983 does not permit *respondeat superior* liability against an entity. *See Monell*, 436 U.S. at 691; *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). Instead, an entity can only be subject to liability where its policy, custom, or practice was the "moving force" behind an underlying constitutional violation. *Monell*, 436 U.S. at 694.

Here the Court briefly addresses a preliminary argument. CoreCivic contends that a municipal claim against it cannot persist if there was no underlying constitutional violation committed by one of its employees. And for good reason. Ordinarily, a plaintiff suing a municipal entity under § 1983 for the actions of one of its officers must demonstrate two elements: (1) a municipal employee committed a constitutional violation, and (2) a municipal

policy or custom was the moving force behind the constitutional deprivation.  *Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1318 (10th Cir. 1998) (citing *Monell,* 436 U.S. at 694).

But liability via an employee's conduct is not the only path to municipal liability.  "In the Tenth Circuit, while unusual, municipal liability may exist without individual liability: for example, for a systemic failure of [] policies and procedures."  *Lucas*, 58 F.4th at 1144 (citing *Crowson*, 983 F.3d at 1191–92; *and Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 306–07 (10th Cir. 1985)).  Mr. Romero does not explicitly invoke the "systemic failure" version of municipal liability, but in essence it is what he argues.  So, the Court will consider that CoreCivic may be liable for systemic failure of policy and procedure regardless of its conclusion about Mr. Peterson.

Moving on, the "moving force" standard has three elements: "to state a claim against a municipal entity, a plaintiff must allege facts showing (1) an official policy or custom, (2) causation, and (3) deliberate indifference."  *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1145 (10th Cir. 2023) (citation omitted).  An official policy or custom may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (citing *Crowson v. Washington Cnty. Utah*, 983 F.3d 1166, 1184 (10th Cir. 2020)).  The plaintiff must further show that "the policy was enacted or maintained with deliberate

indifference to an almost inevitable constitutional injury." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).

In this case, Defendants assert that the evidence shows no affirmative policy, custom, or practice which was the moving force behind Mr. Romero's assault—and that, to the contrary, CCCC promulgated policies governing proper classification and supervision of inmates. (Doc. 168) at 19–22. Mr. Romero responds that CoreCivic violated Mr. Romero's rights by (1) failing to employ a chief of security, (Doc. 183) at 32–34; (2) understaffing, overworking, and exhausting its staff, including through mandatory overtime, *id.*; *also* (Doc. 183) SMFs 50, 82, 98; (3) allowing staff to sleep on the job, *id.* at 32–34; and, (4) failing to enforce promulgated policies with fidelity, including its cell covering policy and its documentation and logbook policies, (Doc. 183) at 32–34; *also id.* at Additional Material Fact ("AMF") M. Even allowing for a systemic failure theory, these allegations stumble on each of the "official policy," "causation," and "deliberate indifference" elements.

CoreCivic is not alleged to have affirmative policies which violated any constitutional rights. Rather, the allegation is that through a failure to hire and a failure to enforce policies, it indirectly created an environment in which constitutional violations were possible. Indeed, "[t]he knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." *Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008).

But, deliberate indifference creates a high bar to municipal liability. To repeat, a municipal entity must have "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation" and "consciously or deliberately" disregard it. *Pulsipher*, 143 F.3d at 1307. The Tenth Circuit has twice rejected deliberate indifference claims where the only proof of officials' knowledge of a substantial risk of harm to inmates was predicted on the existence of a mere *per se* violation of jail policy. In *Hovater v. Robinson*, the Court found that prison officials' knowledge of violations of the policy that a male guard never enter a woman's cell alone was insufficient to trigger deliberate indifference to the threat of sexual assault. 1 F.3d 1063, 1068 (10th Cir. 1993). And in *Barney v. Pulsipher*, deliberate indifference to the risk of sexual assault was not established where officials knew of violations of a policy requiring two guards to be present when female prisoners were removed from their cells. 143 F.3d 1299, 1310–11 (10th Cir. 1998). Instead, the Court reasoned, the officials' would have needed information that a specific guard posed a threat of safety to female inmates in order to trigger the possibility of deliberate indifference. *Hovater*, 1 F.3d at 1068. This reasoning alone appears to foreclose any claim that CoreCivic was deliberately indifferent to prison assault where it may have known of violations of the cell door policy or instances of guards sleeping without other evidence of a risk of assault.

On the other hand, the Tenth Circuit has allowed deliberate indifference claims where there is evidence that officials had more concrete notice of constitutional violations or evidence of a lackadaisical attitude towards pervasive and substantial behavioral problems. For example, in *Gonzales*, the Tenth Circuit concluded there was a material dispute of fact about a Sheriff's knowledge of substantial risk of harm to inmates because of conditions at a county jail where he knew of allegations of sexual assault, ignored the allegations, knew his inferiors did not want to

investigate allegations, left inmates in the control and custody of their alleged abusers, did not regularly visit the jail himself, and knew of other specific lapses of security in the control room. *Gonzales v. Martinez*, 403 F.3d 1179, 1186–87 (10th Cir. 2005).

Similarly, in *Tafoya*, the Tenth Circuit concluded a reasonable jury could conclude that the Sheriff was aware of "pervasive delinquency" by his staff which could create dangerous conditions where they regularly showed up to work out of uniform, slept through shifts, were intoxicated at work, and watched pornographic movies in the control room while on duty. *Tafoya*, 516 F.3d at 919. That Sheriff also knowingly employed detention officers with criminal records. *Id*. at 220. And in a deposition he acknowledged that refusing to punish staff for non-compliance with a the no-sexual-contact-with-inmates policy could lead to sexual assaults in the prison. *Id*. at 219. The Sheriff also failed to implement a grievance procedure which would allow inmates to make grievances without fear of retribution after learning of two sexual assaults against inmates. *Id*. at 220.

Consider, finally, *Keith v. Koerner*, 843 F.3d 833 (10th Cir. 2016). In that case, the Court again found that a genuine issue of material fact existed as to whether the warden acted with deliberate indifference to risk of sexual misconduct by his employees. *Id*. at 842–847. In that case, prisoners reported being sexually assaulted by guards and there was substantial evidence that accusations were credible but that the warden ignored or downplayed the complaints, labeled the complaints unsubstantiated if guards refused to take polygraphs, and otherwise failed to investigate or punish guards even when they took and failed polygraph tests. *Id*. That is, serious evidence of constitutional harms existed which the warden actively ignored.

Turning to this case, the Court concludes the allegations of institutional deliberate indifference are not equivalent to anything like *Gonzales*, *Tafoya*, or *Keith*. The theories that

CoreCivic is constitutionally liable for the lack of a chief of security or from understaffing the facility and overworking its existing staff suffer from a lack of clear causal connection to the risk of assault and a lack of evidence the understaffing was a result of deliberate indifference. That is, Court sees no evidence presented which shows the staffing situation created a substantial risk of assault of which CoreCivic was aware and deliberately chose to ignore by intentionally keeping CCCC understaffed. Mr. Romero makes the conclusory allegation that "[t]he absence of a chief of security virtually ensured that breakdowns in security practices would be unaddressed," (Doc. 183) at 32, but the Court considers this insufficient evidence to create a material dispute of fact about CoreCivic's deliberate indifference to harm.

Next, the allegation that staff slept on the job is also deficient of evidence of causation and deliberate indifference. For example, the court sees no evidence of incidents where sleeping staff created unsafe conditions resulting in inmate assault of which CoreCivic was aware but remained indifferent. To the contrary, Mr. Peterson testified that he had been found sleeping while on shift a few times, but that he was investigated and eventually terminated. (Doc. 183) AMFs J, K, L. This reaction by CoreCivic seems to the Court dispositive of any allegation of deliberate indifference to any problem. The Court also adds that nothing in the sleeping on the job allegation—that is, Mr. Peterson's statement that other staff slept on the job but that he did not report it to CoreCivic, *id.* at AMF L; (Doc. 183-1) at 60:3-25—amounts to the level of "pervasive delinquency" evident in *Tafoya*.

Finally, the allegation that CoreCivic refused to enforce policies like the cell-covering policy or the logbook policy is also deficient. Once again the Court sees no evidence that CoreCivic was deliberately indifferent to constitutional harms by refusing to enforce the cell covering policy. No prior assaults put CoreCivic on notice, for example, and CoreCivic did not

refuse to investigate or respond in any way. To the contrary, the entire allegation is based on Mr. Peterson's testimony that he and other officers stopped physically removing cell coverings themselves, but not that they stopped ordering prisoners to remove them. *See* (Doc. 183) AMF M; *also* (Doc. 183-1) at 33:9-34:3. And Mr. Peterson also testified that when he told the assistant warden certain inmates were not following the cell covering policy that she went to the pod, spoke with the inmates about the policy, and threatened to take away all towels if they were used improperly. (Doc. 183-1) at 35:1-16. Again, this sort of response by CoreCivic is not indicative of deliberate indifference to a problem.

For all these reasons, even accepting the allegations in the light most favorable to Mr. Romero, the Court determines no reasonable jury could find that CoreCivic oversaw a systemic failure of policies and procedures which caused a constitutional violation to which it was deliberately indifferent. The Court grants summary judgment on the constitutional claim against CoreCivic.

B.    *Negligence Claims*

Mr. Romero alleges negligence by each of Mr. Peterson, Ms. Padilla, other CoreCivic staff not named as parties, and CoreCivic vicariously. As the Court summarizes it, he argues that:

(1)    Ms. Padilla violated the standard of care by failing to properly investigate Mr. Romero's background during his intake and as a result placing him in a pod with his co-defendant, (Doc. 183) 34–35;

(2)    Mr. Peterson violated the standard of care by failure to ensure removal of blankets from Mr. Mariano's cell door and by failure to rove and supervise the pod properly, (Doc. 183) 31–32; and,

17

(3)     Officers Torres and Dominguez-Molina violated the standard of care in the control room by failing to be attentive and see the assault, (Doc. 183) 35–36. [3,4,5]

The parties agree that the standard of care in prison contexts is established by the ACA standards. *See* (Doc. 183) at 31 n8.  The Court takes each of the three theories in turn.

1.     *Whether Ms. Padilla Followed Procedures And Appropriately Classified Mr. Romero Is In Dispute*

The parties dispute whether Ms. Padilla breached the standard of care by failing to properly investigate Mr. Romero's available background information and by inappropriately placing him with his co-defendant.  Defendants assert the standard of care, established by CoreCivic's ACA-compliant policies, requires the classifying officer to use "the information provided to them by the arresting agency, the inmate's facesheet, OMS, publicly available information on the nmcourts.gov portal, and information provided by the inmate." (Doc. 168) at 23.  Mr. Romero does not challenge that statement of the standard of care, so the dispute is on the facts.

---

[3] Mr. Romero asserts, in his statement of facts, that CoreCivic employees violated the standard of care by placing Valencia and Wax back in their pod after a previous assault. *See* (Doc. 183) SMF 32.  But he does not otherwise argue for this as a theory of liability, so the Court does not treat it as one.  Even if their classification did violate the standard of care, the Court is not persuaded that it constitutions a violation of a duty to Mr. Romero specifically, that his assault would have been foreseeable at the time, or that it proximately caused his assault.

[4] Mr. Romero also contends that CoreCivic employees violated the standard of care by failure to record incidents in the logbook, (Doc. 183) SMF 20, 22, 103–106, but the Court does not see how this could have caused Mr. Romero's injuries.  Later, Mr. Romero explains that the logbook issues serve as evidence that CoreCivic does not monitor compliance with its policies which goes towards constitutional deliberate indifference.  (Doc. 183) at 33.  The Court, therefore, does not consider the logbook maintenance as an independent theory of tort liability.

[5] The Court also notes that Mr. Romero pleads liability based in the theory that CCCC staff failed to timely respond to Mr. Romero's assault.  (Doc. 35) at 7.  But the theory is never fully explained, argued, or supported with citation to authority in the briefing.  The Court, therefore, does not consider it at this time.

Defendants assert that Ms. Padilla checked all the available documentation related to Mr. Romero and that none of it revealed any co-defendants. (Doc. 168) SMFs 39–46. Mr. Romero, on the other hand, claims Ms. Padilla did not refer to the required documentation, which would have revealed his co-defendant if she had. (Doc. 183) SMFs 39–46.

The proffered evidence consists of a declaration by Ms. Padilla, (Doc. 168-5), and some of the documentation she may have reviewed in processing and classifying Mr. Romero. Ms. Padilla states that,

> While I do not recall Inmate Romero or the exact documents I reviewed in conducting his initial classification, per CoreCivic policy and my general practice, I would have reviewed the information available to me (which included information provided by the arresting agency and Inmate Romero and information available on OMS and the nmcourts.gov portal) to complete Inmate Romero's ICAS form to determine his custody level and housing assignment.

(Doc. 168-5) at ¶ 77. She further attests that she would have reviewed, specifically, Mr. Romero's Arrest/Booking Report, *available at* Decl. of Charles Keeton, Attachment 1 (Doc. 168-2) at 55, a "Minute Order" pertaining to his criminal case, *available at id.* at 56, his "facesheet," *available at id.* at 50, but that none of those show any co-defendants. (Doc. 168-5) at ¶¶ 78–89. She goes on to explain that according to policy, she would have checked the nmcourts.gov portal and would have reviewed the OMS system, either of which could have shown a co-defendant. *Id.* at ¶¶ 90–94. According to Ms. Padilla, those systems must not have shown any co-defendants because she placed Mr. Romero in a unit with his co-defendant, which she would not have done had she known. *Id.* Mr. Romero makes the opposite conclusory argument that had Ms. Padilla followed procedures, she would have known he had a co-defendant housed at CCCC and she would not have placed him in a unit with Mr. Valencia and therefore summary judgment is not proper. (Doc. 183) SMF 45; *id.* at 34–35.

The Court notes that Ms. Padilla does not assert with certainty that she did check all the available documents and systems. And while the attachments show that the facesheet, minute order, and arrest report did not list a co-defendant, the Court is not presented any evidence about what the OMS or nmcourts.gov systems might have revealed about Mr. Romero if referenced. So, Mr. Romero's processing is a sort of black box problem. Mr. Romero entered and left and was assigned to Unit 400-A Pod, with his co-defendant, but the Court cannot be certain how or why. No evidence clearly establishes the truth of what happened, but Mr. Romero's placement with Mr. Valencia permits an inference that it is possible that procedures were not followed. Because the Court is not to make credibility determinations related to Ms. Padilla's testimony and is required to draw inferences in favor of Mr. Romero, it concludes that there is a dispute over what Ms. Padilla did or did not do when she conducted Mr. Romero's intake, and what information that investigation did reveal or could have revealed. A jury is best suited to hear the evidence and find the facts.

Finally, Defendants also argue for summary judgment because Mr. Romero failed to tell Ms. Padilla that he had a co-defendant and is therefore responsible for his own assault. *See* (Doc. 168) SMFs 47, 79–81; *id.* at 28–29. But the possibility that Mr. Romero contributed fault does not preclude any negligence by Ms. Padilla nor require summary judgment for Defendants. To the contrary, it is proper that a jury determine contributory negligence, if any. For these reasons, the Court denies summary judgement as to Ms. Padilla's negligence.

2.   *Whether Mr. Peterson Followed Procedure Regarding Removal Of The Cell Covering Is In Dispute*

Mr. Romero urges that Mr. Peterson breached his duties in two ways: by failing to ensure removal of the cell coverings and by "failure or refusal to competently perform his duties" generally. (Doc. 183) at 31. Defendants assert that the standard of care is that each pod be

monitored by one control room and one roving officer and that the roving officer "conduct frequent and irregularly scheduled security rounds throughout each pod and enforce all CoreCivic policies." (Doc. 168) at 25–26. One of those policies, according to Defendants, is that roving officers must order inmates to remove coverings from cell doors, but not that the officer must physically remove them. *Id.* at 26. Though Mr. Romero argues that Mr. Peterson violated the standard of care by failing to remove the covering, he does not explicitly challenge Defendants' assertion that the standard of care requires something less than physical removal. The Court, therefore, deems the standard of care conceded and rejects the arguments that Mr. Peterson violated the standard by being out of A Pod while roving B Pod or by failure to remove the cell covering himself. The Court focuses on the factual dispute about Mr. Peterson's communication with Mr. Mariano about the cell covering.

Defendants insist that Mr. Peterson undisputedly told Mariano to remove the covering from his cell, which is all the standard of care requires him to do. (Doc. 168) at 26 (citing Declaration of Charlies C. Keeton Ex.1 at ¶¶ 252, 322). Mr. Romero argues that Mr. Peterson did not instruct Mr. Mariano to remove the blanket nor did Mr. Peterson remove it himself, which is evidenced by the fact that the cell remained covered. (Doc. 183) at 31.

The evidentiary record consists of a silent security video recording of Mr. Peterson roving in the pod, *see* Notice of Lodging (Doc. 165); Declaration of Charles C. Keeton (Doc. 168-2) Attachment 15, and Mr. Peterson's Deposition, (Doc. 168-2) Attachment 14. In his deposition, Mr. Peterson states affirmatively that he asked Mariano to take down the cell coverings and that he made sure they were taken down. (Doc. 168-2) Attachment 14 at 42:8–17.

And then there is the video, which ostensibly should be able to confirm or disprove Mr. Peterson's statement, but of which the parties take opposite views. Mr. Romero construes the

video as showing that "Defendant Peterson walked past Cell 206 quickly, without stopping to talk to any inmates." (Doc. 183) at 13, DMF 56 (citing (Doc. 168-2) Attachment 15 at 9:43:04–9:43:07. Later, Mr. Romero describes Mr. Peterson as not even "breaking stride." *Id.* at 29. Mr. Romero also describes that "as Peterson walked down the stairs to the bottom tier, he watched Mariano continue to place more blankets and towels on his cell door." *Id.* at 13, DMF 56. To Mr. Romero, this creates a material dispute of fact.

Defendants argue that even if Mr. Peterson does not break stride, that does not disprove his testimony that he told Mariano to take down the coverings. (Doc. 192) at 11. Furthermore, Defendants interpret the video as showing that "Mariano does remove the covering following Mr. Peterson's advisal." *Id.* And, "Mariano removes the covering as Mr. Peterson walks down the stairs to the first tier, at which time Mr. Peterson glances up to the second tier where Mariano can be seen removing the covering and opening his cell door." *Id.* To Defendants, there is no dispute that Mr. Peterson ordered Mariano to remove the cell coverings. *Id.*[6]

The Court, on its own independent viewing of the video, finds it inconclusive. The video depicts Mr. Mariano hanging one blanket on half of his cell's sliding door. Video (Doc. 165) at 9:43:01. Mr. Peterson walks by, indeed without breaking stride, although he does look towards Mr. Mariano, presumably noticing the blanket. *Id.* at 9:43:03–9:43:05. Mr. Mariano does not immediately remove the blanket; as Mr. Peterson continues down the second-floor walkway Mr. Mariano hangs a second blanket on the other half of the sliding door. *Id.* at 9:43:12–9:43:14. As

---

[6] Defendants also argue that Mr. Romero did not properly disclose expert opinions, or improperly amended his expert report, related to the standard of care and that without admissible expert opinions, he cannot maintain a tort claim against Mr. Peterson. (Doc. 192) at 9–10, (Doc. 196) at 3–4. The Court does not address those arguments here, and in that way they are not foreclosed. Defendants may re-raise them in the pre-trial and trial phases. For now, it suffices that there is a genuine dispute of material fact.

Mr. Peterson begins walking down the stairs, Mr. Mariano removes the first blanket, but only briefly. *Id.* at 9:43:23–9:43:27. He shakes the blanket out, then re-hangs it before Mr. Peterson has reached the bottom of the stairs. *Id.* at 9:43:27. Mr. Peterson appears to look up towards Mr. Mariano's cell, though it is not entirely clear on video. *Id.* at 9:43:27–9:43:28. At that point Mr. Peterson exits while two blankets obscure both sides of Mr. Mariano's cell door. *Id.* at 9:43:28–9:43:33.

Whether Mr. Peterson ordered Mr. Mariano to remove the blanket is unclear. Whether Mr. Peterson saw the second blanket or the removal of the first or the replacement of the first is equally unclear from the video. To what extent he should have ensured compliance with any command is also unclear to this Court. What is clear is that, contrary to his deposition, Mr. Peterson does not ensure the blankets are taken down. Undisputable on the video is that within seconds of walking past Mr. Mariano's cell with one blanket hanging up, Mr. Peterson leaves the pod while two blankets obscure the view into the cell. The video creates a genuine dispute of material facts. The Motion is denied as to Mr. Peterson's negligence.

### 3. *Whether CoreCivic Staff Were Sufficiently Attentive In The Control Room Is In Dispute*

Mr. Romero's final theory of negligence is that the inmates were not properly supervised by the control room staff, Officers Torres and Dominguez-Molina. The Court notes that neither Mr. Torres nor Ms. Dominguez-Molina are named defendants in this suit, so this theory of liability only goes to CoreCivic's potential vicarious liability.[7] The standard of care according to Defendants, and unchallenged by Mr. Romero, is:

---

[7] The Court also notes that Mr. Romero makes a brief assertion that CoreCivic may be directly liable to Mr. Romero for its own negligence. (Doc. 183) at 31. But the Court does not ascertain which allegations would implicate CoreCivic directly, and therefore only addresses CoreCivic's potential vicarious liability.

> that the control room officer regulate access into and out of the housing unit; maintain the housing unit logbook; and regularly monitor the housing areas and the roving officer, which includes monitoring inmates and the roving officer indirectly through facility security camera footage on a monitor within the control room and directly through the two-way windows that look into each pod…. The standard prohibits the control room officer from leaving the post unattended for any reason.

(Doc. 168) at 27.

The Parties dispute the facts. Defendants proffer that Mr. Torres relieved Ms. Dominguez-Molina at 9:55 p.m. as the control room officer, as recorded in the logbook. (Doc. 168) SMF 60. Next, Defendants state that at 10:05 p.m., Mr. Torrez called Mr. Peterson back to A Pod. (Doc. 168) SMF 66. Recall that the parties agree the assault started at approximately 9:57 p.m.—or 8 minutes before the control room reacted. Also undisputed is the fact that Mr. Peterson arrived at the Pod door at approximately 10:10, where he found Mr. Romero bloodied and seeking help, approximately 13 minutes after the assault began.

Mr. Romero disputes the accuracy of the time of the changing of the guard, pointing to Mr. Torrez's deposition testimony that he relieved Ms. Dominguez-Molina when Mr. Romero was standing at the Pod door, which occurred at approximately 10:10 pm. (Doc. 183) SMF 60. Mr. Romero also disputes that the control room called Mr. Peterson at 10:05, referencing Mr. Torrez's testimony that he called Mr. Peterson after he noticed Mr. Romero at the Pod door, again at approximately 10:10 pm. (Doc. 183) SMF 66. Under this view of the facts, the control room did not respond to Mr. Romero's assault for at least 13 minutes.

Defendants argue there is no dispute of fact that Mr. Torres and Ms. Dominguez-Molina met the standard. The core of Defendants' argument is that no evidence suggests the officers were innattentive, and indeed the facts that both officers recorded events in the logbook and that Mr. Torrez called Mr. Peterson at 10:05 show that they were attentive and met the standard of care. (Doc. 168) at 27–28. As for the delay in reaction, Defendants contend that "[i]t is

24

reasonable that DO Torres did not call DO Peterson until he observed inmates congregating outside of the cell, as the interior of cell 206 is not directly visible from the two-way window in the control room." *Id.* at 28.

Mr. Romero urges that there is a dispute of fact because both Mr. Torrez and Ms. Dominguez-Molina testify that they did not see the assault, which is consistent with the delay in responding to it. (Doc. 183) at 35–36. And, he adds that from the control room "they would have been able to clearly see the unusual activity in Cell 206, the attack, and aftermath of Plaintiff crawling through the pod with blood pouring from his nose" if not through the window, then on security footage. *Id.* at 36. Mr. Romero contends that these facts "permit[] an inference that any officer in the room, if any, was not observing the unit." (Doc. 183) SMF 98.

Defendants take issue with this contention, stating that any such inference would be improper because "facts, not assumptions" defeat summary judgment. (Doc. 192) at 21. The Court agrees with Mr. Romero and reasons that an inference does not imply an absence of facts. To the contrary, the Court considers the following facts: an assault occurred, that assault was visible on camera, and that assault prompted no response from the control room until somewhere between eight and 13 minutes later. Inferences are permitted; indeed, the summary judgment standard requires that inferences be drawn in favor of the nonmovant. Here, the logical inference given the facts is that it is possible that the officers in the control room were inattentive. This question, therefore, must be answered by the fact finder and the Court denies summary judgement on the question of liability based on negligent supervision from the control room.

IV.     *Conclusion*

The Court concludes that no reasonable jury could find Mr. Peterson or CoreCivic violated the Eighth Amendment. The Court, therefore, enters summary judgment for Defendants

and against Mr. Romero on the constitutional claims.  The Court additionally concludes that

disputes of material fact preclude summary judgment on the negligence claims and therefore

denies both Motions in part as far as they pertain to the negligence claims.

      The Court enters this Memorandum Opinion and Order under seal in accordance with its

previous decisions to allow the briefing and evidence to be filed under seal.  *See* (Doc. 172).  The

Parties are hereby ordered to meet and confer and submit to the Court proposed redactions no

later than **fourteen days** after entry of this Order.  At that time the Court will enter a redacted

version not under seal or, if no redactions are submitted, will unseal this Order.

      IT IS SO ORDERED.

_____
UNITED STATES DISTRICT JUDGE